**JAMS Mediation, Arbitration, ADR Services**

| | | |
|---|---|---|
| In the Matter of Arbitration Between: | ) | |
| | ) | |
| CHARLES RANDALL, | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | Reference No. 1440006508 |
| | ) | |
| MORGAN STANLEY PRIVATE BANK, NA, | ) | |
| | ) | |
| Respondent. | ) | |

---

## CLAIMANT'S POST HEARING BRIEF

EXHIBIT
**12**

# Table of Contents

INTRODUCTION .................................................................................................................1

FACTUAL BACKGROUND ................................................................................................1

I.  Morgan Stanley Erected Discriminatory Practices in Favor of Women at an Institutional Level ...............................................................................................................................1

    A.  Morgan Stanley administered a diversity-based bonus system that incentivized discrimination ............................................................................................................1

    B.  MS also decided to make the National Makers Award available to females only, further demonstrating its institutional preference for that group. ....................................................4

    C.  MS studied the financial benefits to women in the workplace and coined it H.E.R.S ........4

II.  The Preference for Women was so Engrained, it Was Acknowledged in a Parody Video Starring the Primary Decisionmaker in Claimant's Termination, Kristen Sario.. ....................4

    A.  Given obvious license and even incentive to discriminate, complex manager, Kristen Sario, did exactly that within the Carolinas complex. ....................................................................5

        1.  Sario rocketed through promotions to become the Carolinas' complex manager before turning 40 years old ................................................................................................5

        2.  The diversity metrics and qualitative activities were particularly important for Sario because her other core metrics were poor ....................................................................6

        3.  Sario took MS discriminatory diversity plan and then passed on metric requirements to the branch managers ................................................................................................6

        4.  Sario was also exhaustive in listing every minute detail of any qualitative activities she engaged in relating to diversity .......................................................................................7

        5.  Even within the three targeted groups, Sario showed drastically disproportionate attention to recruiting women ...................................................................................8

        6.  Sario made highly questionable hirings of unqualified minority candidates that backfired but boosted her diversity metrics ...................................................................8

        7.  Sario also showed leniency in not terminating female employees because doing so would have hurt her diversity numbers.....................................................................9

        8.  Sario didn't just prefer women; the evidence shows she had a bias against men as evidenced by her treatment of Alex Reznikov and JT McCormick............................10

III. Chip Starts his Career at MS at its Long Island Complex and is Highly Successful ..............12

    A. Private Bankers are compensated according to several core metrics, percent to goal in loan origination being just one example ....................................................................................12

    B. In 2010, Chip was among the first PBs MS hired and was extremely successful at his first complex in Long Island, New York..................................................................................14

IV. In 2013, Chip is Recruited to Leave a Successful Complex in New York to Join One of the Poorest Performing Complexes in the Country—the Complex..............................................15

    A. The Carolinas Complex was set up at a competitive disadvantage to complexes in the Southeast Region ........................................................................................................15

    B. Chip's early evaluations show his managers were extremely pleased with his performance even though the loan origination percent to goal was not met ..........................................19

V. Beginning in November 2015, Kristen Sario Becomes Chip's Third Complex Manager, and by Every Indication She Viewed Chip Positively in 2016 Just as Chip's Previous Complex Manager, Alex Dunlap..........................................................................................................24

VI. In September 2016, Barbara Power Becomes Chip's Third Regional Manager Replacing Alex Dunlap, but Chip Logs Another Successful Year Despite the Turnover................................25

    A. While Sario was a rising star at MS, Barbara Power was a disengaged Regional Manager on a downward trajectory..............................................................................................25

        1. Power issues Chip a positive 2016 Evaluation; Chip again finishes #2 nationally in Units and his 2016 360 Review is glowing ............................................................26

    B. In 2017, Sario makes plain her preference for women and corresponding desire to have fewer white males ....................................................................................................28

        1. Sario's discriminatory statements ..............................................................................28

        2. Sario's stated desire for an all-female Complex leadership team and the marketing of that team........................................................................................................28

        3. In 2017, Sario is nominated for and considered for the prestigious Makers Award ...29

    C. It is undisputed Chip substantially improves his performance in 2017 ............................30

        1. After being instructed not to be so number driven under a new compensation model, Chip's loan origination dipped in Q1, but the email traffic was extremely positive ...30

        2. Andrew Cucuzza becomes Power's new Assistant Regional Manager and on balance has many positive things to say about Chip as did his counterpart Eric Parker .........32

3. Power skips Chip's Mid-Year Evaluation but gives positive verbal feedback to Chip and issues a favorable 2016 Talent Ranking in mid-June 2017.................................33

4. While Chip was trending in the right direction, Atlantic Coast's Lead PB, Dave Seegers –who was fired along with Chip–was not .................................................................34

D. On September 12, 2017, Sario abruptly moves against Chip through Power...................34

1. Sario initiates a 30-minute phone call with Sario haranguing Chip followed by an exhaustive bullet point email portraying Chip as effectively useless ..........................34

2. The hatchet email's criticisms lack evidentiary support, but Power didn't stop to verify anything that Sario alleged..........................................................................................35

3. Regardless of its lack of support, Sario's "hatchet" email successfully put a target on Chip's back with Power ...........................................................................................36

   i. Power immediately involves HR; a 60-day Action Plan is prepared but never administered; and, Chip is ultimately issued a Performance Warning focused not on his metrics, but on his relationship with Sario ...............................................................37

4. A new Action Plan is rolled out on November 2, 2017 with lofty goals ....................39

E. On November 1, 2017, Chip goes to Jerry Valletta for help but Sario and Power close ranks and Sario pivots to new angles of attack...........................................................................40

F. Sario and Power jointly decide to terminate Chip leaving Cucuzza on the outs and with HR seemingly asleep through the process .............................................................................41

1. Power freezes Cucuzza out of the termination decision-making process...................41

2. Contemporaneous emails show Power marched to the beat of Sario's drum, surrendering total control of the termination to Sario .................................................42

3. MS's HR is a dead stick in the process, providing no checks and balances...............44

4. In yet another irregularity, Power cancelled Chip's initial Year End Evaluation meeting and prepared his evaluation the morning of the termination ......................................45

G. Chip is not given any opportunity to resign, take a demotion, or explore other positions .....................................................................................................................46

H. MS tries to plug the holes in its defense with Jerry Valletta's trial testimony, but he was a big player that offered little more than outlandish and contracted hypothetical testimony about "what he would have done." ..................................................................................47

I. The process for replacing Chip raises additional alarms and hardly absolves MS of potential liability ..................................................................................................................................49

J. Bush was not a magic elixir for what ailed the Carolina Complex's banking and lending; in fact, the Complex's performance worsened in his first year .........................................51

**ARGUMENT** ........................................................................................................................**53**

I. Applying the Supreme Court's Decision in *Bostock*, There is Abundant Evidence that Claimant's Being Male and Over 40 Years Old Caused His Termination .............................53

A. Under *Bostock*, a Plaintiff need only show that his protected status/category was an important enough reason to tip the proverbial scale to termination even if other factors or causes were also in play ......................................................................................53

B. At the Outset, the Scale Tilts Heavily in Claimant's Favor Under the Weight of Institutional Discrimination in Favor of Women at Morgan Stanley Fill in .........................................55

1. MS Diversity Compensation Plan is facially discriminatory under Title VII .............55

2. Respondent's decision to make the Makers Award female-only and its recipients a "sisterhood" is discriminatory........................................................................................58

3. MS's caricature of its own institutional bias in favor of women in the Margin Games and marketing of its H.E.R.S. score speaks volumes ...................................................59

C. Sario's words and actions likewise illustrated her bias in favor of women and younger workers ........................................................................................................................59

1. Sario deployed the diversity plan within the Carolinas Complex in a way that evinced her own bias in favor of women ....................................................................................59

2. Sario made repeated statements evincing a bias in favor of women and against older men ..............................................................................................................................60

3. Sario had a young, hip, fun approach and Disney-like prototype of the people she wanted around her..........................................................................................................60

4. Sario's age bias was so evident it prompted Martha McNeil to retire early..............61

5. Sario made multiple personnel moves in which she hired patently unqualified candidates, while targeting white men in addition to Chip.........................................61

iv

II. Despite Many Attempted Contortions at the Hearing, MS Cannot Untether Sario from Chip's Termination—She was the Primary Decisionmaker or at the Very Least an Influencer under the "Cat's Paw" Theory ............................................................................................63

III. While Claimant has Proven Sex and Age Discrimination Based on the Institutional Bias and Sario's Individual Bias, Claimant Otherwise Prevails on both his Sex and Age Discrimination Claims Applying the *McDonnell Douglas* Burden Shifting Framework.......65

    A. Claimant easily establishes his non-onerour prima facie elements....................................66

    B. Respondent's Legitimate Non-Discriminatory Reason ("LDNR") is slippery and has shifted.....................................................................................................................69

    C. Claimant marshals a barrage of pretext evidence.............................................................69

        1. Respondent's changing reasons for terminating Chip is evidencce of pretext ........70

        2. Respondent's game of musical chairs about who actually decided to fire Chip is evidence of pretext..................................................................................................71

        3. Respondent's LNDRs suffer a chronic lack of supporting documentation ............72

        4. Facing a stiff headwind of positive numbers, and drastic improvements from 2016 when Chip met expectations, MS resorts to cherry picking one metric .........75

        5. Power's repeated failure to follow Company policy in Chip's performance warning, 2017 mid-year review and 2017 annual review is evidence of pretext ....77

        6. Chip being terminated after he continued to improve upon his performance equates to pretext ................................................................................................................79

        7. Respondent's LNDRs are rebutted by a deluge of contemporaneous positive emails,contrary documentation, and otherwise plagued thoroughly impeached testimony by Respondent's witnesses................................................................81

            a. Sario points to complaints by Vicki Strine and Libby Harris that are rebutted by the evidence ............................................................................................81

            b. Respondent's witness Bob Hatala twisted himself in knots trying to disarm two years of highly complimentary 360 reviews of Chip Randall to support Sario's strained claims of FAs not supporting Chip .......................................................82

            c. Finally, Respondent's most pivotal witnesses suffer fatal flaws in their credibility, thereby sealing pretext........................................................................83

                i. Kristen Sario ........................................................................................83

       ii. Barbara Power ..................................................................................................85

       iii. Gerry Valletta ................................................................................................86

   D. Although comparator evidence is not necessary in the prima facie stage or to prove
      discrimination, Claimant proffers multiple examples of private bankers being treated far
      more leniently despite worse objective performance........................................................88

      1. Power and Valletta Treated Herring, Booth, Yielding and Fernandez with Kid
         Gloves ....................................................................................................................89

      2. Power's problems dwarfed the accusations leveled at Chip, but she was shown far
         more leniency and given a glide path to continued employment as a lead PB.......91

      3. Bush had problems as Associate Private Banker and they were magnified during
         his try out and in 2018 and 2019, but he faced no repercussions ...........................92

   E. Respondent's eventual selection of Bush as lead PB is not a Panacea to the mountain of
      other evidence establishing that age and sex bias permeated the termination decision....93

   F. The fact that a male manager over 40 "approved" Chip's termination does not defeat
      Chip's claim for discrimination under Title VII or the ADEA.........................................95

V. Respondent Violated North Carolina Public Policy by Terminating Chip because of his Age
   and Sex.....................................................................................................................................96

**DAMAGES ................................................................................................................................97**

I. If Claimant Prevails, He seeks Back Pay, Front Pay, Emotional Distress Damages, Punitive
   and/or Liquidated Damages, Pre-judgment Interest and Attorney's Fees and Costs ...............97

   A. Back Pay ...............................................................................................................................98

   B. Front Pay ..............................................................................................................................99

   C. Emotional Distress ...............................................................................................................99

   D. Interest.................................................................................................................................100

   E. Attorney Fees and Costs......................................................................................................100

II. Claimant has met his Burden to show that he entitled to punitive damages under his Title VII
   or WDPP Claims. Likewise, Under the ADEA, Claimant has Met his Burden to Show he is
   Entitled to Liquidated Damages...............................................................................................101

A.  Claimant is entitled to punitive damages under Title VII................................................102

B.  Alternatively, Claimant is entitled to punitive damages under his state Wrongful Discharge claim ...........................................................................................102

C.  Claimant is entitled to liquidated damages under his ADEA claim...............................103

**CONCLUSION** ...........................................................................................................**104**

Case 3:24-cv-00187-FDW-DCK    Document 27-12    Filed 06/27/23    Page 8 of 113

# INTRODUCTION

The Undersigned hereby submits Claimant's Post-Hearing Brief. For the reasons set forth below, Claimant has marshalled more than sufficient evidence to prove by a preponderance of the evidence that that his age and sex were ultimately deciding factors in why he was terminated from Morgan Stanley in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 and North Carolina public policy.

# FACTUAL BACKGROUND

## I. Morgan Stanley Erected Discriminatory Practices in Favor of Women at an Institutional Level.

### A. Morgan Stanley administered a diversity-based bonus system that incentivized discrimination.

Morgan Stanley ("MS") implemented a highly mechanized and formulaic system for measuring attainment of various demographic diversity goals, rewarded managers through lucrative bonuses who met these net gain goals and punished those who did not.

MS implemented a compensation plan applicable to its complex managers and branch managers that all but incentivized, if not required, discrimination in favor of three demographic groups of employees: females, Latinos, and African Americans (the "Diversity Bonus Plan" or the "Plan"). (D4 250:17-24, 252:18-23, 254:13, 255:4-15).[1] MS offered two types of diversity-based bonuses under the Plan. It did so in a number of ways.

First, MS offered a formulaic metrics-based diversity award (the "Metrics Bonus") that measured progress in the three demographic groups in four categories: (i) Financial Advisor ("FA")

---

[1] As a recipient of Regional Diversity Award and member of the National Diversity Council, Martha McNeil ("McNeil") is highly credible to testify about both the details of the Bank's monetization of diversity for branch managers and complex managers, and the perversion overall all of the MS's diversity and inclusion program she witnessed. (D4 242:23-245:25; 256:22-257:4).

1

representation, (ii) changes to team representation, (iii) diverse *T-12* growth, and (iv) changes to diverse FA intermediate representation. (D6 192:18-25, 195:22-197:2). The Diversity Bonus Plan assigned certain net gain goals to these three demographic groups to the complex, which then effectively "trickled down" to branches through allocations for pluses in certain categories for each. In other words, gains and losses (measured by the number of employees in these three demographic groups) determined available bonus pools for branches with reference to four mechanical metrics, which in turn incentivized discrimination in favor of the three demographic groups. (D5:271:1-11, 271:14-24). For example, "if a female advisor retired . . . [the manager] got dinged. And so [the manager] had to replace somebody [in the protected group] to counteract a retirement." (D4 252:24-253:8). From there, the branches were then stack ranked within the complex on those metrics, and complexes were in turn stack ranked within the region and nationally. (D4 254:9-11, 255:4-19; D6 193-94). The more additions in these three groupings in the four measurable categories, the higher the stack rank, and the higher the stack rank, the higher the Metrics Bonus. (D4 255:20-25; D6 191:22-23, 195:12-17). Movements up and down in these demographics, which McNeil testified and described as "body counting," were tracked monthly and memorialized in diversity score cards. These "diversity score cards" were reviewed on monthly calls with a diversity officer. (D4 254:17-21; D6 193:12-194:9). In 2017, MS went a step further and added a "punitive" component to the diversity metrics wherein the manager lost money for not attaining the diversity metrics. (D4 258:16-259:11).

Second, MS offered a "Supplemental Diversity Award" tied into the manager's overall discretionary award, which relied less on metrics and involved a more qualitative analysis. (D4 256:4; D6 192:9-17, 196:1-3, 196:7-14). Specifically, the Supplemental Diversity Award tracked the "level of engagement and the quality of the [manager's] efforts toward African Americans,

Latinos, and females." (Ex. 16 at 1329). If the manager was not demonstrating activities designed to hit the metrics, then the discretionary bonus was expected to be low. (D6 196:1-6). Managers would report their qualitative efforts and accomplishments in the aforementioned diversity cards that the diversity officer then reviewed.

For both the quantitative and qualitative diversity bonuses, MS effectively created a parallel diversity evaluation process that tracked diversity efforts in mid-year and year-end evaluations similar to its evaluation process tracking non-diversity metrics. (*See, e.g.,* Ex. 20, 22). MS required managers to submit self-evaluations that summarized both their gains on the metrics and their qualitative activities. MS even engineered its diversity evaluation forms such that the manager did not have the option to indicate "no progress," "no updates," or "no success so far." (D4 190:18-25; Ex. 16 at 1329). Had MS given such options, managers could have more accurately reflected upon efforts to increase diversity that were not yet realized and thus not measurable by MS's highly artificial and inflexible quantitative metrics.

The Arbitrator should reject MS's attempt to silo the significance of its facially discriminatory diversity program. Both the private bank and field operations (which encompass complex financial advisors and complex management) are divisions within MS's Wealth Management Business Unit. (D5 129:12-130:12). The revenues the bank unit generates flow to Wealth Management; that is, the bank does not even have its own balance sheet. (D3 771:19-772:12). Similarly, while there are designated HR staff to the bank division and field operations, HR personnel ultimately report to head of HR for the Wealth Management Business Unit. (D5 132:1-6). Accordingly, while the Diversity Bonus Plan did not expressly apply to the bank division, the Wealth Management Business Unit's express institutionalization of discrimination in field operations certainly impugns the business unit overall.

**B. MS also decided to make the National Makers Award available to females only, further demonstrating its institutional preference for that group.**

Since 2013, MS has utilized the Makers Award "to recognize <u>women</u> across Wealth Management who serve as groundbreakers, innovators, and advocates." (Ex. 28) (emphasis added). Even Chip's regional manager, Barbara Power, was surprised that MS would bestow the Makers Award only to females. (D8 18:12-16). According to MS itself in describing the Makers Award, "[t]his partnership is a testament to our commitment to being the firm of choice for women employees and investors." (Ex. 28). The women who receive the Makers Award have referred to it as a "sisterhood." (Ex. 28 at 11277, 11282, 11361).

**C. MS studied the financial benefits to women in the workplace and coined it H.E.R.S.**

MS has said the silent part out loud—its research determined that greater numbers of women in its workforce (especially at the executive and manager levels) makes the firm and its clients more money. (Ex. 26). MS created a Holistic Equal Representation Score ("H.E.R.S.") score to measure gender diversity, and MS determined that the most gender diverse firms outperformed the least gender diverse firms by 3.1%. The video acknowledges there "is a lot of work left to be done" in promoting women at the manager and executive levels, and the bonus plans are certainly engineered to aggressively improve female promotion numbers to the detriment of qualified male employees.

**II. The Preference for Women was so Engrained, it was Acknowledged in a Parody Video Starring the Primary Decisionmaker in Claimant's Termination, Kristen Sario.**

In 2012, Kristen Sario's ("Sario") superiors recruited her for a "special project"—a film that was supposed to be used in the annual "national managers meeting." (D6 181:11-22; Ex. 25). "It was as a spoof . . . where Morgan Stanley writes a script and kind of makes light of some of the things that have happened throughout the year or some of the leaders . . ." (D6 182:10-16). It was shot at MS's headquarters in its green screen rooms. (D6 183:15-17). The film itself contained

4

several damaging admissions. Sario's character states to a male colleague, "They can't spare me, but they'll have somebody in your desk on Monday." (Ex. 25). Tellingly, Sario then goes on to kill two white males (both appearing to be over 40), while Sario's character, an African American female, and an Asian American female survive. Sario's discriminatory lines were not authored by her; they were in a script provided to her and thus are imputable to the corporation as a whole. (D6 183:18-184:2). Sario did not ask that the lines be changed or express discomfort with them. (D6 184:3-9).

### A. Given obvious license and even incentive to discriminate, complex manager Kristen Sario did exactly that within the Carolina's Complex.

#### 1. Sario rocketed through promotions to become the Carolina's Complex Manager before turning 40 years old.

Sario joined MS in in 2006 to work with her father who was an FA. (D6 8:9-10). By 2011, MS promoted Sario to Complex Business Development Manager ("CBDM") in Sarasota, Florida, and in October 2012—just fourteen months later—MS promoted her to a larger complex in the same role. (D6 8:14-21). About a year later, in October 2013, at age 34, Sario was promoted to non-producing branch manager in Palm Beach, Florida, which resulted in her replacing two men over the age of 40 who then reported to her. (D6 8:22-24).

After just two years in the branch manager role in November 2015, Sario took a massive leap in responsibility when she replaced Patrick O'Donovan as the Complex Manager for the Carolina's Complex (the "Complex"). (D1 175:7-17; D6 9:1-9). At approximately 36 years old, Sario was very young to be a Complex Manager; Donovan was approximately 55 years old, and his predecessor M.A Mullis was even older. (D1 174:18-176:6). Sario skipped the Assistant Complex Manager role—the right-hand role to the Complex Manager—which had greater responsibility than

next highest role she maintained, which was branch manager. (D1 30:1-2, 175:13-17; D6: 219:21-220:5).

### 2. The diversity metrics and qualitative activities were particularly important for Sario because her other core metrics were poor.

Sario's key performance indicators ("KPIs") were poor in her first year as Complex Manager. (Ex. 17 at 1269). She was in the fourth quartile for revenue, PBT (profit before taxes), and NAA (net acquired assets); the third quartile in NMA (net managed assets) and lending; the second quartile in Net T12; and, notably, Sario was in the first quartile in nothing. Yet, she still received a "meets expectations" grade on her evaluation. (D6 211:18-22). Revenue and PBT were particularly important metrics because they are what "drives the business forward." (D6 209:10-22).

Conspicuously, Sario's evaluations stopped listing her performance on KPIs. For example, where negative comments were made in her 2017 "360 Review" were noticeably omitted in her 2017 evaluation and only positive comments were seen in the "360 Review". (*Compare* Ex. 19 at 1284 *with* Ex. 18; D6 223:2-7). In 2017, the same year she turned on Chip Randall, McNeil noticed a "cataclysmic shift" in Sario. The Complex was often dead last in the metrics on the dashboard; metrics which were very public to other managers. (D5 264:6-21). However, the complex was rated "Top 5 in diversity [nationally] with momentum to continue to increase into 2018," and half of her hires were diverse that year. (D6 217:17-25, 226:9-11).

### 3. Sario took MS discriminatory diversity plan and then passed on metric requirements to the branch managers.

In branch manager meetings, Sario said that diversity was the easiest needle to move and thus that she and her department were going to focus on moving on that. (D4 264:22-24). In explicitly acknowledging an illegal quota system, she told branch managers "[they] needed to hire

so many people and x number of them need to be diverse candidates." (D4 271:11-20). Even Sario acknowledged that she did not leave it to chance that the branches would do their share to hit the required net diversity gains. (D6 200:2-10). In her complex manager meetings, Sario also discussed the numeric goals that MS assigned for the three groupings. (D5 271:19-23). Sario even voiced displeasure to McNeil when McNeil did not hire diverse candidates. (D4 271:20-272). McNeil decided to hire the most qualified employees (four white men and a woman), and they were an effective cohesive group, but it did not "help Sario's diversity numbers," which made Sario "disgruntled." (D4 271:20-272:25).

### 4. Sario was also exhaustive in listing every minute detail of any qualitative activities she engaged in relating to diversity.

Just as she was incentivized to do, Sario threw the proverbial "kitchen sink" when describing her diversity recruiting activities. She even described in detail <u>unsuccessful</u> attempts to recruit diverse individuals because that activity was "absolutely" relevant to her diversity evaluation. (D6 205:2-6). For example, Sario trumpeted that she recently made an offer to an African American woman, Gillian Knowles, to join our Private Banking team as a Private Banking Advisory Associates ("PBAA") even though Knowles got "cold feet" and never joined. (D6 204:5-10). Sario even lauded an anticipated future offer to female PBAA candidate, Martha Julia, that had not yet occurred. Sario also included offers she made to candidates she did not have space in her department to hire like Patrick Mitchell and Deborah Talarico. (D6 204:15-206:10). Even her informal mentorship of a female outside her complex got warranted discussion. (D6 226:19-24).

It certainly stands to reason that Sario would highlight the successful recruitment of a female PB in her complex if she highlighted the unsuccessful recruitment of PBAA roles, which are much more junior roles. Indeed, McNeil removed any mystery from the issue in testifying one would "absolutely" identify a role in recruiting a female PB. Tellingly, Sario's diversity evaluations also

7

lauded the Complex Diversity Council she created which was "open to anyone," not just people in the field office. In fact, Sario included Associate Private Banker, Michael Black, on that council. (D6 225:17-25). Accordingly, MS's attempt to maroon the banking operation as a non-entity for Sario's diversity efforts is rebutted by the evidence and is not credible.

5.      **Even within the three targeted groups, Sario showed drastically disproportionate attention to recruiting women.**

Sario's diversity evaluations across different positions and multiple years demonstrate she had a strong preference toward recruitment efforts of women as compared to Latinos and African - Americans, both when she was branch manager and as complex manager. (*See, e.g.,* Exs. 20, 21). Indeed, she recognized she reported a lot of activity around females and that there were times she did not even have any African American FAs or Financial Advisor Associates ("FAAs"), noting that recruiting African Americans was a "challenging space [for her]." (D6 206:11-17; Ex. 21 at 1218).

6.      **Sario made highly questionable hirings of unqualified minority candidates that backfired but boosted her diversity metrics.**

Kristan Vlcek was "totally unqualified." (D1: 204:3-20; D4 266:1-267:21). She was "not a good candidate for the job" and her hiring was ultimately a "colossal failure" after at least six months in the role. (D5 267:6-13; D6 231:12-19, 234:5-19). She never worked in wealth management and had only one-year institutional experience. *Id.* Her role required her to train FAAs and she had never been a financial advisor herself. (*Id.*; D6 231:1-11). In addition, she did not even have the required Series 9 and 10 licenses to supervise financial advisors. (*Id.*; D6 230:2-60). Putting lack of qualifications aside, she had a newborn and was otherwise unable to "successfully execute the job requirements." (D4 266:1-267:4; D5 267:18-22; D6 229:4-18). Vlcek also missed meetings, left work early, did not show up, did not send required emails, and missed deadlines

causing Business Development Manager, Francesca Maines, to step in to perform her duties. (D5 268:1-20). Her performance negatively affected the complex overall. (D5 269:24-270:2; D6 229:15-19). Despite performing so poorly in the role, Sario did not terminate Vlcek; instead, she "transitioned" her to an FAA role—a role she had never performed before—and in doing so, used Vlcek as a positive metric on her diversity report as a diverse hire. (D5 269:7-10; D6 233:20-234:21; Ex. 16 at 1330).

Sario hired Ray Givens (African American) to be a producing branch manager for Lake Norman, even though Givens did not have the required Series 9 and 10 licenses and had never been a branch manager before. (D1 207:8-19; D4 277:24-278; D6 243:15-24). Importantly, Givens initially applied for a Business Development Manager role (which would not have counted as a diversity metric), yet Sario hired him into the Producing Branch Manager role, which was a direct report to her and benefited her assigned diversity goal to recruit individuals in the three groupings into leadership roles. (D6 242:28-244:23). Much like Vlcek, Sario's singular focus on diversity over basic qualification requirements backfired with Givens, too. He was unable to pass a needed test and could not remain in the role. (D6 243:25-244:2). Yet, Givens was allowed to remain as an FA (which benefited Sario's diversity numbers) until he was placed into the Business Development Manager role that he originally applied for. (D6:246:15-247:1).

Sario then made yet another questionable hire when she replaced Givens with Ebony Moore (African American female). (D6 245:15-246:9). Moore was the business services manager and supervised administrative staff. Despite this, Sario saw fit to promote her into a non-producing branch manager role to supervise FAs even though she had also never been an FA herself.

> **7.    Sario also showed leniency in not terminating female employees because doing so would have hurt her diversity numbers.**

Sario went easy on Jennifer Ziegler, the producing branch manager in Lake Norman. Chip informed Sario that Ziegler was complicit in a customer misrepresenting his employment status on a loan application, which is a federal crime. (D1 208:21-210:17). Ziegler also had issues with being easily angered, "caus[ing] disruptions in the office" and Sario had "multiple conversations with HR" about her. (D6 235:5-236:15). Had Sario fired Ziegler, rather than moving her to a financial advisor role, it would have negatively impacted her diversity evaluation. (D6 236:20-24). Predictably, Sario moved her to the FA role where Ziegler continued to have HR issues. (Ex. 108). Ziegler insubordinately instructed a staff member to not mark a deceased client as deceased thereby putting the employer at risk but was only given a verbal reprimand for it. (Ex. 108 at 12152; D6 239:4-240:4).

Establishing a pattern of leniency, Sario also refused to fire a female FA in the Charleston branch, despite indisputable evidence implicating the employee in egregious compliance issues. McNeil managed a "very difficult" female FA, Deidra Marion, who did not come into the office more than once or twice a month. (D4 273:7-15). Worse yet, McNeil caught Marion successfully soliciting "several" clients to take security-based loans to invest in her boyfriend's SEC-registered mold company. (D4 273:15-276:17). This violated MS's policy to use security-based loans to invest in other securities, and it was a "prohibited activity" to make an introduction for a private investment that had not been vetted by MS. (D4 274:23-276:1-17). Yet, when McNeil wanted to terminate Marion, she got "no support from Sario." Instead, Sario told McNeil to "just manage her" and warned that "you need to be very careful because we can't afford to have her bring a lawsuit against us as a female." (D4 275:7-13).

> ### 8. Sario didn't just prefer women; the evidence shows she had a bias against men as evidenced by her treatment of Alex Reznikov and JT McCormick.

Sario inherited Alex Reznikov as her Assistant Complex Manager ("ACM") and he was interim Complex Manager before her promotion. (D1 156:1). Reznikov was "excellent" in the role, effective, and well liked. (D4 279:3-11). The natural progression for an ACM is to a non-producing manager or complex manager role. (D1:194:3-4; D6 219:21-220:5). Reznikov told Chip he needed to watch out for the "girl power" in reference to Sario's all-female complex leadership team. (D1 198:6-9). He told Chip that he was not getting support for advancement from Sario and that she had effectively undermined his advancement while blaming others as the problem. (D1 194:1-16). Sario admitted that she did not recommend Reznikov for advancement. (D6 220:2-11). Reznikov told McNeil that he was "concerned about keeping his job" and that he resigned before Sario could fire him. (D4 280:13-20; Ex. 127). Reznikov's text messages to Chip leave little doubt for his beliefs regarding Sario's preference for women:

- "Every text I got from the Carolina's is betting me 20 bucks that the next banker will be a woman. I think people are starting to see the trend."

- "Just call JT I think he's got enough for 300 lawsuits."

(Ex. 127 at CR 776). Sario did nothing to try and retain him when he submitted his resignation. (D6 228:7-12). Instead, she replaced him with Vlcek, which was a disaster.

Branch Manager JT McCormick told McNeil that he felt Sario and her complex team treated him differently and that Sario had recruited him "under false pretenses." (D4 281:5-19). McCormick was even more explicit than Reznikov: he told Chip that Sario's "all women management team made it very difficult for him to complete his goals and initiatives;" he talked about women being given more preferential treatment; and, he mentioned getting representation or going to HR to try and get out from under Kristen . . ." (D1 200:1-9, 203:21-204:13). On December 13, 2018, McCormick texted Randall the "Margin Games" video (*Hunger Games* parody) and asked if Chip was going to use it with his attorney since he intended to use it for his own case. (Ex. 127

at 1047). McCormick expressed concern for his job safety in response to Chip questioning if he was "safe." McCormick responded, "I think so-but with the long arm of Kristen-who knows." (*Id.* at 1060).

McCormick, Reznikov, and Chip's common accounts of being targeted by Sario are consistent with Sario's own 2017 self-evaluation comments made on January 20, 2018 (just 15 days after Chip was terminated):

> I spent the last 12 to 18 months watching for themes and gaps in our leadership team. <u>My skill set this year has been around managing the leadership team in (sic) inherited up or out.</u> That is something new to me with the help of HR and the region and I feel confident I can recognize poor performance sooner and be more efficient in execution of a plan of action or managing an individual out where needed."

Ex. 19 at 1280 (emphasis added).

### III. Chip Starts his Career at MS at its Long Island Complex and is Highly Successful.

#### A. Private Bankers are compensated according to several core metrics, percent to goal in loan origination being just one example.

MS holds its Private Bankers ("PBs") accountable for six core metrics, all of which are important: (1) Percent to Goal in Loan Origination: how many dollars in loans were opened compared to the stated goal which fluctuates annually ("Percent to Goal"); (2) Balance Growth: how much clients with loans actually borrowed such that MS earned any revenues on the booked loans; (3) Product Mix: securities based lending (which historically tends to be easier to generate), mortgage business (which historically is more difficult to generate), and ultrahigh net loans (sizeable complex loans with long lead times); (4) Number of Units (the total number of booked credit facilities, which could be a mortgage, security based loan, or other type of loan): total number of all loans and the ratio of loans per Financial;  (5) FA Penetration: what percentage of FAs in the

PBs' complex had clients who borrowed money; and (6) Premier Cash Management: how many wealth management clients also opened up banking accounts with MS. (D1 93:2:1, 129:15-21).

Units (number 4 above) are "among the most meaningful metrics" because that "velocity" shows how active the banking business is overall in the market and reflects a lending culture among FAs broadly. (D1:93:14-94:7, 100:11-12, 118:15-18; D7 567:12-21;). Driving a large number of units involves a tremendous amount of work from the banker; it would be easier to eschew such volume work and just focus on closing larger loans. (D1 101:5-12). Thus, it is critical to look at units and actual loan production (percent to goal) together to determine a banker's overall effectiveness. *Id.* For example, a banker could hit his percent to goal on a small number of large UHNW loans and then ignore his low unit volume, but that is not a desirable result for MS. (D1:93:22-94; D7 568:11-20).

While MS asks the Arbitrator to myopically focus on loan origination percent to goal as the "big kahuna," MS's own documents indicate it is on equal footing and considered in concert with other metrics for purposes of evaluating bankers. (D5 171:18-172:5; D7 566:24-567:5). In fact, the "2017 Private Banker Compensation" document lists: gross balances (new money borrowed) and net new balance growth (how much money was outstanding after accounting for loans being paid off) before new loan production (which does not indicate actual revenues); and as Valletta acknowledged, "they are all important . . . that is why they are on there." (Ex. 166; D1 126:11-127:8; D7 565:21-566:23; D9 268:23-269:3). That prioritization makes sense because gross balances and balance growth indicate actual revenue to MS, whereas new loan production just reflects the opening of new loans, which are revenue neutral if the loans are not exercised. (D1 123:22-127:8; D3 771:10-15; D5 132:18-20). Thus, by MS's own on-the-record admission, loan

origination percent to goal is only one among several equally important metrics to determine banker performance, and this Arbitrator should ignore any self-serving suggestion otherwise.

Having the support of the Complex Manager is critical to a PB's success. (D1 131:11-132:9). The Banker cannot make an FA or Branch Manager do anything; the FAs and the Branch Managers are accountable to the Complex Managers. (D1 132:15-133:3; D3 780:14-24). FAs are compensated on lending, but this compensation accounts for only a small percentage of their overall compensation package. (D1 145:3-4).

**B. In 2010, Chip was among the first PBs MS hired and was extremely successful at his first complex in Long Island, New York.**

In 2010, MS hired Chip as a private banker in its Long Island Complex when it opened its banking operation. His manager issued him a "meets expectations" evaluation and was complimentary about Chip and his contributions:

> Chip has an extensive commercial and credit background which helps him in developing relationships with Financial Advisors as well as colleagues when faced with credit and underwriting issues. He is very well thought out and is able to present a solution to complex lending issues. Chip has a good working relationship with product partners, financial advisors and field management. Chip is a team player; he encourages others to discuss best practices and works collaboratively with his colleagues to lock up deals. A recent example of this is when to Chicago for a month as part of the PB swat team that was helping assist Morgan Stanley Credit Corp.
> Chip is off to a productive start. He has been successful in developing relationship with FA's, clients and field management. Chip is based in an office that historically has done very limited banking and lending business. He has managed to grow a stronger pipeline over the past five months. There has been a marketable improvement in the activity within his office and FA relationships.

(Ex. 2). The evaluation also commended Chip for volunteering for the "PB Swat team" which necessitated him living in a hotel in Chicago for a month to assist with stabilizing a mortgage backlog. (D1 134:13-135:5). His 2011 evaluation illustrated continued success:

> Chip has a deep knowledge of the commercial markets and he is able to present effectively in front of UHNW clients and assist FAs in choosing the appropriate strategy and product for the client. Chip has continued to build strong relationships with the FAs in his office.
>
> He closed out the year at 124.6% of plan. He is # 84 in the US. The feedback I have received from the MSSB partners has been positive. Chip is a good communicator and a team player. 360 feedback cited Chip's two strongest competency areas as client relationships and teamwork. Specifically: Extremely good at interfacing with colleague and understands his line of business. Chip has a good rapport with the FAs in his office. He provides formative advice in approaching opportunities to interact with FAs and clients. Chip continues to be a team player and exercise excellent interpersonal skills.

(Ex. 3). Chip was even more successful in 2012. On August 9, 2012, Chip received a "meets" on his mid-year review, which described him as being "a seasoned banker" and touting his ability to "present effectively in front of UHNW clients," while also noting he had "done a great job building trust with FA's and local management team." (Ex. 4). His new Regional Manager, Ned Quinn, issued Chip his 2012 evaluation; it was his best yet. Chip finished the year with an over 200% to goal on loan generation ratio and was also among the top few bankers in the country that year:

> Chip is a great asset to the NY Metro Region. He is extremely analytical, resourceful and knowledgeable about products and solutions to drive revenue for MSWM as well as MSPB. The feedback from the FAs in his office has been positive, emphasizing Chip's contributions in helping to provide solutions . . . Chip's results in 2012 are a leading indicator of the potential Chip can bring to the firm as well as his career. 2012 is a jumping off point for Chip to take the next step as not only a productive individual contributor as a Private Banker, but as a leader on NY Metro Region PB team.

(Ex. 4A; D1 139:8-12).

IV.     **In 2013, Chip is Recruited to Leave a Successful Complex in New York to Join One of the Poorest Performing Complexes in the Country—the Carolina's Complex.**

    A.     **The Carolina's Complex was set up at a competitive disadvantage to complexes in the Southeast Region.**

On June 17, 2013, Southeast Regional Manager, Robert Rettig, offered Chip a Private Banker position in the Complex based in Charlotte, North Carolina, starting on July 1, 2013. (Ex. 5). Rettig told Chip it was a market that needed help and that the previously assigned bankers washed out. (D1 144:9-13). The easy decision would have been to decline Rettig's offer and continue his upward trajectory in New York; however, Chip viewed the Carolina's as an opportunity to "go down there and turn it around in the hopes it would be a feather in his cap" for when he returned to New York. (D1 145:22-25).

The Carolina Complex was going to be a massive challenge. When Chip took over the Carolina Complex, it was nationally ranked as the worst or second to worst complex within MS and had an average loan size of approximately $300,000. (D1 100:20-22; 104:5-7). Chip's second Regional Manager, Alex Dunlap, aptly described the Complex as a "dead market." (D5 111:2-22).

The Complex was also one of the most geographically challenging in the Southeast Region (the "Region"). (Ex. 9B; D8 70-71). Upon arrival, there were six branches (two in Charlotte and one each Lake Norman, Columbia, Hilton Head, and Savannah) and approximately 120 FAs. (D1 146:2-13). Subsequently, Greenville, Spartanburg, Anderson, and Augusta were added. (D1 147:22-148:12). By the end of his time with MS, Chip had fourteen branches across three states covering approximately 16,000 square miles, constituting one of the largest territories in the firm. (D1 147:3-148:25). Accordingly, Chip had a lot of work to do to establish trust with over 200 plus FAs across such a broad geography, particularly because banking is an "out of sight out of mind business [a]nd staying visible in front of advisors is really important." (D5 124:11-20).

Not only did Chip have to drive farther, but he also had to personally close more deals out of necessity because there were fewer "big fish" FAs in the Complex to close these deals, especially in his more rural branches, like Spartanburg, SC and Anderson, SC. Indeed, in the entire complex,

Chip only had approximately four to five "Chairman Club FAs," which were MS's FAs with the biggest books of business and best sources UHNW loans. (D3 624:22-625:21).

Furthermore, Chip also had to grapple with an under-resourced complex in terms of banker teammates. The Complex was originally staffed by two PBs and two APBs. Ironically, while the geography grew substantially, the banker allotment shrunk. When Chip started in the complex, he worked alone with a single APB, who was a shared resource. (D1 115:4-5; 147:2-13). At times, Chip also worked without an APB at all. (D1 147:3-13). He was never assigned another PB. Chip had an APB named Judd Burleigh, but Burleigh resisted traveling and would not accept Dunlap's coaching. Burleigh was on verge of being terminated when he resigned. (D1 162:6-11; D5 179:5-16). With Burleigh's departure, Chip was "resourced" with four PBAAs but these were not bankers, but instead future financial advisors who were learning about banking for a stint, before they could become FAs. (D2 448:5 - 449:21). In 2015 and 2016, Chip was assigned two new APBs but there were issues with their performance. In 2015, MS hired Michael Black, but he was officed in Charleston far away from Chip, which made it difficult for Chip to oversee him. Martha McNeil, the Charleston Branch Manager, informed Chip of Black not showing up to work. (D1 162:12-163:2, 231:9-13; D4 231:23-232:19). Similarly, his second APB, Jared Bush, had a hard time putting in a full day of work, was late or unprepared for meetings, and did not follow up well. (D3 637:17-25, 644:6-7). Both Black and Bush had no commercial lending experience and were relatively inexperienced bankers overall, so Chip needed to teach and train them before they could be fully deployed. (D1 114:19-115:7).

Chip also had the highest number of financial advisors per banker in the Region. As Alex Dunlap observed, in addition to having "one of the most geographically challenging markets in the region . . . [Chip also had] the highest FA:PB ratio among his peers." (Ex. 4A). According to a 2016

heat sheet, Chip had 207 FAs to cover, which was more than any other PBs in the market. (Ex. 6A; D1 149:21-152:13). Many PBs had fewer than 100 FAs, including Stacey Herring (Southwest Florida Complex, 93 FAs), Debbie Booth (Alabama, 89 FAs), Caroline Yielding (Alabama, 124 FAs), Carrie Calloway (West Palm Beach, 116 FAs), and Mike Fernandez (who is Latino and under 40) (North Florida, 111 FAs).

The Complex was also assigned one of the highest production goals per banker in the Region. Despite the widespread challenges facing Chip in his "dead market," the 2016 heat sheet showed Chip's goal to be $405,852, which dwarfed the goals assigned to every single female or minority PB: Herring's ($222,353), Debbie Booth's ($200,890) and Yielding's ($229,189), Calloway's ($292,720) and Mike Fernandez's ($245,000). (*Id.;* Ex. 6A). Given the unique uphill challenges Chip faced – and which senior MS employees acknowledged – this outsized goal in comparison to his female and minority peers was and is unjustified.

Chip also endured endemic turnover at the two most critical positions. Over 4.5 years, Chip reported to three different Regional Managers: Robert Rettig, Alex Dunlap, and Barbara Power. (D1 153:8-14). In addition, Chip also had three different Complex Managers in that time frame: M.A. Mullis, Patrick O'Donovan, and then following an approximately two-month gap with no complex manager, Kristen Sario began in November 2015. (D1 154:23-157:25). Likewise, Chip also had three different Assistant Complex Managers. (D5 133:4-17). Turnover of this kind can present challenges to a PB and the Complex as a whole. (D5 133:7-12). However, Chip successfully established supportive relationships with M.A. Mullis and Donovan. (D1 155:9-22; 157:8-18). Donavon lauded Chip in Chip's 360 review (Ex. 8).

In contrast, Private Bankers like Andrew Cucuzza (who was promoted to Assistant Regional Manager) in the Atlanta Perimeter Complex, were positioned for success in a way the Complex was

not: (i) Cucuzza's complex was staffed with a lead PB, a PB and an APB (in contrast to the Carolina's Complex with a lead PB and two APBs); (ii) Cucuzza's complex covered a smaller geography (suburbs of Atlanta vs. three states); (iii) Cucuzza's complex had fewer FAs (160 vs. 207); (iv) Cucuzza's complex had more Chairman Club FAs; (v) Cucuzza had a much lower goal to hit ($330,158 vs. $405,852); and (vi) Cucuzza had the same Complex Manager, Walter Jamison, who was a leader among Complex Manager when it came to Banking and Lending. (D3 719: 22-25, 722:12-25, 723:25-724:13, 775:6-776:9).

### B. Chip's early evaluations show his managers were extremely pleased with his performance even though the loan origination percent to goal was not met.

Chip's first boss in the Carolina's, Robert Rettig, was clearly pleased with Chip's performance in 2013 based on his meet's expectation annual evaluation:

> Relocated from NJ one office, 3 man team, to covering wide market with dedicated APB, immediate impact to units in region 1st qtr., penetration and production numbers are mediocre because new to market and averaged with previous market, established great relationships with CM, BM and the key FAs in the market, adopted to market type very well, positive energy on team, team player . . . .Team player, shows great leadership potential, creates sales and presentation idea, partners with other PB in regions well, amazing mob of adoption and culture change for new region, adjusted to different market type very quickly and well, immediate adoption of CM, strategic FA, very strategic and tactical on driving business.

(Ex. 9). Chip was at 71% of percent to goal at $324M in production, but Rettig's message to Chip was "great job." (D1 158:15-19).

Beginning in May 2014, Chip had to start over with a new Regional Manager, Alex Dunlap. (D1 10:20-21). Dunlap conducted due diligence when he took the position, which included talking to Rettig and reviewing reports. (D5 102:5-103:11). Rettig never reported anything inconsistent with the favorable 2013 review. (D5 103:12-105:11) In September 2014, Dunlap issued Chip an exceeds 2014 Performance Summary that recognized Chip's "positive attitude in the face of

adversity," "leadership traits" and his "having elevate[d] the entire team morale through example."

The review also noted:

> While Chip is relatively new to the Carolina's complex, he has had a <u>big impact in short period of time</u>. His strong product and process knowledge has delivered a level of comfort to the FAs in market that encourages their participation. He is quickly accelerating production, showing large % increase in both tonnage and units in Q2, though just shy of goal. <u>Even though he just missed Q2 goal at 99.7%, chip is an exceeds due to his can-do attitude and collaborative approach to regional team initiatives.</u> <u>Although Chip's coverage territory is one of the most challenging in the region with 200+ advisors and 14 offices between 3 states</u>, he is still quick to action and takes any changes of coverage in stride. Chip should continue to hustle and drive business in market, but also step back to take a tactical approach to UHNW opportunities. He has the skill set and knowledge to execute on Tailored Lending UHNW opportunities and needs to take a strategic approach; leveraging APB, LA and SEAL resources to identify and extract these opportunities. From a development standpoint, I encourage Chip to continue demonstrating leadership among the team by collaborating on team calls and elevating his peers.

(Ex. 9B) (emphasis added). In fact, Chip was on Dunlap's radar for promotion to Senior Private

Banker which is MS's most advanced banker. (Ex. 12A; D5 109:14-20; 113:21-114:3). Dunlap's

2014 evaluation of Chip was also replete with praise:

> Chip had a <u>solid 2014 production year</u> with $316MM in commitments and 476 units. Up 55% and 53%, respectively with both the SBL and mortgage businesses increasing a great pace. <u>Chip grew his market at a rate that outraced his peers, despite having additional offices added to his coverage territory on two separate occasions through the year</u>. Without complaint, Chip runs towards the opportunity to showcase his talents, despite the increased geography and goal – his attitude is consistently positive with a can-do approach that <u>has won him an FA following</u>. ... Despite those challenges, Chip has done a tremendous job tackling the challenge and building a business that serves the advisors and produces results for the bank . . . . Overall, Chip has generated a lot of production with little resources (lacking ACM, CBDM for most of the year). I am encouraged with the right team in place, Chip can take on a mentor and market leader role to drive the business to new levels. Chip is a consistent contributor to team calls and always willing to share best sales practices. In 2015 I look to Chip to be one of the SE region's

> peer leaders. His willingness to always learn and improve is a lesson
> for the broader team.

(Ex. 10; D5 127:13-14). (emphasis added). Chip also received the "Big Hitter" award for leading the nation in units. (Ex. 10A; D1 166:2-5). For reasons Dunlap could not explain, the evaluation was not scored, but given the "exceeds expectation" score in that year's performance summary and the "Big Hitter" award, one can only reasonably conclude that it was a "meets expectation" evaluation.

Chip ultimately had a strong year in 2015, but his Q1 (54.66) and Q2 (51.93) for loan origination was off track, which culminated in a performance warning being issued on August 4, 2016. (Ex. 106). Nevertheless, Dunlap was supportive and assured Chip that he should keep doing what he was doing, and the performance warning would go away. (D1 167:1-14; 172:8-10). Indeed, in an April 13, 2015, email discussing Chip's Q1 performance, Dunlap noted mitigating circumstances, including "challenging market with 12 offices in parts of 3 states; highest FA gearing in region . . . significant change with advisory partnership- [Complex Manager] was let go and there is no [Complex Development Manager] in market . . .," as well as Chip's APB being new to the market. (Ex. 11).

In any event, the performance warning established that Chip was extremely coachable and responsive when a manager raised an area for improvement. In the remaining five months, Chip catapulted to Number 2 in the nation for unit production by year end and booked the largest loan in the Southeast Region and fourth largest nationally, which was a "big deal" according to Dunlap. (Ex. 15; D5 139:13-14, 140:15-18). He finished Q4 at 147.25% (Number 3 in the region that quarter) and was awarded a substantial discretionary bonus; the bonus documentation noted "Chip has demonstrated goal for 2015." (Ex. 13; D5 137:3-138:19). That year was also a landmark because it was also the year Chip lifted the Carolina's off the bottom and leapfrogged two other

complexes: Alabama (Debbie Booth) and Central North Florida (Mike Fernandez). (Ex. 106C; D5 141:7-10).

In fact, Dunlap emailed his boss Jerry Valletta and the national leader Chad Johnson:

> Another triumph is Chip Randall, struggling this year, eclipsed our quarterly unit record-booked 162 deals for 86M despite performance managing out an APB in the market [Judd Burleigh] in his market. Chip wins the hustle award for the region.

(Ex. 12B). Chip finished 2015 Number 2 in total units sold and was also top five in the nation with the fourth largest UHNW loan. (Ex. 15).[2] Chip's 2015 "360 Review", which is a critical part of the evaluation process, was also highly complementary, including comments by one of the bankers in the Complex's most successful markets that "Chip is a marketing genius. His ideas for driving business, especially mortgages, are unparalleled." (Ex. 8 at 286). Patrick O'Donovan, Sario's Complex Manager predecessor, also had high praise in Chip's 2015 "360 Review" stating: "[Chip] demonstrates his dedication to the needs of the Complex, our FAs and clients by way of his connectivity to the branches and management teams . . . Chip has willingness to partner with management to get the job done, making himself available at any time to deliver a message or work with an FA." O'Donovan similarly acknowledged the vast territory as a challenge for Chip and notes that Chip was working diligently to improve his results. *Id.*

---

[2] Andrew Cucuzza attempted to downplay Chip's role in the Palmetto Healthcare System loan and compromised his credibility in doing so. Furthermore, Cucuzza's testimony on the topic was hearsay; he had no personal knowledge of the deal and wasn't even an ARM at the time. While Cucuzza claimed House made statements to him that allegedly minimized Chip's contributions, he could not even recall whether the alleged conversation with House occurred before or after Chip's termination or how the topic even came up. (D4 67:21-70:2). Bobby House is a current MS employee, but MS did not call him. In truth, Chip's testimony of his role was buttressed by a contemporaneous email from the advisor on the deal who unequivocally stated, "my largest client recently borrowed 90M. We could not have done it without the help of Chip Randall, Bobby House and David Natske. Those guys are great." (Ex. 29 at 6016; D1 105:1-106:10). Indeed, Branch Manager, Will McMaster, the leader of the branch where the deal was transacted and Alex Dunlap, the RM at the time, both recognized Chip's obvious contributions in bringing such a loan to fruition. (D3 695:16-697:17; D5 164:17-23).

Dunlap issued Chip a 2015 annual evaluation with high praise, but again it inexplicably did

not contain an overall score and Dunlap could not remember what score he provided:

> A slow start to the year put Chip in a difficult position for 2015. Changes in advisory management and the loss of an APB resource added ongoing production headwinds; however, Chip, with a resilient attitude, adjusted his business model several times through the year and the back half of 2015 shows improvement. Q1 results show 59 SBL units booked, Q3 nearly doubled that volume with 114. Chip has the highest individual unit production of any PB in the region; however, he also has the lowest average ticket size. This evidences he has the ability to manage a significant amount of deal flow, but needs to focus upstream on larger clientele and larger deals to ensure success. Reflecting on current engagement pitch and ensuring his brand reflects HNW Private Banker would serve him well. Given high FA population and broad geography, managing resources is paramount to success. Chip has a unique opportunity to leverage four PBAAs in his market to assist in driving the platform. This could prove to be a beneficial addition in managing smaller ticket deal flow and allowing Chip to focus on an up-market approach to HNW client segment.
>
> Chip is resilient and maintains a positive attitude in the face of adversity. He is genuine in his desire to see his business partners succeed and is proven to be developing as a mentor. His creative thinking has led to several best practices and he is constantly developing new ideas and fostering a sharing environment with the team. Chip is a team player and always available to assist his peers.

(Ex. 14; D5 144:19-21) (emphasis added).[3]

Putting aside the laudatory comments in the reviews, Dunlap testified favorably about Chip

describing him as: (i) always having a positive attitude and good teammate (D5 105:14-21); (ii)

giving a good sales presentation (D5 106:18-19); (iii) being generous with sharing information with

---

[3] Had Chip been issued a needs improvement annual evaluation score in 2015 Dunlap would expect to see "improvement required" designated in the Talent Ranking; or, if someone received a meets expectations evaluation score, it would be logical for them to be rated "solid performer" on the Talent Ranking, which is how Chip was ranked. (Ex. 64A; D5 5-9). Accordingly, while there is some convenient mystery for MS around what overall score Chip received in his 2014 and 2015 evaluations, the Talent Rankings demonstrate the overwhelmingly positive commentary in those evaluations. The fact that the one scored performance summary Dunlap completed for Chip was <u>exceeds</u> expectations point strongly to his having received a meets expectations score. Indeed, Cucuzza acknowledged that he reviewed all Chip's Carolina Complex evaluations at his deposition and interpreted them as meets expectations. (D4 117:4-15).

other private bankers (D5 106:20-25); (iv) showing leadership by always being willing to contribute to team decisions and always raising his hand (D5 112:2-13); (v) being "super likable" and good with client facing and relationship building (D5 114:20-25); (vi) being experienced not just in banking generally, but in MS's culture and model (D5 115:6-12); (vii) "genuinely wanting to succeed in the business" (D5 126:21-22); (viii) being someone who always had a new idea and being a good deal guy (D5 150:10-22); and, (ix) being steady, insightful, and persistent. (D5 162:1-7).

## V. Beginning in November 2015, Kristen Sario Becomes Chip's Third Complex Manager, and by Every Indication She Viewed Chip Positively in 2016 just as Chip's Previous Complex Manager Alex Dunlap.

Sario's ascension to the Complex Manager role presented challenges for Chip. Sario was not only new to the complex, but she had never been a Complex Manager before. Making matters worse, she skipped over the Assistant Complex Manager role entirely and had only been a branch manager for approximately two years and managed two relatively small branches.

Chip tried hard to foster a strong relationship with Sario as he had successfully done with Mullins, Donovan, and his Complex Managers in New York. He bought Sario artwork and visited her house with his APBs (D1 177: 9-14). And he pushed to set up events with her, travel with her, and to have at least monthly and even weekly meetings as reflected in contemporaneous documents. (D1 177:15-186:8; Ex. 87). Unfortunately, Sario was only minimally involved in banking and lending in 2016 and the first half of 2017. (D3 659:21-25). Indeed, it was not until June 2017 that Sario was finally "close to being able to commit so much more time to banking and lending" and signaling a willingness to put a six-month banking and lending plan in place—something Chip had been pushing from the beginning. (R. Ex. 30; D3 660:1-11).

Sario had lots of positive things to say about Chip in the "360 Review". (Ex. 30). She selected all positive adjectives to describe Chip: "committed, responsive, credible, friendly and reliable." (Ex. 30 at 312). She also listed Chip's "creative and collaborative approach to growing the business" and his being a "valued business partner" as attributes that differentiated him. (Ex. 30 at 314). Her observation about Chip needing to start with a "yes" was not a negative reflection on him as a banker. As Chip's last Regional Manager Barbara Power noted, Chip's pragmatism and ability to provide a quick "no" was better than a protracted "maybe," and she and Dunlap both backed Chip up on a "no" Chip provided to Sario regarding an FA recruit banking and lending request. (Ex. 141; D1 224:5-226:7; D8 26:16-30:15). Indeed, Sario never conveyed any concerns about Chip in 2016. (D8 46:5-7).

Similarly, Alex Dunlap was pleased with Chip's performance. Dunlap did not consult with HR regarding Chip and could identify no documents that would have reflected negatively on Chip. (D5 151:8-13; 152:5-9). While MS did not produce a mid-year evaluation for 2016 for Chip, there are two talent review documents that are favorable. First, on May 20, 2016, there is a 9-box talent designation box that lists Chip as a "B3 solid performer, which means "good to very good performance." (Ex. 140BB; D4 146:23-247:4) Second, in October 2016, Allison Carriere emailed a 9-box spreadsheet for comment that likewise listed Chip as a "B3 solid performer." (Ex. 64A). Indeed, as discussed below, Power consulted with Dunlap, and issued Chip a meets/meets evaluation.

## VI. In September 2016, Barbara Power Becomes Chip's Third Regional Manager Replacing Alex Dunlap, but Chip Logs Another Successful Year Despite the Turnover.

### A. While Sario was a rising star at MS, Barbara Power was a disengaged Regional Manager on a downward trajectory.

Beginning in September 2016, the revolving door continued with Barbara Power becoming Chip's third Regional Manager in four years. She too presented a challenge for Chip; she was a disengaged and aloof manager from a coaching and mentorship standpoint with Chip. (D1 214:14-18). She met with Chip only a handful of times in the approximately fifteen months she managed Chip before his termination. She provided him minimal, if any, one-on-one coaching. (D4 111:20-112:3). She cancelled trips with Chip to visit branches and she even failed to show up at an important dinner and baseball game with her boss Jerry Valletta, Chip, and his two APBs, Michael Black and Jared Bush. (Ex. 163; D1 213:212; D9 193:3-6).

Although Power got a free pass from Valletta in 2017, Power's conduct received deserved scrutiny by 2018 as Chip's testimony about Power's shortcomings were magnified and even her integrity called into question. Valletta issued Power a performance warning requiring immediate improvement with respect to demonstrating good judgement, honoring work commitments, refraining from regularly cancelling meetings, and "being upfront and transparent with [her] management team at all times and avoid[ing] making misrepresentations." (Ex. 31). Valletta also issued Power a needs improvement evaluation score lambasting her for her judgment and noting she had "no impact on banking success," possessed an "inability to establish relationships," and had a lack of visibility resulting in part from her chronic practice of cancelling meetings. (Ex. 32). Notably, Valletta found Power to have been dishonest with him about a company trip and he questioned more broadly why she had the largest personal expenses of any banker nationally. *Id.*

1. **Power issues Chip a positive 2016 Evaluation; Chip again finishes #2 nationally in Units and his 2016 360 Review is glowing.**

On January 9, 2017, Power issued Chip a positive meets/meets evaluation for the 2016 year after conducting thorough due diligence and conferring extensively with Dunlap and speaking with relevant stakeholders. (Ex. 33; D3 748:8-11). Power took a holistic view of Chip's performance

and was not myopically focusing on percent to goal loan production, which was 72.92% for the year. (D1 216:5-13; D3 748:17-21). Power's evaluation comments were sparse unlike her predecessors, but nonetheless complimentary. She described Chip as steady, insightful, realistic (very comfortable in assessing situations and expressing obstacles), persistent, and knowledgeable (which differentiated Chip from his peers). Her 2017 evaluation of Chip, likewise recognized his "solid relationships with WM teammates," referring to financial advisors and complex leadership (Ex. 141; D8 25:17-26:18; 31:22-32-7).

On January 3, 2017, Power was "very pleased" to also learn that Chip was Number 2 in the nation in unit production, missing by only two loans to a highly respected national banker in the mortgage space. Power was also aware Chip earned the top spot in units nationally in 2014. (Ex. 35; D1 218:4-12; D8 51:13-52:16).

Indeed, Chip's 2016 "360 Review" left little doubt he had a successful year. Every single evaluator listed five positive adjectives to describe Chip and their comments were extremely laudatory:

- Bob Hatala (Charlotte Branch Manager): knowledgeable, approachable, sense of humor, professional, balanced / Financial advisors are very welcoming to Chip speaking and meeting with their UHNW clients. Quite a complement toward his professionalism and knowledge.

- Bobby House (UHNW Specialist): steady, insightful, realistic, persistent, knowledgeable / Chip brings a calm to situations that foster an environment of professional thinking rather than emotional decision-making.

- Nino Migoya (Mortgage Specialist): professional, efficient, bright, confident and sociable / Chip is very adept at seeing the big picture and always looming for ways to improve processes and create efficiencies.

- Eric Parker (Assistant Regional Manager): committed, responsive, credible, friendly, reliable / Chip has distinguished himself with is sales skills, organization skills, and detail-oriented talents by creating a culture and network of Advisors across wide and difficult territory, all of whom that have adopted the mortgage and SBL platform

27

utilization for their clientele with consistency and effectiveness. His reach extends well beyond his daily presence.

(Ex. 30.) Echoing the 360s, there was also abundant email traffic from both Sario and Power reflecting positively on Chip. (*See. e.g.,* Ex. 34 at 7498-7499, 7888-89, 7900-7901, 8094-95; Ex. 42 at 8485; D8 57:3-21).

## B. In 2017, Sario makes plain her preference for women and corresponding desire to have fewer white males.

### 1. Sario's discriminatory statements.

In 2017, Sario made several comments indicating her view that there were too many white men in her organization. For example, on or around September 20, 2017, during a car ride with Chip and Francesca Maines, Sario discussed the Greenville, South Carolina branch (which was exclusively all white men) and stated "how do we get diversity in this branch. It doesn't look the way we want it to look. We need to get it younger in there, we need to get women in there, how do we do it." (D1 188:4-14). On another occasion in a complex leadership meeting in November 2017, Sario said, "diversity is the number one goal, number one focus" for 2018. She again brought up the "Greenville problem," when her new Assistant Complex Manager, Kristan Vlcek, asked what the problem was. Members of Sario's female leadership team chimed it: "too old, too white and too male" and laughed about it. (D1 190:16-25). Sario made similar comments about older white male branch managers during car rides with Chip questioning whether they had enough "energy," including Chuck Lee (Anderson), Will McMaster (Columbia), Jon Porter (South Carolina) and on one occasion, Martha McNeil. (D3: 645:22-646:5).

### 2. Sario's stated desire for an all-female Complex leadership team and the marketing of that Team.

Sario publicly expressed her desire to have an all-female complex leadership team. (D4 265:6-8). Furthermore, once she attained her all-female leadership goal with the hiring of Kristen

Vlcek and Francesca Maines, she was quick to market her all female team. For example, on December 11, 2017, Sario scheduled a tea party directed to only female FA recipients, inviting them to mingle "with other women and our all-female complex leadership team." (Ex. 23; D6 320-9-321:11). This invitation was "worrisome" and "surprising" to Martha McNeil, a Regional Diversity Award and former MS Diversity Council member. McNeil testified, "I can't imagine somebody receiving an invitation that says, come mingle with your all-male management team." (Ex. 23; D4 267:12-21). Chip would go on to express that "Kristen liked hiring all female employees" to Power's new Assistant Regional Manager, Andrew Cucuzza. (D3 784:15-19). However, Cucuzza did not see a reason to escalate Chip's discrimination report even though he acknowledged it violated MS's discrimination policy to give preference to a particular group in hiring. (*Id.* At 785:24-785:11).

### 3. In 2017, Sario is nominated for and considered for the prestigious Makers Award.

Sario's brazen discriminatory comments occurred against the backdrop of her 2017 nomination for the MS's female-only "Makers Award". Sario considered the "Makers Award" to be the crowning achievement of her career. While the official announcement of Sario's receipt of the award was not made until December 13, 2017, she was dishonest at trial when she repeatedly claimed she had no idea she had been nominated or who nominated her. Contemporaneous emails show that Sario knew at least one person who nominated her for the award when she was notified of the award. (*Compare* D6 140:22-142:8, 315:24-25-319:12 *with* Ex. 28 at 11304). The likely explanation for Sario's misrepresentation on this point is that her ignorance allowed MS to argue that her candidacy for the award could not have played a role in her targeting of Chip. Alternatively, it is inconceivable that Sario would have just forgotten who nominated her or when she learned of the nomination for literally the most impactful career achievement she ever attained.

29

What is undisputed, however, is that Sario once again marketed her having an all-female complex leadership team in MS's amplification of her receiving the award. Sario provided a photo of herself and her all-female complex team, which was shown during the video interview MS produced detailing her receiving the award. Chip and Hatala were not included in the video or photo. (K. Sario Deposition, p. 354). News of her recognition in December 2017 rippled throughout the organization. Sario received a chorus of praises from fellow female Makers' recipients welcoming her to the "sisterhood,"—a term which surprised even Power. (Ex. 28 at 11282, 11277, 11361, 11779).

**C.     It is undisputed Chip substantially improves his performance in 2017.**

     **1.     After being instructed not to be so number driven under a new compensation model, Chip's loan origination dipped in Q1, but the email traffic was extremely positive.**

In 2017, MS changed the banker compensation model, converting it from a formulaic bonus plan focused on hard numbers to a discretionary model. (Ex. 166; D1 226:9-227:17). The National Sales Leader, Chad Johnson's directive was to be "more consultative" and not so number driven in pushing loans. *Id.* Chip took that direction literally; he should not have. (D1 228:3-8). After his Q1 numbers dipped, Power told him to "go back to what you were doing and ramp up your number again." (D1 2231:2-3; 232:7-15).

The email traffic throughout February all the way through July was uniformly positive about Chip's performance. On February 17, 2017, Power was bullish, telling Chip, "this is your year my man." (Ex. 40). Following a meeting with Chip and Valletta, Power emailed Chip on April 21, 2017 stating, "I left re-energized around the work you and your team have on the plan. I know you will execute" and Valletta echoed her optimism (Ex. 41; D1:26-23; D7 357:15-21; D9 194:9-17).  Sario

was also extremely upbeat about banking emailing Power on March 8, 2017 saying that there was "so much momentum with my banking team." (Ex. 39).

> ### 2. Andrew Cucuzza becomes Power's new Assistant Regional Manager and on balance has many positive things to say about Chip as did his counterpart Eric Parker.

In 2016 and 2017, the Assistant Regional Manager was Eric Parker, an adept evaluator of talent. (D3 727:16-19). In addition to Parker's laudatory comments about Chip in the 2016 "360 Review", Parker also complimented Chip in many in emails as well, including on October 10, 2016 where he told Chip "you are a real pro." (Ex. 43). Similarly, on March 8, 2017, Parker advocated having Chip lead a summary to the other Region's PMs sales call on the plan he was executing with Sario (Ex. 44).

Beginning in March 2017, Power had an ARM resource in Cucuzza, who had been promoted from Assistant Complex Manager. All the non-lead private bankers reported to Cucuzza, but his job also included helping lead private bankers grow their businesses in the six complexes that were assigned to him—Chip's Complex was one of them. (D3 727:24-729:6).

Cucuzza had many positive things to say about Chip, including, he was an expert in banking and lending; he was personable, dedicated, steady, insightful, resilient, persistent, and creative; a good problem solver; a good presenter and was highly engaged with client, management, and FA issues and questions; and adept at seeing the big picture and looking for ways to improve process and create efficiencies. (D3 742:1-747:3, 756:3-9).

Cucuzza was in the market more than Power and was not advocating major course corrections for Chip. (D3 772:17-773:25).[4] Instead, Cucuzza was giving Chip additional ideas and

---

[4] On or around May 5, 2017, Cucuzza told Chip he could get in trouble for telling him this, but that Chip had an "optics problem" and that Sario had "thrown him under the bus" and that she had nothing good to say to cautioned that Power "was very easily influenced." (D1 240:16-242:10).

emphasizing things Chip could concentrate on more. Those additional ideas were memorialized in an informal action plan for the Complex even though Chip was already performing them. For example, he was proactive in book reviews and collaborating with Bobby House to highlight UHNW opportunities. (Ex. 45; D1 246:23-247:24). The action plan was not HR directed nor disciplinary. (D3 774:4-12).

Cucuzza's email traffic regarding Chip was uniformly positive. For example, on June 21, 2017, Cucuzza was reporting "really good momentum" and stating, "overall we are seeing very good results this quarter." (Ex. 48). Similarly, on July 5, 2017, Cucuzza specifically informed Power: "Chip and team had a fantastic quarter . . . we've got a good story to tell there. I think Kristen will jump on the momentum and help us drive business." (Ex. 55). Power likewise agreed with Cucuzza's assessment and she understood Chip was responding well to his coaching and she was optimistic about Chip's future. (D8 72:21-76:2). Cucuzza did not meet with Chip until early June, so he did not take credit for Chip's fantastic quarter. (D3 773:12-774:3).

Cucuzza and Power were excited with Chip's progress on this plan and thought Chip's teamwork with Sario looked really good and that the Complex would continue to improve. (D3 764:2-11, 778:3-8, 782:16-18; D8 89:18-90:2). For example, on August 9, 2017, Power emailed: "[I]mpressive Chip. This teamwork with Kristen is exciting. I am pleased to see how much you are actively working with she and her team. Nice!" Cucuzza added, "this looks really good." (Ex. 47 at 9598). Power understood that Chip was actively trying to engage with Sario. (D8 87:21-25). On August 18, 2017, Power emailed to Chip "nice work . . . keep it up. You are ensuring that Carolina's is on the map." (Ex. 51). Then, on August 23, 2017, Power added "I am very excited about what changes I am seeing Chip. Keep it up." (Ex. 52; D8 91:15-23). And on August 31, 2017, Cucuzza wrote to Chip: "I've seen all the hard work you, Jared and Michal are putting into this, and I'm glad

to see the results are following. I really liked the way you've partnered with Kristen and how she's

holding each branch manager accountable." To which Power responded, "I could not agree more."

(Ex. 53; D3 780:4-9). Power acknowledged that Chip was working hard to partner with Sario, even

as late as September. (D8 91:15-19).

### 3. Power skips Chip's Mid-Year Evaluation but gives positive verbal feedback to Chip and issues a favorable 2016 Talent Ranking in mid-June 2017.

Mid-year evaluations are required; their purpose is to examine how the PB is trending and

to notify them of any deficiency or weakness, so they have an opportunity to improve. (D3 730:15-

731:5). If a mid-year is completed, it will contain employee <u>and manager</u> comments, which should

indicate any disagreement with the PB's self-assessment. (D8 76:8-24; D9 124:9-125:2) (emphasis

added). In 2016, Chip prepared a self-assessment, but Power did not do her job and conduct a mid-

year review with Chip. (Exs. 1, 45; D1 234:4-10, 280:4-6). Had Power completed the mid-year,

there would be a version with comments, but none was produced. Power could only meekly testify

that she "thinks" she issued one to Chip. (D8 78:22-79:4).

Power did prepare a favorable Talent Review Ranking for Chip in June 2017. (Ex. 90A; D8

83:15-85:9). She lauded Chip as having creative thinking and being innovative and rated him as

"high" for demonstrating flexibility and motivation to move into a different role" and "welcoming

opportunities for development." (Ex. 90A). She ultimately placed him in the overall grouping "at

potential/average performance." *Id.*

Similarly, the email traffic from Power and Sario to Chip into the first part of September

2017 was extremely positive. For example, on September 5, 2017 Power wrote "fantastic work

Kristen and Chip. Keep the momentum going and finish strong." (Ex. 58 at 9971). Likewise, on

September 5, 2017, Sario emailed Chip "Whoa!! Doing a happy dance" in response to update from

Chip. (*Id.* at 9973). On September 9, 2017, Sario emailed "happy feet are doing a little jam right now" in response to Chip and the complex being #2 in nation on CD stack. (*Id.* at 9993)*.* Finally, on September 18, 2017, Sario emailed "incredible!" in response to a Chip update. (*Id.* at 10187). Power was also very positive in informal feedback she provided Chip, as was Sario. (D1 238:1-9).

### 4. While Chip was trending in the right direction, Atlantic Coast's Lead PB, Dave Seegers—who was fired along with Chip—was not.

While Chip was surging, Dave Seegers failed to improve. (D9 196:4-8). On July 5, 2017, in the same email where Cucuzza praised Chip, he observed, "The opposite happened in ACC. They are last in the region in FA participation, percent to goal, balance growth and PCM. I can't find one positive thing happening there." (Ex. 55). While Power gave Chip a favorable Talent Ranking in June 2017, she did not do so for Seegers rating him as "low potential and below average performance." (*Compare* Ex. 90A *with* Ex. 140A; D8 96:12-15). Seegers also had a less favorable employment record than Chip. As of August 2014, Seegers was rated in the bottom 10% (when Chip was rated in the middle 70%. (Ex. 140A at1609; D9 145:9-14). On September 6, 2017, Power asked HR to pull Seegers' performance for the past two years for a conversation that was to be held with HR; Power had no recollection of doing so for Chip at that time, which is consistent with the avalanche of positive emails she sent to him. (Ex. 56; D4 113:15-114:4; D8 94:3-24).

### D. On September 12, 2017, Sario abruptly moves against Chip through Power.

### 1. Sario initiates a 30-minute phone call with Sario haranguing Chip followed by an exhaustive bullet point email portraying Chip as effectively useless.

There was a sea of change in Chip's future at MS on September 12, 2017. Such change which was triggered by a thirty-minute phone call Sario initiated with Power, in which Sario unleashed a torrent of criticism portraying Chip as an effectively useless banker. Power took notes of the call but shredded them. (D8 100:22-101:22). However, Sario memorialized her complaints

in a twenty-bullet point email (the "bullet point email" or the "hatchet email") (Ex.147). The bullet point email came out of left field and is an absolute outlier among the veritable mountain of positive emails from both Power and Sario. In fact, it is the first negative email in the entire document production from Sario about Chip. (D8 97:2-6). If there were any other prior negative emails Sario sent, they should have been in the 14,000-page document production—but there were none. Sario had never conveyed anything negative to Chip nor had Power shared with Chip that there were any issues with Sario prior to this point. (D1 257:8-19; D3 783:6-784:4).

> ### 2. The hatchet email's criticisms lack evidentiary support, but Power didn't stop to verify anything that Sario alleged.

At the outset, Sario's bullet point email puts phantom torpedoes in the water that are not substantiated by a single document, and they run headlong into the actual record evidence.

- For example, Sario broadly claims FAs viewed Chip like a car salesman and that they allegedly did not have a team or collaborative or consultive relationship with him. Yet, Sario could not identify a single note she took to corroborate the complaints she claims she fielded from FAs, branch managers or anyone on her complex leadership team. (D6 291:3-21). In contrast, Power herself had commented favorably in Chip's 2016 review on Chip's relationships with FAs and in emails, as did several of Chip's 360 reviewers. (Ex. 33, 42 at 8485).

- In addition, Power should have taken the allegation of Chip being a car salesman in stride because the banker's job is in fact to "sell" to FAs. Indeed, Power described her MS job duties as "leading the sales team," referring to bankers. (D7 337:12-13.) Similarly, Dunlap referred to "selling" banking products. (D3 29:1-5.) MS used "sales" in banking titles; Chad Johnson, Valletta's boss, was the "National Director of Sales." (D8 838:18-21). Cucuzza claimed he supported Bush over Black because Bush had "better sales skill." (D3 869:23-24). Furthermore, some FA dissatisfaction with banking stems from dissatisfaction with the problems with mortgage platform the banker could not control. (D8 104:7-4). McMaster and McNeil spoke uniformly on this point about the "disaster[ous] nightmare" resulting from MS "outsourcing" the mortgage underwriting function. (D3 618:1-12). McMaster's 2017 360 was clear as to who was to blame: "the mortgage experience for our customers has to improve for Chip and his team to be successful with this product. This is a firm 'fix' and not a Chip 'fix.'" (Ex. 190 at 336; D3 617:19-618:12). McNeal added, "at any given time, a financial advisor could have a great relationship with Chip . . . but hate the bank. So it's two different things." (D8 220:18-22). Accordingly, most branch managers were sympathetic toward the banker

when these problems arose, but it also caused McMaster in particular to urge his FAs to not do mortgage business at times. (D3 618:14 – 619:16).

- Similarly, Sario unfairly faulted Chip for not attending a "Growth Summit" when it was actually <u>her</u> who rescheduled the Growth Summit to occur while Chip was on a vacation with his wife. Chip's vacation was calendared with Sario and pre-approved by Power six or eight months in advance. (D1 283:9-1; D2 487:3-24; D6 281:11-18). Even Power acknowledged, Chip would have no fault in missing the Growth Summit under these circumstances. (D8 110:2-23). In any event, Chip trained Bush all along, and assisted Bush and Black with the specific materials and presentation. Chip had Bush present at the Growth Summit and according to Sario, he (Bush) did "a great job." (D1 113:25-114:1; D6 97:8-9; D8 479:16-480:11). Sario also speaks out of both sides of her mouth when, on the one hand claiming Chip should not have delegated Bush to present at the Growth Summit, while also criticizing Chip for allegedly not involving Bush enough with substantive tasks. (D6 94:1-6, 96:4-24). Her attempt to have it both ways reveals the speciousness of her criticism regarding the Growth Summit.

- Sario's criticism that Chip was not fully utilizing or not effectively leading Black and Bush is also rebutted by contemporaneous documents. (Ex. 82 at 8096-97; Ex. 83; D8 63:6-9). Indeed, in 2017, APB Eric Parker described Chip, Bush, and Black as "an awesome team" and never indicated otherwise to Sario. Emails show Chip and Black were involved in effective "lunch and learns" at the branches, which Sario thought was "great." (Ex. 85; K. Sario Deposition p.263). And in Power's Talent Review (which evaluates current performance and future potential), she described Chip as average with respect to "demonstrating leadership ability. (Ex. 90A at 15282; D5 110:2-9). Black and Bush also had many positive things to say about Chip in his 2017 "360 Review". Power and Valetta also told Chip he was doing a good job growing and developing his APBs. (D3 622:8-19).

Unfortunately for Chip, Power ran with Sario's email as if it was gospel. She did not independently speak with any branch managers or FAs to verify any of Sario's criticisms or confirm her depictions of complaints coming from them. (D8 105:8-107:16). Power did not ask Sario to provide notes or emails to corroborate her contention that she shared her misgivings directly with Chip. (D8 140:3-9). Moreover, Power did not show the email to Chip or give him an opportunity to respond to the broadside allegations Sario levelled against him nor did she allow Cucuzza to do so either. (A. Cucuzza Deposition p. 185).

      **3.**      **Regardless of its lack of support, Sario's "hatchet" email successfully put a target on Chip's back with Power.**

i. **Power immediately involves HR; a 60-day Action Plan is prepared but never administered; and, Chip is ultimately issued a Performance Warning focused not on his metrics, but on his relationship with Sario.**

On September 19, 2017, Power sprang into action. Randall is suddenly lumped in with Dave Seegers and Power has Cucuzza prepare Action Plans for both. (Ex. 58 at 10191; D8 107:17-108:4). Power began emailing with HR about performance managing Dave Seegers, Rob Mickler, and Chip—all three white males and each over 50 years of age. (Ex. 59A; D4 118:5-15) (emphasis added). In the emails, Power specified that she wanted to "have a discussion with legal given the extensive relationship damages with Complex Mgt." *Id.* Tellingly, Power did not consult with legal regarding Dave Seegers whom Cucuzza had "nothing good to report." (D8 117:1-7). Prior to the hatchet email, Power had no recollection of consulting with HR about Chip. (D8 115:16-116:9).

On September 21, 2017, Power then had Cucuzza assist her with preparing a 60-day Action Plan although Cucuzza never advocated that such a plan was necessary. (Ex. 61; D8 123:4-7). Notably, the Action Plan does not focus on Chip's performance metrics or indicate Chip was not on track with those metrics. (D3 788:12-15). Instead, it simply identified activities to do around partnership with the Complex. (D3 787:4-9). On September 25, 2017, Power apprised and consulted with Sario about her previous consultations with HR. (Ex. 60). Oddly, Chip was not ultimately issued the Action Plan. (D1 259: 8-10).

Instead, on or around October 12, 2017, which was just a few days after he returned from his vacation, Power effectively ambushed Chip. (D1 259:20-264:24). During a lunch meeting with Chip and Bush, Power bluntly conveyed that they had a "problem with Kristen Sario." Power then pulled out some documents purporting to show that the Complex was in the bottom three for the past three years. (D1 259:7-260:16). However, Chip and Bush contested the numbers. Power then

asked Chip to step out and she met alone with Bush for about 30 minutes before returning to Chip's office. (D1 260:17-20). In a change of tact, Power said positive things about Chip and she wanted to make sure he was "happy in [his] role." She questioned whether he wanted to work directly with Alex Dunlap or as a trainer. Chip assured her that he liked his job and that he needed the job as a sole breadwinner in his family. He would "do anything [he] can to fix this relationship." (D1 261:1-13). Chip asked Power squarely, "Are you putting me on verbal? Are you writing me up?" Power responded, "No. No. I'm just here to help. We've got to fix this problem. We're going to fix it. I see all the hard work you've done. We're going to make this work." (D1 261:1-24). However, it was also troubling that Power told Chip that he could not meet with Kristen on his own. She insisted that he meet Sario with <u>Jared</u>, which was effectively a reversal of their roles. (D1 262:11-262:19) (emphasis added). Furthermore, Bush subsequently confided in Chip that Power told him "Randall's out, he's finished. If you want this role, you have to step up and show us you can do it." (D1 263:13-16).

Prior to this point, Power never informed Chip that Sario was unhappy with him nor did Sario. Though Power testified that she notates material personnel conversations and creates business review PowerPoints for her banker meetings, Power could not identify any notes or emails establishing she previously informed Chip of any Sario issues. (D7 559:17-563:23).

On or about October 16, 2017, Power emailed Chip a written performance warning back dated to October 12, 2017 and asked him to sign it. (Ex. 62; Ex. 63; D1 265:24-266:3). Notably, Power skipped over providing Chip a verbal warning first, which is the first step in MS's progressive discipline policy. (D4 184:5-8). In any event, Chip reminded her that she said he was not even getting a verbal and questioned why she was emailing him a written warning. (D1 264:2-17). Tellingly, Power did not have Cucuzza assist with the performance warning drafting; she did

not ask his opinion regarding whether a performance warning was warranted; and, she did not have him participate in its issuance. (D3 792:8-793:9; D8 123:8-124:20).

Chip being issued a performance warning was odd for several reasons. First, in addition to occurring amidst the sunshine of dozens of positive emails that year, Power emailed Chip the warning on the very same day she praised him for having increased to 95% of plan and expressing confidence in his ability to "keep the momentum you had the past month." (Ex. 63; D8 111:3-17; K. Sario Deposition, p. 303). Second, other important players were seemingly puzzled as well. Cucuzza's comments to Chip about the performance warning were reassuring: "keep doing what you're doing. You guys are having the best year you've had." (D1 266:17-22). Parker also reached out to Chip and said, "You have a Sario problem. . . just keep doing what you're doing. Just keep running. You're going to be fine." (D1 267:3-9). And House did not sugarcoat his opinion of Chip being issued a performance warning stating, "It's BS. You've got some support. Just keep doing what you're doing." (D8 267:10-15). Third, performance warnings were a rarity. Other than Chip and Seegers, Cucuzza and Carriere could not identify any other instances where performance warnings had been issued to bankers in the Southeast Region. (D3 861:7-19; D4 202:17-203:13). Odder still, Power violated the terms of the written warning and did not meet with Chip weekly as specified in the document. (D1 266:1-13; D8 119:12-23).

### 4. A new Action Plan is rolled out on November 2, 2017 with lofty goals.

On November 2, 2017, a new Action Plan with new goals was issued to Chip. These goals were designed to be "stretches" and were to be used to highlight successes. These were not goals set with the expectation that Chip would be terminated if he failed to hit them. (D3 806:23-807:25). Indeed, some of these targets were not realistic. There was "no way that Chip would get to the 75% by year end;" it would have required him to lead the nation. (D3 808:1-18). Chip finished the year

at 56.02% and no other complex in the SE Region hit 75%. Just ten of the complexes even finished in the 50% mark like the Carolina's. (Ex. 6B). The second goal set was a Premier Case Manager target of 782. At the time, Chip was at 455 and needed 376 to hit 100% in less than two months. Finally, there was no requirement for Chip to close a UHNW loan. In any event, Chip showed extensive activity connecting Bobby House with FAs in Q4. (R. Exs. 48, 54; D4 106:-110:19).

**E.** **On November 1, 2017, Chip goes to Jerry Valletta for help but Sario and Power close ranks and Sario pivots to new angles of attack.**

Chip was understandably "rattled" by the course of recent events and went to discuss the situation with Jerry Valletta. (D1 268:19-269:23). Sario had never given Chip any indication that there was a problem in their relationship. (D4 103:22-104:3; D8 272:20-273:1). Chip told Valletta on the surface he and Sario seem to have a great relationship, which was in direct contrast to what Power put in his performance warning. (D1 269:10-16). Chip relayed to Valletta that Power had forbade him from talking with Sario on the topic. Valletta, instead, told Chip to speak directly with Sario. (D1 269:21-22).

On the way back from McMaster's oyster roast, Chip disclosed to Sario that Valletta and Power had shared her (Sario's) bullet-point email with him. (D1 271;19-21). During this conversation, Sario acknowledged sending an email to Power, but claimed it was "nothing serious." Chip pleaded that he needed the job as the sole breadwinner of his family and Sario assured him "nobody is getting fired. You're on my team for 2018. Don't worry about it." (D1 272:2-10, 274:10-12).

In reality, Sario had pivoted to a new angle of attack and intensified her efforts to oust Chip. On November 2, 2017, Power warned Sario of Chip's call to Valletta and asked that they talk "ear to ear" about it. (Ex. 66). On November 6, 2017, Power met with Chip and attempted to get him to admit that he knew he had a problem with Sario—contrary to what he told Valletta. (D1:274:18-

24). Chip pointed out that Sario was next door and suggested that the three meet to discuss the matter, but Power refused (D1 275:7-11). Then on November 7, 2017, Power emailed Sario a blow-by-blow of her and Chip's meeting, including Chip's contention that Sario never communicated any problems directly to him. (Ex. 67; D8 140:10-15).

Rather, than acknowledge her lack of communication, Sario again charted two new angles of attack: (i) she claimed that Chip had a problem with his relationship with her Complex Leadership Team broadly, including Vicki Strine, Libby Harris, and Francesca Maines; and, (ii) Chip "lacked self-awareness" in his denials because she had "expressed concerns and constructive feedback on multiple occasions" about his relationship with the broader Complex and had "past and recent discussions regarding Chip's alleged other shortcomings." (Ex. 67). Although Sario provided no dates of when she allegedly conveyed her concerns to Chip or when her team allegedly complained about Chip, no one asked her to provide any further details or copies of her alleged notes. Rather, it appears that Sario's conclusory statements in this regard were simply accepted as true, and Chip was labeled as lacking self-awareness.

After the Valletta call, Power, Sario, and HR also conspicuously stop emailing details and prompt each other for phone calls. (*See., e.g.,* Exs. 68, 69). Sario also disengaged from working with Chip. For example, they were scheduled to have individual book reviews with FAs in Columbia, but Sario only sat in on one partial meeting and then claimed she had to leave early for her yoga class. (D1 266:6-277:23).

**F.    Sario and Power jointly decide to terminate Chip leaving Cucuzza on the outs and with HR seemingly asleep through the process.**

**1.    Power freezes Cucuzza out of the termination decision-making process.**

On December 19, 2017, Cucuzza emailed Power all the ways Chip had been collaborating with Sario and her team. (Ex. 69). Cucuzza believed Chip embraced his coaching and was diligently

41

trying to improve and dedicated to meet the needs of the Complex. Cucuzza never indicated otherwise to Power. (D3 742:2-13, 745:13-15, 818:8-13, 810:7-10; Ex. 70). Even Power understood that Chip was working hard to save his job, going above and beyond by offering to spend his own money to travel to Dallas in September—the same month Sario wrote the hatchet email. (D8 93:2-18, 149:8-15; Ex. 58 at 10165).

Though Cucuzza was most familiar with Chip's progress, Power did not ask Cucuzza's opinion or seek his recommendation as to whether Chip should be terminated. (D8 144:17-145:7). Power did not even alert Cucuzza that Chip had received a positive 2017 360 review. (D4 100:6-11). Cucuzza never volunteered or suggested that Chip should be terminated, let alone put on a performance warning; Power likely did not ask Cucuzza's opinion because she knew he was an advocate of Chip. (D4 115:1-116:6). In fact, Power informed Sario about Chip's termination before Cucuzza. (D3 813:4-7).

### 2. Contemporaneous emails show Power marched to the beat of Sario's drum, surrendering total control of the termination to Sario.

Power did not even wait for the final year end numbers to become available before deciding to terminate Chip, and therefore, reasonably indicating the numbers did not matter. (D8 151:19-152:14). Rather, contemporaneous emails show that Sario was the impetus for Chip's termination and that Power ultimately relinquished Chip's fate to Sario. At the outset, Power did not go to Valletta and suggest Chip be put on a performance warning, let alone be terminated, before the bullet point email. (D9 200:18-23, 203:12-20). Rather, on December 19, 2017, Power wrote to Sario: "If Chip has not improved in his relationship with you and your team (based on your assessment and mine), I will be asking personnel to support a final written notice of termination. If he has improved, Andrew and I will continue to work with him on sustaining his performance." (*Id.*; Ex. 69; B. Power Deposition, p. 308-10). Then, after speaking with Sario on December 19,

2017, Power emailed Sario on December 20, 2017 stating: "following our discussion, I met with my personnel team to share your feedback as well as mine. Given the lack of improvement and unwillingness to embrace the feedback, I am recommendation termination." (Ex. 71) (emphasis added). And on January 4, 2018, Power—a "good communicator who tries to be as accurate as possible in emails"—admits stating in an email to Sario, "I hate that you and I have gotten to this point with Chip, but I know our decision to terminate Chip is the right one." (Ex. 72) (emphasis added). Even Power acknowledged a plain reading of her initial reference to "you and I" and "our decision" would lead a reasonable reader to conclude "our decision" referred to her and Sario. (D8 146:5-18). In the email, Power even assured Sario she will share the "talking points and details once I close the loop with legal," leaving little doubt of Sario's preeminent role in the termination decision. (D8 146:19-147:2). And, within hours of Chip being informed of the termination, Sario emailed Power and Cucuzza asking "do I need to do anything from my seat to terminate Chip in the system or open the PB position?" (Ex. 92; D3 819:23-820:8). Even Respondent's Answer refers to "Kristen Sario, the Complex Manager and decision-maker" in Chip's termination. The admission occurred in the introduction and could not plausibly have been an oversight with experienced counsel. Respondent's very late amendment to its Answer does not negate the admission.

The termination script similarly corroborates that Chip was terminated because of Sario, not performance on his core metrics. It states: "I have noticed you've been making an effort, but that effort isn't converting into positive results, in particular you haven't been able to establish a positive relationship with the complex." (Ex. 73) (emphasis added). Tellingly, the script also states, "lets add a few brief references to the nature of the deficiencies," but there is no reference to Chip's objective performance on his core metrics. Just like the performance warning, the monocular focus is the relationship with "the complex." *Id.* Power also went off script and acknowledged that Chip

had decent performance metrics, but that he was nonetheless terminated because he "managed to lose the confidence of the wealth management partners." (D8 278:6-16). After the meeting Chip called Allison Carriere and asked her what loss of confidence of wealth management partners meant. She responded "Kristen." (D1 280:20-23).

Even the U-5 form disavows that Chip was fired relating to his performance metrics. It identifies "separation relating to performance in the role, non-sales and non-client related" as the termination reason. (R. Ex. 74). The U-5 aligns with the contemporaneous emails and the timeline following Sario's hatchet email — Chip was fired because of Sario.

### 3. MS's HR is a dead stick in the process, providing no checks and balances.

Carriere seemingly played no traditional compliance role typical of a human resource professional. That is, Carriere did not conduct any investigation whatsoever to determine if Sario's allegations against Chip were valid nor did she even direct Power to do so. (D4 171:21-174:9). She did not review any of Chip's previous evaluations or 360s. (D4 173:2-25). Carriere could not identify anything she did to vet whether the motive behind terminating Chip might be discriminatory. (D4 174:18-175:9). Furthermore, Carriere's recollection of the core events around Chip's termination was vacuous. She could provide no details about meeting with Barbara Power regarding the termination decision nor was there any documentation relating to the meeting. (D4 179:4-22). Although there were many other progressive discipline options short of termination, it does not appear that Carriere even broached the topic. (D4 180:12-181:19). Carriere could not identify any other situations where a banker had been terminated for performance, but never been issued a needs improvement evaluation. However, even that anomaly apparently did not raise a red flag for her. (D4 195:20-196:13). Finally, although Carriere claimed MS's preference is to terminate employees in person, no attempt was made to do so in Chip's case. (D4 189:2-190:14).

4. **In yet another irregularity, Power cancelled Chip's initial Year End Evaluation meeting and prepared his evaluation the morning of his termination.**

If nothing else, Power was consistent in not following Company procedure. She cancelled the initial meeting she set up to issue Chip's 2017 annual evaluation just as she had skipped his mid-year and the weekly performance warning meetings. (D1 280:3-12). It stands to reason that if she had relinquished control over Chip's future to Sario that she would not bother to do any of these mandatory managerial tasks.

The 2017 annual evaluation Power completed for Chip is damming from multiple angles. First, although she repeatedly cancelled the scheduled meeting to go over Chip's 2017 evaluation, she still did not prepare it until the day of his termination. Even then, she did not issue it to him. (D1 280:4-13; D8 155:22-156:2). If there was a genuine effort to allow Chip to keep his job based on performance results, Power would have followed through with his 2017 annual evaluation in the normal course. Instead, it appears the evaluation was deliberately delayed and then penned in anticipation of litigation. Second, Power acknowledged she deviated from procedure by adding the term "overconfident" into Chip's 2017 evaluation. Specifically, that section of the evaluation is only supposed to include adjectives used by the 360 reviewers. (D8 156:3-157:21). Third, the 2017 evaluation unfairly attempts to blunt the significance of the positive 360 review by claiming Chip "failed to include critical complex stakeholders." Yet Power had authority in 2017 to add reviewers and failed to do so; and Power further conceded Chip had included "absolutely appropriate" reviewers. (D4 97:17-23; D8 157:22-158:10). Fourth, she cherrypicked from the 360s by completely ignoring the glowing substantive comments by the reviewers in favor of regurgitation of themes from Sario's hatchet email. Finally, Power characterized his 2017 performance as a "poor

year," even as Chip blew his 2016 numbers out of the water and earned a meets/meets expectations that year. (*Compare* R. Ex. 100 *with* Ex. 33).

Not to be undone, Power also plummeted Chip's talent ranking down two scores from a three (between 30% and 70%) to a one (bottom 10%) after having his best performance year. (R. Ex. 132; D8 191:5-192:21). No other banker on the report was moved more than one slot down, let alone after having their best year. (D9 195:10-15).

### G.    Chip is not given any opportunity to resign, take a demotion, or explore other positions.

Unlike Power who was given paid leave to look for a job and permitted to step down to a PB role (an option Cucuzza suggested for Chip as an alternative to termination), Chip was given not given the option to remain in the role and explore other opportunities nor was he given the option of accepting a demotion or resigning. (D1 280:24-281:10; D3 813:18-814:19; D8 153:1-154:10; D9 228:10-19). Power could not even recall a discussion about permitting Chip to resign even as she understood the damage done by having a termination on his U-5. (D1 281:12-282:17; D8 154:3-10). In fact, MS was only willing to give Chip the "soft landing" of working through end of the month, <u>if</u> he signed a waiver and release. (D8 152:15-153:6).

Valletta claimed to be open to assisting Chip find another position, but the way Valletta went about it sounded more like he was checking Chip's references in his previous complex. Valletta reached out to Chip's previous Regional Manager, Ned Quinn, because Valletta "wanted to get some more feedback . . .before making any suggestions." (D9 223:16-224:9) In a quick minute conversation, Quinn did not say anything negative about Chip and instead referred Valletta to the Assistant Regional Manager, Liz Cioffi, who was at the time Chip's peer. (D9 227:1-20). In a couple of minutes long phone call, Valletta allegedly asked Cioffi, "tell me about your working relationship with Chip; how is he as a banker?" and then Valletta added, "I assume you wouldn't

want him back." (D9 109:1-4, 225:17-18, 227:21-2, 229:2-8). What Valletta recounted of Cioffi's alleged response—that Chip "had some talent" but was "kind of middle of the road and . . . had a challenged work ethic and he was kind of lazy—is squarely rebutted by Chip's contemporaneous evaluations, which state the exact opposite. (*Compare* D9 229:9-13 *with* Exs. 2, 3, 4).[5] Indeed, Chip's last evaluation, in which he was 202% percent to goal, stated Chip had "made a commercial impact on our business from the time he joined Morgan Stanley" and forecasted his promotion. (Ex. 4A). Valletta did nothing else to try and find Chip another role. (D9 227:24-228:6).

### H. MS tries to plug the holes in its defense with Jerry Valletta's trial testimony, but he was a bit player who offered little more than outlandish and contracted hypothetical testimony about "what he would have done."

Valletta was just as he described himself: he operated at a "30,000 foot level" looking at the "big picture" across 200 private bankers and a $50B national business. (D8 121:4-122:13, 126:18-21; D9 208:5-7). There is zero documentary evidence that Valletta ever contemplated terminating Chip Randall. Even Power testified that Valletta was not advocating for Chip's termination, and he was not the force behind Chip's termination. In other words, Power all but confirmed that Valletta's attempted late-trial heroics were for show only. (D8 1554:11-20). MS's privilege log does not indicate any involvement with Valletta until January 3, 2018—days after the decision to terminate was made. Furthermore, he is not referenced as being involved at all in the critical emails between Sario and Power where the termination is discussed. (Exs. 131, 71) Valletta could not identify any notes corroborating when he was consulted on the termination or otherwise provide a date. (D9 210:1-5).

---

[5] Quinn's alleged referral, Liz, was never Chip's manager. She was a private banker that teamed with Chip. (D2 399: 17-23). Ironically, Chip covered for Ms. Cioffi's territory (which spanned two additional branches) while she was on maternity leave for 4-5 months and still achieved the highest percent to plan bookings to date. (D1 139:21-140:12; Ex. 4A at 2). Accordingly, it does not appear likely that she would have called him "lazy."

47

Valletta took no initiative to independently investigate the situation with Chip and Sario. Instead, he relied strictly on Power and Cucuzza. (D9 266:22-25). Valletta did not speak with Sario directly about Chip and did not recall being shown any texts or emails corroborating that Sario had told Chip she was unhappy with him. (D9 214:8-216:5). Valletta never asked Power or Sario to provide him any documents, emails, or texts to substantiate that they previously conveyed to Chip any displeasure. (D9 214:23-216:5). Valletta also never circled back with Chip and allowed him to respond to Sario and Power's unsubstantiated claims or permitted him to show emails and texts showing he was receiving positive feedback from Sario. (D9 216:9-14; 221:1-7). Valletta just concluded Chip had been dishonest with him. (D9 106:14-18).

Indeed, Valletta was in the dark on several critical points that he admitted would have been significant to know in evaluating whether Chip should be terminated. He was not even aware that Chip received a meets/meets evaluation in 2016. (D9 190-8-16). He was not aware that Power failed to issue Chip a mid-year review and failed to meet weekly with Chip as directed in the performance warning. (D9 198:15-199:21; D9 212:3-11). Nor did Power did not apprise Valletta of the positive feedback she received from the three branch managers. (D8 129:4-8; D9 213:1-214:12; D9 213:1-214:7). Power also did not inform Valletta that Cucuzza wanted to give Chip more time and had Valletta known that he would have delved further into it. (D9 222:15-223:12).

Valletta also even a basic understanding of the Complex's history as a frame of reference for evaluating Chip's performance. Valletta did not know or consider that Chip inherited what Alex Dunlap described was a "dead market." (D9 168:13-18). He did not know that Chip faced challenges of having an additional state (Georgia) added to his territory and that Chip's coverage spanned a whopping 14 branches. (D9 170:12-25). He was not aware that Chip had "generated a

lot of production with little resources" and grew his market a pace that outpaced his peers." (Ex. 10; D9 175:3-12; 212:3-9).

**I.     The process for replacing Chip raises additional alarms and hardly absolves MS of potential liability.**

The same day Chip was terminated, MS acted to replace him "as soon as possible." However, the position was not filled for eight months; this begs the question: why? (D3: 822:17-20; D8 148:1-8). On paper, Power was the hiring manager, but in reality Sario played a much more active role in filling the position from the get-go. When Power informed Sario of Chip's termination, Power immediately solicited Sario for candidates. (Ex. 93). Thereafter, Sario was actively involved in recruiting candidates to replace Chip. (D6 308:18-21). The very same day Chip was terminated, Sario solicited candidates internally. (Ex. 94; D6 308:22-09:2). Sario also advertised Chip's job on her LinkedIn account stating: "Charlotte Carolina's Complex Private Banker Position available. Please message me . . . Looking for an excited individual to join our team at Morgan Stanley." (Ex. 95) (emphasis added). Sario had never previously used LinkedIn to recruit candidates; thus, illustrating how important filling Chip's role was for her. (Ex. 95, D6 309:11-310:10). In contrast, Power testified that she did not do any recruiting herself.

Although members of Sario's team recommended Michael Black, in late January, Sario advanced a female candidate, Susan Nestor, who replied to her LinkedIn post. (D3 827:13-828:2; D6 310:11-14).  Sario "felt very highly" of Nestor and conveyed her "positive view" to Power and Cucuzza. (D6 313:10-15; D8 160:3-18). Ultimately, there were only three candidates passed on to Power to interview: Nestor, Bush and Black. (D8 160:2-9). Cucuzza's email about Nestor's candidacy clearly reveals it was a three-way hiring decision: "I think the three of us should circle up on where things stand." (Ex. 138) (emphasis added). On March 7, 2020, Power and Cucuzza interviewed Nestor. (D3 828:17-21). Power and Cucuzza both found Nestor not to be a good fit for

the role and thought she was at most a candidate to be an <u>associate banker</u>. (D3 829:8-25; D7 507:6-20).

Chip's ultimate replacement, Jared Bush, was in the cupboard the whole time. However, Power and Valletta had no intention of inserting Bush or Black in the role initially. (D8 147:13-18). Indeed, Sario had expressed her concerns about Bush to Power—the same concerns Sario would later list in his 2018 "360 Review" (lax, reactive, untimeliness, etc.). (D8 162:11-163:23).

In mid-to-late March 2018, Cucuzza and Power assert they nonetheless decided to offer Chip's job to Bush. They obtained Valletta's approval, informed Bush of his selection, and then had to retract the offer. (D9 231:15-233:9). MS asks the Arbitrator to believe that Valletta, a twenty-five-year MS veteran manager, approved Bush's promotion without clearance from his boss, Chad Johnson, and that Johnson effectively nixed the promotion. (D8 163:24-165:15; 196:24; D9 232:20-233:2). This explanation is dubious because it relies on Valletta being incompetent and hapless.

Cucuzza told Chip why his position went unfilled for so long—Sario was pushing unqualified female candidates, so they told her there was a hiring freeze in place. (D2 309:24-310:8). Cucuzza's explanation makes sense. It is undisputed that Sario advanced Nestor who was unqualified, and she also advocated for another female banker, London Crowder, to be promoted to lead banker. Crowder was not qualified to be lead, and Power ultimately promoted her to a private banker role instead. (D8 161:7-16).

In any event, the fact that Bush was ultimately selected was likely the result of litigation considerations. The legal department was consulted within days of Sario's hatchet email—a full month before Chip was even issued the performance warning—and was involved in drafting talking points all along the way. (Ex. 131). Indeed, if there was any question if Chip would take legal

action, it was resolved when Chip did not return the waiver and release by the end of January 2018. (D3 825:9-826:5).

**J.      Bush was not a magic elixir for what ailed the Carolina Complex's banking and lending; in fact, the Complex's performance worsened in his first year.**

MS claims that Bush was promoted in August 2018 because by that point he had established that he was ready for the role, but that contention is belied by record. The Complex was on a major upward trajectory by the end of 2017, but the Complex experienced a substantial contraction in Bush's first year:

|  | **2017**<br>**(Chip's last year)** | **2018**<br>**(Bush's first year)** |
|---|---|---|
| Gross New Balances | $81M in 2016 to $99M<br><br>+22.45% increase<br><br>#13 nationally | $99M to $74M<br><br>-25.11%<br><br>#57 nationally |
| Lending Production | $295M to $383M<br><br>+30%<br><br>#15 nationally | $377M to $369M<br><br>-1.94%<br><br>#28 nationally |

*(Compare* Ex. 116D 13634 *with* Ex. 116D 13635). Indeed, Bush missed "on several key metrics" according to his 2018 annual evaluation. The only reason he hit loan origination percent to goal was because the goal was lowered across the complexes. (Ex. 106D; D9 173:11-16, 246:12-23). Chip likewise would have exceeded the lowered goal based on his 2017 production.

It was not just the numbers. Sario and others expressed serious concerns about Bush in his 2018 360 review. (Ex. 116A; D9 246:21-247:3). According to Sario, Bush's struggles in the role were fundamental:

> Timeliness. Jared needs to make being early and on time a priority. There seems to be a 'lax' attitude about meetings and communication. I hear this from branch managers and the senior leadership team on a regular basis. This makes people feel like he

51

> does not take his role seriously. I have seen improvements, but there
> is still not consistency here.

(Ex. 116A; D6 330:21-25). She also called out his lack of follow up, all of which could create

problems with FAs opening their book of business to him. (D6 330:17-25). Libby Harris also called

out that "Jared needs to learn to not respond that something can be done until he is sure that it can

be done." (Ex. 116 at 418). Hatala stated Bush needed to work on establishing trustful relationships,

something he never observed in Chip's 360. *Id.*

In 2019, Bush's 360 evaluation was permeated by a chorus of even more negative

commentary with Sario leading the charge. (Ex. 117A). The first three adjectives Sario chose were

critical: "overwhelmed, inconsistent, lacks follow up." (Ex. 117A; D6 332:1-8). Similarly, Hatala

led his adjective selection with "overwhelmed," and another commentor described Bush as "lax."

Though Hatala always provided five adjectives to describe Chip, he was apparently short on words

to describe Bush (using only three words in 2018 and 2019) and he offered no explanation why.

(D9: 24:1-24). In 2019, Hatala called out Bush needing to be "more proactive reaching out to FAs

with pending loan situations in an effort to keep them updated on status," and acknowledged at the

hearing that there were frustrations with Jared's productivity and responsiveness. (Ex. 117A at D9

25:21-26:3; 28:7-17; 33:1-34). If Hatala's description of himself as a "sugar coater" on 360's is

credited, Bush's issues were likely much worse.

The feedback from other reviewers also painted a picture of Bush's deficiencies in the basic

blocking and tackling of the role:

- Jared has a tendency to be non-confrontational. He will tell an advisor what they want
  to hear instead of the blunt truth.

- Stay confident. Don't let others cause you to question yourself.

- Jared needs to tighten up on his product knowledge and follow up. To grow the B&L business, he will need to work with the FA's UHNW clients and not allow follow up to go to the side.

- Continue to work on his mastery of our products and services.

Ironically Libby Harris, whom Sario claimed was one Chip's detractors, gave Chip a more favorable 360 review than she did Bush. In fact, her recommendation for Chip to improve effectiveness was a knock-on Chip's APB (Bush and Black at the time):

| Randall 2017<br>360 Review (Ex. 90) | Bush 2018<br>360 Review (Ex. 116A) | Bush 2019<br>360 Review (Ex. 117A) |
|---|---|---|
| • Knowledgeable, goal driven, resourceful, intelligent, professional<br>• Chip is knowledgeable of banking and procedures and responds to your answers in a positive manner.<br>• Chip needs to work with his <u>associate bankers to help them see the benefit of having better relationships with members of the management team</u>. (Emphasis added) | • Talented, sincere, approachable, responsible, respective<br>• Jared is well liked by the FAs and support staff<br>• Jared needs to learn not to respond that something can be done before he is sure that it can be. Gather al the facts and then respond. Get the SM/CRO's involved from the beginning of something instead of them only knowing when it becomes an issue | • Agreeable, approachable, communicative, client focused<br>• Jared is well liked by the FAs and support staff.<br>• Jared needs to continue to work on his policies and procedures. |

## ARGUMENT

**I.    Applying the Supreme Court's Decision in *Bostock*, There is Abundant Evidence that Claimant's Being Male and Over 40 Years Old Caused His Termination.**

**A.    Under *Bostock*, a Plaintiff need only show that his protected status/category was an important enough reason to tip the proverbial scale to termination even if other factors or causes were also in play.**

Separate from the *McDonnell-Douglas* burden shifting test (*see infra* Sections IV-V), the Supreme Court in *Bostock v. Clayton County*, 140 S.Ct. 1731 (2020) relied on the statutory language of Title VII of the Civil Rights Act of 1964 ("Title VII") to determine whether an

employer took an adverse action "because-of" sex in violation of said statute. Title VII provides that it is unlawful for:

> An employer to fail or refuse to hire or to discharge any individual, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, **because of** such individual's race, color, religion, sex, or national origin.

42 U.S.C. 2000e-2(a)(1) (emphasis added). Writing the majority opinion in *Bostock*, Justice Neil Gorsuch made clear:

> Title VII's "because of" test incorporates the "'simple' and 'traditional' standard of but-for causation. . . . [A] but-for test directs us to change one thing at a time and see if the outcome changes. . . . This can be a sweeping standard. **Often, events have multiple but-for causes**. . . . When it comes to Title VII, the adoption of the traditional but-for causation standard means **a defendant cannot avoid liability just by citing some other factor that contributed to its challenged employment decision.** So long as the plaintiff's sex was one but-for cause of that decision, that is enough to trigger the law.

*Bostock v. Clayton County*, 140 S. Ct. 1731, 1739 (2020) (emphasis added) (citing *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2524 (2013)). Using such standard, under Title VII, a plaintiff does not need to prove that discrimination was the only reason for the adverse employment action; he need only show that his protected status/category was an important enough reason to tip the proverbial scale to termination even if other factors or causes were also in play. *Id.* Within his reasoning of "multiple but-for causes," Gorsuch explained by way of example and provided: an employer that has a policy of "firing any woman he discovers to be a Yankees fan" violates Title VII when it enforces the policy because even though the worker's fandom plays a determining role in the decision, her sex is still part and parcel to her firing. *Id.* at 1742.

In turn, Title VII allows a plaintiff to prove his case by a preponderance of the evidence using "direct or circumstantial evidence." *Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711,

714, n. 3, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983); *See also*, *Monk v. Potter,* 723 F.Supp.2d 860, 874 (E.D.V.A. 2010) (holding that a plaintiff may establish a claim of discrimination by demonstrating through direct or circumstantial evidence that sex . . . discrimination motivated the employer's adverse employment decision . . .). The Supreme Court even recognized evidence that a defendant's explanation for an employment practice is "unworthy of credence" is "one form of *circumstantial evidence* that is probative of intentional discrimination." *Reeves v. Sanderson Plumbing Products, Inc.,* 120 S.Ct. 2097 (2000) (emphasis added). And finally, the reason for treating circumstantial and direct evidence alike is both clear and deep rooted: "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003).

**B.      At the Outset, the Scale Tilts Heavily in Claimant's Favor Under the Weight of Institutional Discrimination in Favor of Women at Morgan Stanley.**

**1.      MS Diversity Compensation Plan is facially discriminatory under Title VII.**

Plaintiff was terminated as a consequence of MS's Diversity Bonus Plan because he is a man. "Reverse discrimination" violates Title VII as said statute makes it unlawful:

> For an employer to fail or refuse to hire or discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1). To be clear, Title VII protects white employees from discrimination based on their race; *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 278-80 (1976); and it protects men from discrimination based on their sex; *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 42 U.S. 669, 685 (1983).

Furthermore, under Title VII, a voluntary "affirmative action plan" cannot "unnecessarily trammel" the rights of white employees. *Smith v. Va. Commonwealth Univ.*, 84 F.3d 672, 676 (4th Cir. 1996). Terminating a white male employee to achieve a hiring and/or retention target for women of minorities constitutes such trammeling; as does setting numeric targets "intended to maintain racial [and gender] balance." *Lilly v. Beckley*, 797 F.2d 191, 194-195 (4th Cir. 1986). *See United Steelworkers v. Weber*, 443 U.S. 193, 208 (1979); *Lilly v. Beckley*, 797 F.2d 191, 194-195 (4th Cir. 1986).

Applying *Weber* and *Smith* from above, it is hard to imagine a scenario where MS's diversity plan did not, or would not, trammel the rights of male employees. Because not only did MS intensely track its progress in hiring and retaining women and minorities, but in reality financially incentivized increasing the number of individuals in those groups. For example, the plan "assigned net goals to the three groups (females, African Americans and Latinos) to the complex which then effectively 'trickled down' to the branches through allocations for pluses in certain categories for each." (D5 271:1-11, 271:14-24). The branches were then stack ranked within the complex and complexes stacked against other complexes, as well as compared to the national average for growth. (D4 254:9-11, 255:4-19). In essence, the "more additions in the groupings, the higher the stack rank." (D4 255:20-25). And in turn, MS utilized a "metrics-based diversity award" that "paid out diversity bonuses based on growth on the metrics and based on those stack rankings." (D6 191:22-23, 195:12-17).

More surprising, MS went a step further and added a "punitive" component to the plan where managers would lose money for not attaining diversity metrics. (D4 258:16 – 259:11). Such punitive component was in effect in 2017 and 2018 when Claimant was terminated. *Id.* To illustrate, Martha McNeil—former MS branch manager and member of the National Diversity Counsel—

provided that if a female advisor retired…you got dinged. And so, you had to replace somebody [in the protected group] to counteract a retirement. (D4 252:24-253:8). Accordingly, the Arbitrator should find that any so-called diversity plan that financially *punishes* employees that do not attain diversity metrics, is a plan that inevitably leads to the trammeling of white male employee's rights in violation of Title VII.

The Arbitrator should reject any attempt by Respondent to silo the significance of its facially discriminatory diversity plan. MS has tried to argue that the diversity plan only applied to the "field operations" of the Bank and Chip's termination (as a private banker) would not affect diversity metrics or awards; however, both the private bank and field operations (complex FAs and complex management) are divisions within the Wealth Management Business Unit ("WMBU"). (D5 129:12-130:12). Similarly, there are designated HR staff to the private bank and field operations, but both ultimately report to the head of HR for the WMBU. (D5 132:1-6). So, while the plan did not expressly apply to the bank division, the WMBU's express institutionalization of the discriminatory plan in field operations certainly impugns the business unit overall. This is made even clearer by the fact that MS also created a "Supplemental Diversity Award" that was more qualitative (than the "metrics-based diversity award") and tracked the "level of engagement and quality of the [manager's] efforts toward African-American, Latinos, and females." (Ex. 16 at 1329). Thus, a manager's role in the hiring of a diverse **private banker** would absolutely be something to include in a diversity scorecard in order to raise the Supplemental Diversity Award. (D4 251:9-252:9). Even more tellingly, Sario's Diversity Evaluation forms lauded the Complex Diversity Council she created which was "open to anyone"—not just those in the field office; indeed, Sario included APB Michael Black on said council. (Ex.19; Ex. 164; D6 225:17-25). Accordingly, MS's attempt to

maroon the private bank as a non-entity for Sario's diversity efforts is rebutted by the evidence and not credible.

### 2. Respondent's decision to make the Makers Award female-only and its recipients a "sisterhood" is discriminatory.

Courts have routinely found that voluntary affirmative action plans that provide membership or benefits to only one gender, on its face violate Title VII. *See Smith v. Virginia Commonwealth Univ.*, 84 F.3d 672, 675 (4th Cir. 1996) (finding "an affirmative action plan that provides pay raises to only female faculty members, on its face violates [Title VII])." Here, making it even more evident that MS had a preference for hiring and retaining female employees, starting in 2013, it created a "Maker" award "to annually recognize **women** across wealth management who serve as groundbreakers, innovators and advocates." (Ex. 28) (emphasis added).

The "Makers Award" as a national process is not engineered to be awarded only to women; however, in its iteration at MS, was specifically restricted to women. The Maker Award is not a county fair ribbon; it was "such an honor" available at MS according to Sario. (D6 141:18-21). MS elaborated in its announcement of Makers recipients that "this partnership is a testament to our commitment to being the firm of choice for **women** employees and investors. *Id.* (emphasis added). Even as a practical matter, the women who won the Morgan Stanley Maker's award referred to fellow inductees as being in a "sisterhood"—a clear signal that this award was a female only award. (*Id.* at 11277. 11282, 11361). Power in her hearing testimony even stated it "would surprise [her]" to know that Morgan Stanley, in 2017, utilized the Makers program "to only award or recognize females." (D8 18:12-16). Indeed, even MS admitted that 2018—five years after the inception of the Makers award—was "the first year [it] received *nominations* for men." (Ex. 28) (emphasis added). Put simply, the same year Chip was terminated because he was a white male, MS acknowledge that it had never awarded a Makers Award to a male. Having such benefit and award—exclusive to

women—violates Title VII and further shows MS had an institutional preference for hiring and retaining women over men.

### 3. MS's caricature of its own institutional bias in favor of women in the Margin Games and marketing of its H.E.R.S. score speaks volumes.

MS's institutional bias in favor of women was so ingrained that MS produced the "Margin Games" movie portraying white men as dispensable and women as irreplaceable. (Ex. 25). The aforementioned movie was filmed at MS's headquarters; a script was written and obviously approved; and costs were undoubtably incurred with its production. The fact that Sario was the star of the movie-makes its import unmistakable to the claims-Chip wasn't in the movie, but he might as well have been one of the two men with an arrow in his back.

Resolving any doubt as to MS's institutional priority in favor of women, MS's publicly developed and marketed the H.E.R.S. score, revealing that its promotion of gender diversity was not necessarily philanthropic, but instead geared toward increasing financial returns. (Ex. 26).

### C. Sario's words and actions likewise illustrated her bias in favor of women and younger workers.

### 1. Sario deployed the diversity plan within the Carolinas Complex in a way that evinced her own bias in favor of women.

 Sario ruled with a heavy hand when it came to her branch managers and their acquiesce to the hitting diversity metrics. Indeed, in branch meetings Sario stated that diversity was the easiest needle to move and that they were going to focus on moving that. (D4 264:22-24). She told branch managers "[they] needed to hire so many people and x number of them needed to be diverse candidates" and was "very disgruntled" with McNeil when she hired the most qualified candidates who did not help her diversity numbers. (D4 271:11-272:25). Sario also discussed her numeric goals in complex leadership meetings too. (D5 271:19-23). Sario's sole focus on diversity is made abundantly clear by the fact that, in 2017, Sario's complex was often dead last in the

59

business/revenue metrics, but Sario's complex was rated "Top 5 in diversity" [nationally] with momentum to continue to increase in 2018, and half of her hires were diverse that year. (D6 217:17-25, 226:9-11).

2.    **Sario made repeated statements evincing a bias in favor of women and against older men.**

Sario was at several points brazen in conveying her biases in favor of women and against older males. She openly professed her desire to have an all-female complex leadership team. (D4 265:6-8). She repeatedly talked about having older white men in certain complexes as a problem that needed to be solved. For example, Sario referenced the Greenville branch and stated: "It doesn't look the way we want it to look. We need to get it younger in there, we need to get women in there, how do we do it." (D1 188:4-14). Sario also borrowed from MS's institutional playbook of the women's only Makers Award, to schedule tea party to meet her all female leadership team. Significantly, the tea party was exclusive to female FAs. (Ex. 23). And although it was not a "verbal" statement, Sario's deliberate decision to include a photo of her all-female complex leadership team in her Makers Award promotional materials certainly speaks volumes. Especially given that Chip Randall and Bob Hatala attended complex management meetings and were not included. (D6 235:16-21).

3.    **Sario had a young, hip, fun approach and Disney-like prototype of the people she wanted around her.**

Beyond the words she used, Sario also exuded her preference for youth. Sario emphasized "fun and games" in her meetings that stood in stark contrast to the seriousness of her position. (D4 269:2-270:25). The activities she chose were childish or summer camp-like, such as her attempt to hold a meeting at the Whitewater Rafting Center where she planned to have attendees zipline. (D4 269:12-270:17). Other activities included Sario renting a church van to play music together on a

trip Atlanta, and Sario cajoling Growth Summit attendees to do the "football game wave" for her boss. (D4 270:6-15). At another complex meeting where she was presented a bouquet for winning the Makers Award, Sario gave out different awards in high school like categories, such as "biggest clown" and handed out prizes in bags with pink tissue paper. (D5 29:16-30:9). Ultimately, McNeil concluded "I know that the Disney look is important. And I think she translated that look as being important to her complex. She showed a preference for younger people. She hired only attractive people." (D4 270:5-10).

### 4. Sario's age bias was so evident it prompted Martha McNeil to retire early.

Martha McNeil is no delicate daisy. She rose into management in the financial industry in the 1990's and forged an extremely successful career at MS, punctuated by her receipt of the Makers Award and Regional Diversity Award. (D4 256:22-257:4, 284:5-7). The fact that McNeil retired early from MS in fear of Sario is evidence of the public perception of Kristen Sario's bias and her influence in the firm:

> She [Sario] made me feel like an old irrelevant failure. And it has taken – my career meant a lot to me. I don't do things that aren't meaningful. I don't waste time on it. It has taken a while for me to get back on my feet as far as self-confidence. And then I look at my wall and I look at the accomplishments I had during my career. And I left feeling like an old woman that was going to be fired.

(D4 287:24-288:9).

### 5. Sario made multiple personnel moves in which she hired patently unqualified candidates, while targeting white men in addition to Chip.

Sario's actions in effectively managing out a highly qualified male, Alex Reznikov, and replacing him with a patently unqualified female, Kristan Vlcek, show the depths to which gender drove her decision making. Reznikov was by all accounts a successful ACM, but left MS based on his belief Sario was biased against him and was blocking his advancement (which Sario admitted

was true) and in anticipation that she would terminate him. (D1 194:1-16; D4 280:13-20; D4 288:6-9; Ex. 127 at 0776). Sario made no attempt to retain Reznikov. Instead, she hired Vlcek who every witness acknowledged was either patently unqualified for the job or bad at the job. (D5 267:6-13; D6 231:12-19, D6 234:5-19). The one positive of Vlcek's hire for Kristen Sario—her diversity numbers went up as did her diversity bonus.

Indeed, Sario hiring a highly unqualified Vlcek was not an anomaly. She did the same with Ray Givens, who apparently received special consideration despite being a male because he was African American and under 40. Like Vlcek, Givens did not have the required licenses, but more than that, had not even applied for the Producing Branch Manager position Sario placed him in. And when Givens failed to pass the required licenses, Sario went back to the diversity well and promoted Ebony Moore to be the Lake Norman Branch Manager even though Moore previously just supervised the administrative staff at the branch and had never been an FA. Somehow Sario decided to insert Moore in a position where she was required to supervise FAs. (D6 245:15-246:9).

Sario did not demonstrate her bias just in hiring decisions. She also sheltered and retained female employees with serious performance or conduct considerations, either giving them a free pass or re-assigning them within her complex in a way that benefited her diversity metrics. Although Vlcek's hire and employment was seemingly an unmitigated disaster, Sario simply transitioned Vlcek to an FA role thereby buoying her diversity metrics. Similarly, Sario overruled Martha McNeil's attempt to terminate FA Deidra Marion after she was caught violating MS policy and federal law by duping MS clients to take out ill advised security based loans to finance her boyfriend's mold company. Sario likewise protected Jennifer Ziegler after Chip reported Ziegler's complicity in mortgage fraud, and despite the fact that Ziegler had already proved to be a lightning

rod from a conduct standpoint. Sario again used the trick of making lemonade out of lemons by ultimately removing Ziegler from her producing branch manager role but retaining her as an FA.

## II.      Despite Many Attempted Contortions at the Hearing, MS Cannot Untether Sario from Chip's Termination—She was the Primary Decisionmaker or at the Very Least an Influencer under the "Cat's Paw" Theory.

As a starting point, the Arbitrator need not analyze Sario's decision to terminate Chip under a "Cat's Paw" theory because contemporaneous emails evidence that Sario was not only the impetus in the decision to terminate Chip, but was either "the" decisionmaker or, at minimum, a joint decisionmaker with Power. Power's email to Sario on January 4, 2018 is undeniable: "I hate that you and I have gotten to this point with Chip, but I know our decision to terminate Chip is the right one." (Ex. 72) (emphasis added). Power, in her hearing testimony, further admitted that a reasonable reading of her email was that she and Sario were the ones that made that decision. (D8 146:5-18).

> **Q**.      …a plain reading of your sentence in which you refer initially to hating that you and I have gotten to that place, that a reasonable interpretation of that would be that your -- your reference to "our decision" relates to you and Kristen Sario?
>
> **A**.      "It could be absolutely, yes."

*Id.* Despite Power's aforementioned admission, MS dubiously asks the Arbitrator to suspend basic English comprehension to somehow find that Sario was anything less than a joint decisionmaker in Chip's termination. This cannot be; doing so, would require the Arbitrator to impermissibly grant inferences in Respondent's favor and to completely ignore the plain meaning of the words in Power's email: "our decision to terminate Chip." (Ex. 72).

Even assuming *arguendo* Sario is not a decisionmaker, the evidence exceeds what is required to prevail on this point under the "Cat's Paw" theory. *Staub v. Proctor Hospital*, 562 U.S. 411, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011). In *Staub*, the Supreme Court held that, under the "Cat's Paw" theory, an employer can be held liable for a discrimination even if the ultimate

decisionmaker herself holds no discriminatory animus as long as the plaintiff can demonstrate that her decision was influenced by another who does hold such animus. Expanding upon *Staub*, both the First and Second Circuits have held:

> [a biased employee] who was not a supervisor d[id] not necessarily absolve [the employer] of potential liability for [the plaintiff's] discharge, because there was no basis to believe that *Ellerth's* acceptance of employer liability premised on a finding of negligence should be limited to…supervisory employees.

*Vasquez v. Empress Ambulance Service, Inc.,* 835 F.3d 267, 274 (2d Cir. 2016) (citing *Velazquez-Perez v. Developers Diversified Realty Corp.*, 753 F.3d 265, 273 (1st Cir. 2014) (alterations in original); *see also Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 290 (4th Cir. 2004) (holding "Title VII and the ADEA do not limit the discrimination inquiry to the actions or statements of formal decisionmakers for the employer.").

Applying the holdings in both *Vasquez* and *Valezquez*, the Arbitrator should find that Sario's discriminatory preference influenced Power and by extension Valletta in his cursory approval of the termination recommendation. As Complex Manager, Sario effectively ruled the fiefdom in which Chip worked; he was officed in her building and his job was to provide banking and lending services to her and her team. Although Power was Chip's boss on paper, the contemporaneous emails demonstrate that Power all but genuflected to Sario when it came to banking in the Complex.

In addition, the contemporaneous emails and trial testimony leave no doubt that Sario caused Chip's termination. Her bullet point email was the catalyst, and the emails show Sario remained in the driver's seat with Power the rest of the way. (Ex. 71). In fact, during hearing testimony, Power elaborated:

> **Q.** So you acknowledge that you were, you know, relying on and even soliciting Kristen Sario's opinion of Chip Randall in making a decision around his termination, correct?

> **A.**    I needed her input around his performance, specific to the
> concerns and the action plan, yes.

(D8 141:17-22). Most importantly, Power even admitted that had Sario not sent the bullet point

email and all other factors remaining the same, she would **not** have terminated Chip:

> **Q.**    **Assuming that Kristen Sario had never sent that bullet
> point e-mail**, okay, and lets just assume the feedback from
> Kristen Sario was effectively the same as you got in 2016,
> okay? And Carolina's complex finishes at 93 percent, the best
> it had ever finished. **Would you have terminated Chip
> Randall; yes or no?**
>
> **A.**    **Probably not. I would have given it more time.**

(D8 184: 9-17) (emphasis added). Power's above admission seals the issue— Power did not make

an independent decision to terminate Chip; she was ultimately in league with Sario and Sario's

discriminatory bias flowed through her.

Valletta's role as an approver of the "recommendation" is no prophylactic to Sario's

influence.  Valletta admitted he operated at a 30,000 feet altitude with a national focus and that he

simply deferred to Regional Managers on personnel decisions given their day-to-day access to the

bankers and the complex manager. (D8 126:16-21). Indeed, Power testified Valetta was "not the

force" behind Chip's termination; instead, she was the one who made the recommendation and

presented the information to Valletta and HR. (D8 154:11-20). Valletta did not conduct his own

due diligence regarding the matter and was in the dark as to several critical facts. (D9 266:22-25).

In fact, the privilege log and contemporaneous emails show Valletta was not involved until well

after the termination decision was made, and he identified no documents to support that he played

any greater role in the decision or that he would have fired Chip absent Sario's influence. (Exs. 131,

71).

**III.    While Claimant has Proven Sex and Age Discrimination Based on the Institutional
Bias and Sario's Individual Bias, Claimant Otherwise Prevails on both his Sex and**

**Age Discrimination Claims Applying the *McDonnell Douglas* Burden Shifting Framework.**

**A.      Claimant easily establishes his non-onerous prima facie elements.**

Under the *McDonnell Douglas* framework, a plaintiff's burden to make a prima facie case is "not onerous." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *Sassaman v. Gamache*, 566 F.3d 307, 312 (2d Cir. 2009) ("The Supreme Court has used the adjective 'minimal' to describe the burden of establishing a prima facie case of discrimination in violation of Title VII, and we have likewise held that the 'plaintiff's burden of establishing a prima facie [Title VII] case is de minimis.'" (citations omitted)). The Arbitrator should be careful not to treat the prima facie burden as a seawall for the defense; it is not meant to be:

> The prima facie requirement for making a Title VII claim "is not onerous," *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089, and poses "a burden easily met." *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987). The prima facie phase "merely serves to raise a rebuttable presumption of discrimination by 'eliminat[ing] the most common nondiscriminatory reasons for the [employer's treatment of the plaintiff].'" *Hollins v. Atlantic Co.,* 188 F.3d 652, 659 (6th Cir.1999) (quoting *Burdine,* 450 U.S. at 253–54, 101 S.Ct. 1089). It is "only the first stage of proof in a Title VII case," and its purpose is simply to "force [a] defendant to proceed with its case." *EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 861–62 (6th Cir. 1997). This division of intermediate evidentiary burdens is not meant to stymie plaintiffs, but simply serves to "bring the litigants and the court expeditiously and fairly to the ultimate question." *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089.

*Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000).

Claimant agrees that the first three elements are: (1) membership in a protected class; (2) satisfactory work performance; and (3) adverse employment action, all of which are easily established here. Chip is in a sex and age protected class and his termination constitutes an adverse action.

The second element merely prompts a plaintiff to show by a preponderance of the evidence that he met the employer's legitimate job expectations, which again is not meant to be onerous. Where the plaintiff proves discrimination through pretext, the plaintiff is inherently attacking the "legitimacy" of the job expectations. *Hill v. S.E. Freight Lines, Inc.,* 523 F. App'x 213, 215 (4th Cir. 2013). Courts do not get caught up on analyzing job expectations in a prima facie case where, as here, a plaintiff makes a showing that a defendant's evidence is pretext which challenges the legitimacy of the expectations causing plaintiff's termination. As the Seventh Circuit observed in *Brummett v. Lee Enterprises, Inc.,* 284 F.3d 742, 745 (7th Cir. 2002):

> A plaintiff may be able to meet the second part of the prima facie case without showing that he met his employer's legitimate expectations. As we explained in *Fuka v. Thomson Consumer Electronics,* 82 F.3d 1397, 1404 (7th Cir. 1996), an individual who meets the other criteria for a prima facie case and also demonstrates that the employer's legitimate expectations were themselves pretextual can survive the first prong of *McDonnell Douglas.* Under those circumstances, the prima facie case is subsumed into one of establishing pretext under *McDonnell Douglas*'s third prong. We have also considered this merger analysis appropriate in cases where the reason for the employee's termination was alleged to be a sham designed to hide the employer's discriminatory purpose.

Accordingly, the Arbitrator should analyze this element by considering the mountain of evidence set forth in the pretext analysis of this brief. *See infra* Section III.C.

Either way, Claimant has marshalled ample evidence to establish that he was in fact meeting the employer's legitimate performance expectations. Chip received favorable evaluations his entire career at MS, including in Power's evaluation of him issued in January 2017. Cucuzza, had many glowing things to say about Chip and commented on how well Chip was doing just months before his termination. (D3 761:21-764:17; Ex. 49). Power's own emails, even after the performance warning, reflect Chip's positive performance as well. (*See e.g.,* Ex. 47; D8 87:6-25). And then there are the numbers: Chip's gross new balances, which measures actual revenues compared to the

previous year, increased by 22.45% (13/138 nationally); Chip's net balances increased by a whopping 15.94% from $390,333,000 to $452,564,000 (9/138 nationally); and he achieved 92.79% to goal in lending production (the highest production in that complex ever and up from 52.44% when Chip first took over the Carolinas Complex). Chip's production increased 29.90% from $295,020,000 to $383,242,000 (15/38 nationally) (D8 168: 8-21). More importantly, Chip's numbers in 2017 were much stronger than his numbers in 2016 when he was issued a "meets/meets" on his annual performance review. and Sario was impressed with him. (Exs. 33, 54; D6 268:3-7). Accordingly, it is evident that Chip was meeting Respondent's legitimate job expectations and has therefore satisfied this element of his prima facie case.

The fourth element of Chip's prima facie case warrants more discussion than the previous three because it has been articulated in slightly different iterations under both the ADEA and Title VII. This element does not require plaintiffs to show that someone outside of the protected class was treated more favorably or replaced by some outside his class "if the plaintiff can introduce other circumstantial evidence of discrimination." *Gordon v. Holy Cross Hosp. Germantown, Inc*., 385 F. Supp. 3d 472, 480 (D. Md. 2019), *aff'd*, 780 F. App'x 84 (4th Cir. 2019), cert. denied, 207 L. Ed. 2d 176 (June 8, 2020) (*citing See Bryant v. Aiken Reg'l Med. Centers Inc.*, 333 F.3d 536, 545-46 (4th Cir. 2003).

Chip has marshalled an array of circumstantial evidence of discrimination, irrespective of a comparison of the treatment of others, by virtue of the MS institutional discrimination and the multi-layered evidence of Sario's own bias. *See supra* Sections I. B-C.

Assuming some modicum of disparate treatment evidence was required, Chip has that in spades too, which is detailed in Section III. D below. For example, Stacey Herring, Carole Yielding, and Debbie Booth, Chip's female peers, and Fernandez (under 40) were all performing worse that

he was, but none of them were terminated. Moreover, with respect to Chip's ADEA claim, he eventually replaced by Jared Bush—someone "substantially younger."

**B.** **Respondent's Legitimate Non-Discriminatory Reason ("LDNR") is slippery and has shifted.**

Throughout this matter, MS has taken a shotgun approach to defending its dubious decision to terminate Chip. At first, Respondent proffered that it terminated Chip because he was not "able to establish a positive relationship with the complex." (Ex. 73). Indeed, Chip's U-5 form indicated that his separation related to "performance in the role, *non-sales, and non-client related*." (Ex. 74) (emphasis added). However, Respondent later (in its Motion for Summary Judgment), changed its reason for termination to "poor job performance" and "missing his objective production metric and ranking among the bottom of his peers" (i.e., *sales* metrics) which was in direct contradiction to the U-5 form it had previously issued. This type of strategic retreat or recasting of reasons for a termination are themselves compelling evidence of pretext as discussed in detail below. In addition to the array of institutional and Sario specific evidence of bias, there are at least seven (7) independent reasons upon which the Arbitrator could find pretext.

**C.** **Claimant marshals a barrage of pretext evidence.**

At the pretext stage, a Claimant does not have to prove that he was in fact fired because he is a male or due to his age, he simply has to offer evidence from which a reasonable inference can be drawn that Respondent's proffered reason for the termination is false or not credible. *See Burgess v. Bowen*, 466 F. App'x 272, 277 (4th Cir. 2012) (citing *Reeves v. Sanderson Plumbing Prods. Inc.,* 530 U.S. 133, 120 S. Ct. 2097, 147 L.Ed.2d 105 (2000). The entire premise of the *McDonnell Douglas* standard is that a fact finder can infer a discriminatory motive because it has effectively disbelieved the employer's alternative explanation as is the case where the reason for termination is not by the record evidence. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 256

(1981) (holding that Plaintiff may succeed in his burden of persuasion by indirectly showing that the employer's proffered explanation is unworthy of credence); *see also*, *Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) ("[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination even without further evidence of defendant's true motive.").

### 1. Respondent's changing reasons for terminating Chip is evidence of pretext.

When an employer makes substantial changes to its proffered reasons for discharge over time, an inference of pretext is allowed. *Haynes v. Waste Connections, Inc.* 922 F.3d. 225-226 (4th Cir. 2019); *Wesley v. Arlington Cnty.,* 354 F. App'x 775, 783 (4th Cir. 2009) (holding a reasonable jury could find [defendant's] shifting explanations and reasons for its decision not to promote [plaintiff] are mere pretext for discrimination). The Court has reasoned that shifting and inconsistent explanations given by the employer can be inferred as pretext because they are often developed over time to counter evidence suggesting discrimination. *E.E.O.C. v. Sears Roebuck & Co.,* 243 F.3d 846, 853 (4th Cir. 2001) (citing *EEOC v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir. 1994).

Here, Respondent has not just shifted, it has attempted an extreme makeover of its initial reason for termination. Respondent's own termination script states Chip was for being "[un]able to establish a positive relationship with the complex." (Ex. 73). Immediately after that meeting, Allison Carriere confirmed with Chip that he had been fired because he had a "Kristen problem." (D1 280:20-23). Then in a U-5 form, Respondent confirmed and described Chip's termination as "separation relating to performance in the role, *non-sales, and non-client related*." (emphasis added). Furthermore, Power admitted in the termination call that Chip had decent performance metrics, but that he was nonetheless terminated because he "managed to lose the confidence of the wealth management partners." (D8 278:6-16).

In litigation, Respondent has effectively tried to un-Sario the termination, in favor of a version where the termination is rooted in "missing his objective production metrics (i.e., sales) and ranking among the bottom of his peers." (D8 182:6-20). Even Valletta chimed in that the decision to terminate Chip was because "the numbers weren't there…the trends were the same…the overall performance was towards the bottom." (D9 64:20-24). The reason for this strategic retreat is obvious—Sario is blighted with pock marks evincing bias, as is MS. However, such seismic shifts, especially when revealed to be for tactical reason, constitute fertile ground for disbelieving the employer's story writ large and inferring discrimination, which is what the Arbitrator should do.

## 2. Respondent's game of musical chairs about who actually decided to fire Chip is evidence of pretext.

The documents show that Sario was in effect the primary decisionmaker or at the very least a joint decisionmaker in Chip's termination. The Arbitrator need only read Respondent's original Answer to reach this conclusion; it describes Sario as the "the Carolina Complex Manager and decision-maker..." (R. Answer at 2) (emphasis added). Moreover, Sario's position of prominence in Chip Randall's termination is shown by contemporaneous emails where Power is actively soliciting and relying upon Sario's input and the explicit fact that Power and Sario jointly decided to fire Chip. (Ex. 72). There is no documentary evidence to suggest that Valletta did anything more than rubber stamp the termination after the decision was already made. At the hearing, MS thrust Valletta into the line of fire making bold, unsubstantiated claims exaggerating his involvement. Curiously, though, Valetta's name was not mentioned a single time in Respondent's Answer, and Respondent's Motion for Summary Judgment merely makes the unremarkable point that "Valletta had to approve the discharge decision." (R. Mot. at 22).

While insulating Sario from the decision to terminate Chip helps to inoculate Respondent from her discriminatory statements, the fallacy of the attempt whipsaws with devastating

consequences on pretext. That is, courts have long held that an employer's inconsistent or implausible position on decisionmaker identification can cause a reasonable jury to reject the proffered LNDR. *See Christensen v. Titan Distib., Inc.*, 481 F.3d 1085, 1095 (8th Cir. 2007) (holding "none of the [employer's] decision-makers who testified at trial were willing to accept responsibility for making the [employment] decision," and this was evidence contributing to the conclusion that a reasonable jury could find the [employer's] asserted reason as pretextual). Similarly, in *Turner v. Kansas City S. Ry. Co.*, 675 F.3d 887, 902 (5th Cir. 2012), the court held that "by misidentifying the relevant decisionmaker for so long, [the employer] has not acted to bring us expeditiously and fairly" to the ultimate question of whether the defendant intentionally discriminated against the plaintiff. Accordingly, the court in *Turner* found that the employer had not met its burden of producing LNDRs that motivated the actual employment decisions at issue. *Id.* at 904. Like the courts in *Christensen* and *Turner,* the Arbitrator should also find that Respondent's game of musical chairs on who actually made the decision to terminate Chip is evidence of pretext.

### 3.    Respondent's LNDRs suffer a chronic lack of supporting documentation.

Judges and juries expect to see a paper trail justifying and corroborating an employer's proffered LNDR, especially when performance is at issue. *Laxton v. Gap Inc*., 333 F.3d 572, 580 (5th Cir. 2003) (in ruling for plaintiff in Title VII claim, the court noted "[the decisionmaker] testified that she made multiple calls to assistant managers and that employees lodged numerous complaints against [plaintiff]. Yet [defendant] produced no contemporaneous written documentation of any employee complaints, despite testimony that the corporation abides by rigorous record-keeping policies)." When an employer has no documents to support its claim that an employee was a poor performer, but the normal application of its policies and procedures should

have created such documentation, a jury could reasonably disregard the employer's claim as merely an "afterthought" and not the true reason. *See Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 137 (2d Cir. 2000). Any evidence that tends to prove the proffered reasons are "post hoc" justifications should satisfy the employee's burden to show pretext. *See Plotke v. White*, 405 F.3d 1092, 1102 (10th Cir. 2005).

Other than the hatchet email and the performance warning that followed (which are removed as discriminatory precursors to termination), Respondent's case for Chip's termination is utterly lacking for documentary support. Both Sario and Power reported in their testimony that they were copious notetakers, but neither of them could marshal a single-entry corroborating Chip's alleged performance problems. For example, Sario provided in her hearing testimony:

> **Q.**  So your answer is, you don't have and you can't point out to the arbitrator any note that you ever took to corroborate any of the complaints that you claim you received regarding Chip Randall; correct?
>
> **A.**  I do not have notes to share with you.
>
> **Q.**  What about electronic notes? A word document or something that you created. Can you point to even a Word document to corroborate any of the complaints you say you received from Chip Randall -- or about Chip Randall?
>
> **A.**  You would have to corroborate them with the source. **I do not have notes to provide you.**

(D6 291:3-21) (emphasis added). Power's testimony showed that she suffered the same documentation deficiency:

> **Q.**  Now, can you identify for us any document -- and I'm not asking about emails that you sent Kristen Sario or she sent you. I am asking about any documents that you created memorializing any instance in which you claim met with Chip Randall and raised that he had, I guess, a problem with his relationship with Kristen Sario or with his relationship with other complex partners? Because I haven't seen them.

**A.** Okay. If I did, you would have seen it. So I am not sure.

**Q.** I'm moving to Exhibit 147. All right. Now, this is the e-mail that Kristen sends you on September 12, 2017 (referred to as the "hatchet" email above). Ma'am, prior to September 12, 2017, and I have spent a good amount of time showing you positive emails from Kristen Sario. Can you identify any email Kristen Sario sent that was negative or critical about Chip Randall?

**A.** Not if it's not been provided. I cannot think of any in particular that were emails.

(D7 559:22-560:7; D8 97:2-6). Instead, Sario resorted to depicting a veritable uprising from her complex and among branch managers against Chip's continued employment so much so that she claimed to "lose credibility with her senior leadership team"; Valletta, too, ominously lamented a wholesale withdrawal of support from a large subset of FAs. (D6 78:21-22; D9 111:8-10; 165:17-19). Yet, neither Power, Sario, nor Valletta could point to a solitary email or document corroborating these alleged crises. (D6 290:19-291:2). MS's gambit in this regard is akin to telling the Arbitrator it just stormed all day, but seeing no puddles in the pavement.

Instead of providing documentary support for Chip's termination, Respondent is relegated to attempting to resurrect Dunlap's August 2015 performance warning of Chip. However, that warning was dead and buried as evidenced by Dunlap calling Chip's work the rest of that year (2015) a "triumph" and worthy of the "hustle award." That year, Chip even received a $50,000 discretionary bonus for his performance. (Exs. 12, 13; D9 180:10-25). Furthermore, Dunlap's warning had nothing to do with Chip's relationships issues in the complex—it was solely numbers driven. to do Given the total lack of supporting documents in the lead up to Chip's termination, the Arbitrator should find Respondent's contentions are merely "post hoc" justifications and thus unworthy of credence.

4. **Facing a stiff headwind of positive numbers, and drastic improvements from 2016 when Chip met expectations, MS resorts to cherry picking one metric.**

Respondent's contention that Chip was terminated based on his production metrics/sales is not supported by the evidence. To be sure, not a single "talking point" (Ex. 73) in the termination conversation with Power mentioned production/sales issues, much less a "percent-to-goal" issue, nor did the September 2017 "Action Plan" (Ex. 61). Moreover, Power admitted that she did not even wait for the 2017 year-end performance metrics to be released before deciding to terminate Chip. Because of that, Respondent now dubiously asks the Arbitrator to focus only one metric—percent-to-goal—as its LNDR. However, the Arbitrator should find that Respondent's post hoc, cherry picking of one metric to justify its termination of Chip is evidence of pretext.

MS tracked and evaluated bankers on a myriad of metrics, but in litigation Respondent now asks the Arbitrator to ignore all but one metric: the percent-to-goal. *Cook v. CSX Trans. Corp.,* 988 F.2d 507, 512 (4th Cir. 1993) ("[T]o focus on one piece of the record without considering the whole would distort the permissible inferences to be drawn."). Even Respondent's own evaluations do not connote more significance to percent-to-goal; for example, Respondent's 2017 mid-year review specifically measured many additional metrics: gross balances, net balance growth, new loan production, product mix, deposit growth, and pipeline. (Ex.1).

While MS asks the Arbitrator to myopically focus on loan origination percent to goal as the "big kahuna", MS's own documents indicate it is on equal footing and considered in concert with other metrics for purposes of evaluating bankers. (D5 171:18-172:5; D7 566:24-567:5). In fact, the "2017 Private Banker Compensation" document lists: gross balances (new money borrowed) and net new balance growth (how much money was outstanding after accounting for loans being paid off) before new loan production (which does not indicate actual revenues); and as Valletta acknowledged "they are all important . . . that is why they are on there." (Ex. 166; D7 565:21-

566:23; D9 268:23-269:3; D1 126:11-127:8). That prioritization makes sense because gross balances and balance growth indicate actual revenue to MS, whereas new loan production just reflects the opening of new loans, which are revenue neutral if the loans are not exercised. (D1 123:22-127:8; D3 771:10-15 D5 132:18-20).

Furthermore, "number of units" are "among the most meaningful metrics" because that "velocity" shows how active the banking business is overall in the market and reflects a lending culture among FAs broadly (D7 567:12-21; D1 93:14-94:7; D1 100:11-12; D1 118:15-18). Driving a large number of units involves a tremendous amount of work from the banker; it would be easier just to focus on closing larger loans. (D1 101:5-12). It is critical to look at units and actual loan production (percent to goal) together. *Id.* For example, a banker could hit his percent to goal on a small number of ultra-high net worth loans and then rest on his laurels with low unit volume, which is not a desirable result for MS. (D1 93:22-94; D7 568:11-20).

Had Respondent evaluated Chip on all the metrics, Chip was among both the complex's (and the nation's) top performing bankers that year. In fact, in 2017, Chip had almost double the national average for growth (22.45% increase), ranking 13th out of 138 private bankers for growth; 9th in the nation for net balances; and 15th in the county for lending production. (Ex. 75; D8 168: 8-21). Importantly, Chip's numbers in 2017 were much stronger than his numbers in 2016 when he was issued a "meets/meets" on his annual performance review. (Ex. 33). Therefore, the fact that Respondent cherry-picked one metric—conveniently, the metric in which Chip's numbers happened to be the lowest—to best support its LNDR, is evidence that its expectations were a "sham designed to hide the employer's discriminatory purpose." *Warch v. Ohio Cas. Ins. Co.,* 435 F.3d 510 (4th Cir. 2006).

Finally, focusing only on percent-to-goal (which should not be the case because Respondent has yet to produce a single document showing it relied on the "percent to goal" metric to terminate Chip) Chip had his best year ever and was leaps and bounds better than what he had achieved in the previous three years. If Chip "met expectations" on his evaluations in 2014 (82.9%), 2015 (87.7%), and 2016 (72.4%), it follows that he would once again meet expectations at 92.79% in 2017—his best year yet. Respondent's argument that Chip was terminated because he did not hit 100% is misplaced. Only a handful of complexes ever achieved or exceeded 100%: 2013 (5 of 12), 2014 (5 of 12); 2015 (4 of 12) and 2016 (4 of 12). (D8 170:21-172:3; D9 238:3-240:10). Thus, the fact that Chip did not "meet expectations" after his best year in percent to goal, suggests there was another factor in the mix. The emails show that "other factor" is Sario. Indeed, courts have found that contradictions between yearly performance evaluations and the proffered non-discriminatory reasons are sufficient to prove pretext. *See EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 408–09 (4th Cir. 2005) (prior satisfactory performance evaluations can be evidence that a more recent claim of poor performance is pretext for discrimination); *Worldwide Network Servs., LLC v. Dyncorp Int'l, LLC*, 365 Fed.Appx. 432, 442–43 (4th Cir. 2010) (same); *Moss v. City of Abbeville*, 740 F. Supp. 2d 738, 747 (D.S.C. 2010) (where plaintiff had positive performance reviews and there were no intervening poor performance reviews prior to termination, a reasonable jury could conclude employer's stated reason for termination was pretextual).

**5. Power's repeated failure to follow Company policy in Chip's performance warning, 2017 mid-year review and 2017 annual review is evidence of pretext.**

Deviations from company policy or procedure are also classic fodder for pretext. *Stiles v. General Elec. Co.*, 1993 WL 46889 at *4 (4th Cir. 1993) (holding that evidence indicating that Defendant failed to follow established [Company] procedures helped Plaintiff to raise a genuine

dispute over whether [defendant's] stated reasons for his discharge were pretextual); *Hamilton v. 1st Source Bank*, 895 F.2d 159, 162 (4th Cir. 1990) (same)*; Greer v. Paulson,* 505 F.3d 1306, 1319 (D.C. Cir. 2007) (an employer's failure to follow its own procedures may be evidence of pretext).

Here, Respondent first deviated from Company policy when it failed to issue Chip his 2017 mid-year review. Power and Cucuzza both acknowledged that mid-year evaluations are required; their purpose is to examine how the PB is trending and to notify them of any deficiency or weakness so they have an opportunity to improve. (D3 730:15-731:5). In June 2017, Chip prepared the self-assessment portion of the mid-year review, but Power did not do her job and conduct a mid-year review with Chip. (Exs. 1, 45; D1 234:4-10; 280:4-6). That is, if the mid-year review was completed it would have contained employee <u>and manager</u> comments, which would indicate any managerial disagreement with the PB's self-assessment. (D8 76:8-24; D9 124:9-125:2) (emphasis added). There were no manager comments on Chip's 2017 mid-year review. (Ex. 1). Instead, Power meekly testified that she "thinks" she issued one to Chip. (D8 78:22-79:4). Therefore, like *Stiles* and *Hamilton*, the Arbitrator should find that Respondent's failure to issue Chip's mid-year review, as required by its own policies, evidences pretext. *See also Tuttle v. Metro. Gov't of Nashville*, 474 F.3d 307, 319–20 (6th Cir. 2007) (employer's failure to timely complete plaintiff's performance review in accordance with its required procedures was evidence of pretext for ADEA claim).

Along those same lines, on or about October 16, 2017, Power emailed Chip a written performance warning back dated to October 12, 2017 and asked him to sign it. (Ex 62; Ex. 63; D1 265:24-266:3). Notably, Power skipped over providing Chip a verbal warning first, which is the first step in MS's progressive discipline policy. (D4 184:5-8). Once more, Company policy was deviated from when Power completed Chip's 2017 annual review the same day he was terminated (D8 155:22-157:2). Even more egregiously, Power deviated from Company policy by "insert[ing]

an adjective in [Section] A that was not on the 360" on Chip's 2017 annual evaluation. Specifically, Power testified:

> **Q.** ...So you told me that it is inappropriate for a manager to insert an adjective in 2A that isn't in the 360. I have shown you the document and confirmed for you that **"overconfident"** is not an adjective in [the] 360. Do you acknowledge that --
>
> **A.** I do.
>
> **Q.** -- you should not have inserted that adjective into this evaluation based on your earlier testimony?
>
> **A.** I -- I would acknowledge that, yes.
>
> **Q.** And that would be **a deviation from that policy or procedure when it comes to these evaluations, correct?**
>
> **A.** **I would assume so, yes,** unless is shows up in [the] 360 somewhere.

(D8 157:6-21) (emphasis added). All of the above shows that Power repeatedly failed to adhere to Company policy when issuing mid-year reviews, performance warnings, and annual reviews—all critical documents in justifying a termination. Such failure to adhere to Company policy is further evidence that Power had no intention of allowing Chip to remain employed after Sario expressed her displeasure with Chip and should be viewed as pretext.

> **6. Chip being terminated after he continued to improve upon his performance equates to pretext**.

Respondent has repeatedly attempted to portray Chip's performance as poor and has particularly honed-in on Chip's failure to improve in an attempt to support Power and Sario's decision to terminate Chip. In reality, Chip was significantly improving upon his performance when he was terminated, which is evidenced by numerous performance metrics. Indeed, in 2017 (as compared to 2016), Chip had a 22.45% increase in gross new balances (13/138); 15.94% increase

in net balances (9/138); 29.90% increase in lending production (15/138); and, was at 92.79% for percent to goals as compared to 72.29% in 2016. (Ex. 106C; Ex. 106D). Predictably, Respondent refuses to acknowledge Chip's 2017 improvement in every metric provided in the aforementioned exhibits and, and instead, makes broad and inaccurate misstatements claiming the Chip's performance was suffering. Yet, Respondent has been unable to identify any other banker that was fired after having their best year. (D3 819:1-6).

Even outside of the metrics, Respondent fails to represent the overwhelmingly positive feedback Chip was receiving throughout the year. For example, the email traffic throughout February all the way through July was uniformly positive about Chip's performance. On February 17, 2017, Power was bullish, telling Chip, "this is your year my man." (Ex. 40). Following a meeting with Chip and Valletta, Power emailed Chip on April 21, 2017 and stated, "I left re-energized around the work you and your team have on the plan. I know you will execute" and Valletta echoed her optimism (Ex. 41; D1:26-23; D7 357:15-21; D9 194:9-17). Sario was also extremely upbeat about banking, emailing Power on March 8, 2017, that there was "so much momentum with my banking team." (Ex. 39). In June 2017, Power prepared a favorable Talent Review Ranking for Chip in June 2017. (Ex. 90A; D8 83:15-85:9). She lauded Chip as having creative thinking and being innovative, rated him as "high" for demonstrating flexibility and motivation to move into a different role," and "welcome[ed] opportunities for development." (Ex. 90A). She ultimately placed Chip in the overall grouping "at potential / average performance." *Id.* Even in September 2017, Sario and Power expressed positive feedback to Chip. On September 9, 2017, Sario emailed "happy feet are doing a little jam right now" in response to Chip and the complex being #2 in nation on CD stack. (Ex. 58 at 9993*).* Finally, on September 18, 2017, Sario

emailed "incredible!" in response to a Chip update. (*Id.* at 10187). Power was also very positive in informal feedback she provided Chip, as was Sario. (D1 238:1-9).

> **7. Respondent's LNDRs are rebutted by a deluge of contemporaneous positive emails, contrary documentation, and otherwise plagued thoroughly impeached testimony by Respondent witnesses.**

Contemporaneous documents that belie alleged performance or conduct issues are often fatal to a respondent's defense because juries rightly credit the documents over *post hoc* testimony. Here, the fact finder could walk across the English Channel stepping on laudatory emails sent from the alleged decisionmakers regarding Chip Randall—many sent in the same year and even weeks before Chip was terminated. (*See e.g.,* Exs. 47, 52, 53). Even more convincing, Chip's 2017 360 review created on or around October 20, 2017 (the last formal review issued prior to his termination) was uniformly positive. (Ex. 90). In an attempt to minimize the volume and veracity of such positive contemporaneous documents, Respondent put forward several key witnesses that provided contradictory statements to the aforementioned documents. The Arbitrator should find such post hoc testimony unpersuasive and not credible.

> **a. Sario points to complaints by Vicki Strine and Libby Harris that are rebutted by the evidence.**

Sario testified that Libby Harris and Vicky Strine complained about Chip (to her) and were against Chip even participating in leadership meetings. (D6 332:12-22.) Yet, Harris's 360 of Chip was positive. (Ex. 90). She described Chip as "knowledgeable, goal driven, resourceful, intelligent and professional" and that "Chip's knowledge of banking procedures and responds to your answers in a positive manner." *Id.* Even Vicki Strine's testimony about Chip at trial was positive. For example, she testified that "Chip and I had a good rapport" (D5 212:3) and agreed with Sarios's adjectives in the 2016 360 review describing Chip as responsive, credible, friendly and reliable. (D5 217:8-14; D6 332:17-22). Ironically, the actual documents show it was Bush that Strine and

81

Harris had problems with—not Chip. While saying positive things about Chip on his 360, Harris stated that "Jared needs to learn to not respond that something can be done until he is sure it can be…" and "Jared needs to continue to work on the policy and procedure at MS." (*Compare* Ex. 90 *with Ex.* 116A; Ex. 117A).

### b. Respondent's witness Bob Hatala twisted himself in knots trying to disarm two years of highly complimentary 360 reviews of Chip Randall to support Sario's strained claims of FAs not supporting Chip.

Charlotte SouthPark Branch Manger Bob Hatala found himself in common company with every other person who reviewed Chip Randall on a 360 Review—he was extremely laudatory of Chip. Respondent created its own undoing when Kristen Sario portrayed Bob Hatala and many of his FAS being extremely unhappy with Chip (D6: 78:1-15), despite the 360 reviews saying otherwise. Respondent called Hatala to effectively impeach his own 360 reviews of Chip. In doing so, Hatala provided the Arbitrator even more fodder for disbelieving MS's defense and thereby finding pretext. In particular:

- Hatala made a dubious reversal regarding his desire to have Chip officed in his branch. It is undisputed that Hatala initially requested Chip to be officed in his branch. (D8 208:2-3; D3 616:4-12.) However, Hatala and Sario claimed, he subsequently rejected Sario's request to move Chip to that office because Chip "pisses the advisors off." (D6 78:1-15). Hatala's trial testimony of wanting him then not wanting him is suspicious because in both of Hatala's 360s when asked what he would suggest Chip do to improve effectiveness, he requests Chip spend more time with his financial advisors. Indeed, in 2016 Hatala stated, "Chip's talent is his approachability. Continue to leverage this by increasing visibility with the financial advisors", and in 2017 he listed "more visibility in the branch." (Ex. 30 at 315; Ex. 90 at 336).

- Hatala further tried to wipe away his consistent, laudatory comments about Chip in his 360 reviews by claiming he had a weakness for being "overgenerous" and that he "sugarcoated" or "embellished" his responses for Chip. (D8 219:13-16, 222:8-10). His explanation for his convenient retreat from the contemporaneous 360 comments is not credible for several reasons. First, the 360 evaluation is an anonymous process, and he had the option of opting out from reviewing Chip entirely, so there would pressure to sugarcoat things or consequence for not doing so. (D8: 228:1-14; D9 16-24). Second, Hatala acknowledged and understood the importance of open and frank

feedback on 360s as a leader of one of the most profitable branches. (D8 228:15-19). Third, Hatala did provide negative feedback in Bush's 360s, describing him as "overwhelmed" and admonishing him to be "more proactive reaching out to FAs with pending loan situations in an effort to keep them updated on status." (Ex. 117A at 425). Accordingly, any attempt to contradict his previous positive reviews of Chip is unpersuasive and not credible.

- Sario and Hatala's claims about FA dissatisfaction also crumble under scrutiny at a microlevel. Sario also claimed that the Biggers and Browlow group were dissatisfied with Chip; however, Hatala actually paid for Chip to fly down and meet with a client prospect in Dallas with that group, which Power acknowledged was "positive" reflection on Chip. Likewise, Chip's 2018 newsletters reported subsequent positive activity with the group. (*Compare* D6 77, 210:16-211:7 *with* Ex. 163; R. Ex. 48; D8 49:18-51:3). Furthermore, Hatala invited Chip to play at the "Possum Open" tournament, and Chip actually played gold with Biggers (aka "Possum") at that tournament every year, so it seems dubious there was tension in that relationship. (D8 228:24-230:12; D9:14:21-25). Regardless, no one reported to Power that this group complained about Chip. (D8 50:2-4).

While Hatala explanations for the reversals set off credibility alarms, his bias to testify favorably for MS and for Sario were even more apparent. In short, Hatala testified that he has been employed by MS for 25 years and he wants to retire there. Sario even granted his request to move to Charleston, which was his "dream job" and presented additional bonus potential for him. (D8 240:25-241:12; D9:10:18-11:1).

        **c.**     **Finally, Respondent's most pivotal witnesses suffer fatal flaws in their credibility, thereby sealing pretext.**

        **i.**     **Kristen Sario**

Suffice to say, if the Arbitrator finds that either Power or Sario are of questionable credibility, then it logically follows that Respondent's LNDR would be rendered non-credible as well. As a starting point, Sario lied about her employment history at Disney both to colleagues and even on her LinkedIn account. This was not some little white lie; Sario made her Disney background a focal point of her identity at MS. (D6 166-67; D4 271). In fact, the very first sentence in her Makers Award announcement references Disney. (Ex. 27A; D6 166-67).

More specifically, Kristen Sario misrepresented how long she worked at Disney. Her LinkedIn says she worked at Disney from 1998 through June 2013 (a period of thirteen years), and she testified to that duration initially in her deposition. (Ex. 161F; D6 168:19-168:7). In truth, Sario's Disney records reflect she only worked there from March 1998 through August 2000 (two years and 6 months) and July 22, 2006 through November 19, 2011 (five years and 4 months), for a total of seven years and 10 mos. (Exs. 161A, 161E). Instead of owning up to her misrepresentation, Sario dubiously pointed the finger at her MS "risk officer" for the inaccuracy. (D5 177). Sario's Makers Award announcement also falsely stated, "she nailed that Disney audition and started singing, dancing and puppeteering just five hours after graduating from high school," which Sario later testified was also inaccurate. (Ex. 27A; D6 170:4-172:4). She further exaggerated her role by telling colleagues she was a "Disney princess," which she claimed were prestigious positions at Disney. (D6 180:1-15; D8 15:1-16:18). In reality, she was a low wage hourly worker doing primarily non-speaking puppeteering roles and having never spoken or sang on a stage. (D6 177:34-180).

Martha McNeil also caught Sario in a lie in connection with diversity. (D5 4:16-6:5). Specifically, Sario told McNeil that Regional Diversity Officer, Adrienne Everett, had chewed her (Sario) out because one of McNeil's FAs reached out directly to Everett regarding funding for a diversity event. (D5 4:16). Everett then called McNeil and said:

> I have to apologize to you. Kristen called me and asked me to portray that I chewed her out about you asking for this diversity money. And it is not true. That is not how it went down. Kristen called me and said, will you act like you were upset about this and go along with this?

*Id.* McNeil felt so strongly about the issue, she confronted Sario and said, "if we are going to have a relationship, you have to tell me the truth about what is going on." (D5 5:23-24).

Similarly, McCormick reported being misled by Sario in his recruitment into the branch manager role. (D4 281:5-19). Reznikov also reported that Sario told him there were others blocking his advancement when in reality it was her. (D1 194:1-16; D6 220:2-11).

### ii.    Barbara Power

This is a unique case where a manager involved in a termination decision is found to be dishonest in her own disciplinary actions and performance evaluations. (Exs. 31, 32). Indeed, the performance warning represents a broadside attack on Power's integrity and honesty, admonishing her to "be upfront and transparent with your management team at all times and avoid making misrepresentations." Valletta's use of the term "misrepresentations" was not made lightly. (D9: 133:20-134:8). The warning also raised questions about representations Power made about where she would even be officed. (D9:132:5-22). Power had the option of declining to sign her written warning or submitting a rebuttal to the extent she disagreed and chose not to. (D7 524:17-25). Valletta conducted due diligence before making these accusations and testified they were accurate. (D9 131:19-132:4). Valletta did not let up on when he issued Power a double needs improvement 2019 performance evaluation. (Ex. 32 at1139). The evaluation again took aim at Power's integrity. Where the written warning questioned misrepresentations she made about her travel, the annual evaluation called out Power's "excessive travel expenditures" and "personal expenses [which] were the "largest of any manager nationally" and juxtaposed them against feedback from bankers that she was not "visible in the market." (Ex. 32 at 1137).

Unfortunately for Respondent, Valletta's beliefs regarding Power's honesty were born out in her trial testimony several times:

- Power testified in her deposition that she never heard anything inconsistent from Bobby House about what he reported in his 360 comments of Chip but attempted to say otherwise at hearing and was otherwise evasive in the questioning. (D8 35:20-37:22).

- Power initially claimed she did not take any notes of her conversation with Sario the day before the hatchet email and was impeached with her deposition transcript indicating the opposite. (D8 97:7-101:22).

- Power denied asking Chip if he was happy in his role when she allegedly issued him the performance warning before being confronted with her contrary answer in her deposition. (D8 120:19-122:10).

- At the hearing, Power danced around whether she had consulted Cucuzza for his opinion before deciding to terminate Chip before being confronted with her deposition testimony, in which she admitted she had not. (D8 143:16-145:7).

- On direct exam, Power testified that she resigned because "I was spending a lot of time on the road traveling and other things and had some health issues that I wanted to focus on and I was probably not as engaged in my role at that point at the end of 2018 because of those issues. I just felt like I was not doing the job well and needed to focus on my health and well being." (D7:512:7-25). On cross when she was confronted with her performance warning and double needs improvement evaluation, Power admitted that the pending poor evaluation was one of the factors in [her] deciding that I was going to resign. (D8 536:6-16). Power explained the glaring omission because it was "something I'm really not comfortable talking about." (D7 537: 9-25).

- Power described Parker as "relatively neutral," but Parker's 360 reviews were "glowing" and contemporaneous emails were likewise positive referring to Chip as a "real pro" and suggesting Chip present to other Region PBs. (*Compare* D8 41:3-13 *with* Ex. 30 at 314-15, Ex. 35 at 8096; D8 42:3-12-44:19). She acknowledged that Parker never advocated that Chip be written up or terminated. (D8 45:9-19). In fact, Parker was re-assuring with Chip after the performance warning, telling him: "Just keep doing what you're doing. Just keep running. You're going to be fine." (D1 267:3-9).

### iii. Gerry Valletta

With Power and Sario saddled with serious credibility issues, MS had Valletta walk out on a limb making outlandish and unsubstantiated contentions that he would have terminated Chip regardless of Sario's input and even if Chip had attained 100% to goal. (D9 71:5-11; 76:1-4; 75:15-24; 237:8-23). Valletta's convenient hypothesizing at trial snaps under the weight of the actual record evidence for six separate reasons. First, Valetta could not identify a single note or email to corroborate that he intended on terminating Chip. (D9 125:14-24). Second, he never actually contacted Power on his own initiative and recommended that Chip should be terminated. (D9 127:3-

8). Third, Valletta's contention is a revelation made for trial—MS's Summary Judgment brief is fifty (50) plus pages and references Valletta's role repeatedly, but never asserts that Valletta contemplated or would have fired Chip absent Power's recommendation or Sario's opposition. Fourth, Chip received a "meets/meets" evaluation in 2016. In 2017, Power gave Chip a favorable talent ranking; Chip dramatically increased his performance metrics; and, he received a very favorable 2017 360 review. (Ex. 33; D9 190:22-25; 262:3-264:7). Fifth, Power would not have recommended Chip be terminated were it not for Sario. Even Cucuzza did not want Chip terminated, so query why Valletta (at the national level) would have done so. Sixth, there were other private bankers who, unlike Chip, were in the bottom 10% in talent rankings and had needs improvement scores (between 2014 and 2017) who were not even issued a performance warning, much less terminated.

Furthermore, Valletta further squandered his credibility in several other respects:

- He dubiously claimed that Chip was going to be terminated at the end of 2015 and only retained his job because of a "hiring freeze." Dunlap himself said there were no conversations about terminating Chip at that time. (D5 88:23-89:3). Valletta could point to zero corroborating documents. Rather, contemporaneous documents show that Dunlap was actually thrilled with Chip, awarding him the "hustle award," and Valletta himself was impressed. (Ex. 12; D9 180:10-25). In addition, at the end of that year, Chip was recognized nationally in two metrics (#2 units and #4 in largest UNHW loan) and was paid a $55,000 discretionary bonus. (Exs. 13, 15). In the year prior, Chip received the Big Hitter Award and Dunlap issued Chip an "exceeds expectations" performance evaluation. (Exs. 9B, 10A; D1 96:13-97:24; D9 146:21-25). Valletta's claim that Chip would have been terminated, not once but twice, is also dubious because Valletta was involved in very few private banker terminations and could not even identify any others. (D9 122:14-123:22). In fact, despite issuing Power a performance warning and a double needs improvement evaluation in the same year, Valletta did not have plans to demote Power, let alone terminate her. He ultimately supported her transition into a banker role after she resigned from her manager role. (D9 138:24-140:5 & 141:10-142:11).

- Valletta grossly oversold and exaggerated facts in describing his alleged rationale for approving Chip's termination. He claimed Chip did not do the "basics of the job." (D9 73:8-9). However, Chip's performance record, evaluations, and 360's squarely rebut this contention. Valetta claimed that "a large subset of FAs were saying I don't want to do business with Chip" and "the FAs have made up their mind . . . it wasn't going to change"

as another reason why Chip was terminated. (D9 111:8-10; 165:17-19). No other witness contended that Chip had a problem with FAs broadly. In fact, of approximately 250 FAs, Cucuzza could only identify five who expressed anything negative about Chip. (D4 77:2-78:9). By virtue of Chip being among the top in the nation in unit count, it is apparent that large numbers of FAs did business with him. Indeed, Chip was actually at 110% to target on FA participation in Q2 of 2017 and above the regional average in FA participation as of his 2017 mid-year review. (Exs. 1, 55A). McMaster, Crawley, and McNeil all had favorable things to say about Chip's relationship with FAs. Dunlap also observed: "Chip's attitude is consistently positive with a can-do approach that has won an FA following in the Complex;" and, 360 reviewers were uniformly positive on Chip's relationships with FAs, including Hatala who stated: "FAs are very welcoming to Chip" and listed Chip's "ability to connect with FAs" as an attribute. (Exs. 10 at 280, 9 at 335, 90 at 314).

- Valletta testified that Chip "absolutely" had generous resources to cover 14 branches across three states because he had two APBs. Again, the record evidence shows the opposite. Chip had "the highest FA/PB gearing ratio among his peers," and that the overwhelming majority of regions had a lead PB and at least 1-2 PBs; Chip and Seegers were the only complexes that had a lead PB and zero PBs. (*Compare* D9 171:12-17 *and* Ex. 105). Indeed, in 2014, Dunlap lauded Chip for having "generated a lot of production with little resources," but once again Valletta was ignorant of these facts. (Ex. 10). Valletta also tried to equate an APB and PB as effectively being equal, despite the fact that PBs have higher levels of required experience. Seemingly, Valletta attempted to deny the obvious reality that it was preferable to have a banker with more experience. (D9 177:23-178:12). Making it abundantly clear, Dunlap testified plainly that having two PBs is better than having one PB and an APB. (D5 125:19-23).

- Valletta dubiously claimed that he approved Power's recommendation because "the numbers weren't there" and falsely claimed "improvement wasn't happening" and the trends were still the same. (D9 64:20-22). Yet, Valletta was ignorant as to essential facts or just plain wrong. On cross, Valletta had to concede that "the trends were better" at times in 2017, including in Q2 and that Chip had demonstrated positive trends in 2017 as compared to his numbers in 2016, and that Chip also had positive trends in the national and stack rankings since taking over the territory. (D9 197:6-17; 234:5-236:10; D9 240:11-242:16).

**D.      Although comparator evidence is not necessary in the prima facie stage or to prove discrimination, Claimant proffers multiple examples of private bankers being treated far more leniently despite worse objective performance.**

Despite Title VII and the ADEA not requiring comparator evidence in order to establish a claim, Chip can show that there were multiple females and substantially younger PBs who were treated more favorably. When using comparator evidence, a plaintiff is not required to produce evidence that shows "precise equivalence and culpability between employees." *Moore v. Charlotte*,

754 F.2d 1106 (4th Cir. 1985). The Fourth Circuit has recognized that in cases of alleged disparate discipline, "the reality is that the comparison will never involve precisely the same set of work-related offenses occurring over the same period of time and under the same set of circumstances." *Cook v. CSX Transp. Co.*, 988 F.2d 507, 511 (4th Cir. 1993).

In this particular matter, the Arbitrator should be weary of applying too mechanical a standard because MS's reason(s) for terminating Chip has evolved, such that it has arguably stacked the deck to make a precise comparison more difficult. The contemporaneous emails and even the termination script establish Chip was terminated because of alleged relationship issues with the wealth partners (*i.e.,* Sario). Tellingly, the bullet point email does not even call out banking and lending business results. Rather, the core metric "rationale" is born as a litigation argument. In any event, Claimant does not simply advance the comparator information below to establish disparate treatment outright—which would independently form the basis for ruling in his favor—but rather, to also illustrate that the leniency shown to the female PBs and Fernandez (under 40) makes MS's contention that Chip was terminated for poor performance on his metrics, less believable (i.e., pretextual). In other words, regardless of whether the other PBs also had their Complex Managers pushing vigorously for their termination as Sario did, Power and Valletta's failure to even issue a performance warning to PBs with more serious performance issues certainly undermines their contention that Chip's metrics tipped the scales to termination.

1. **Power and Valletta Treated Herring, Booth, Yielding and Fernandez with Kid Gloves.**

- **Lead Private Banker Stacy Herring (Southwest Florida)**
  Herring's 2015 talent review raised serious questions about her competency. Although she came from a mortgage background, mortgage processing was identified as an area for development because something that should take 30 seconds took Herring 5 minutes. The talent review called out "needed improvement" in her business results and identified basic issues with her communication skills. It even dramatically labelled Herring as having "maximum verbosity." Power also had serious concerns with Herring. After Herring's

complex missed the majority of its targets, Power issued her a "needs improvement" evaluation and struck the same chord regarding communication: "several teammates have provided feedback that Stacy needs to continue to develop active listening skills, restate what the FA or partner says in order ensure clear understanding. Listen more and speak less." Furthermore, Power raised questions about Herring's leadership, including her failure to advocate for her teammates and to help them, and to operate as a peer-to-peer leader. Although there were questions about "her ability to adapt to a private banking role coming from mortgage, Dunlap and Power admitted only "verbal conversations" occurred— **termination was never in the discussion**. (D3 846:19-850:20; D5 178:16-17; D8 178:9-13; D9 162:16-21). Even when it became apparent Herring could not be successful as a lead banker, she was transitioned into a private banker job within her complex, with HR not even being consulted. (D9 160:22-161:7).

- **Lead Private Banker Debbie Booth (Alabama) and Caroline Yielding (Alabama)**
  Power and Valletta showed biblical level grace with Debbie Booth. In 2014, Booth was rated in the bottom 10 percent (when Chip was in the middle 70%) (Ex. 140A at 1609). In the 2016 talent ranking Booth was listed as C2 performance improvement required and being in the bottom 20%; likewise, her fellow banker Caroline Yielding was in the bottom 10% and given a "needs improvement" score (Ex. 140B). In 2016, Power gave Booth a "needs improvement" score for Performance and Contributions, and she had slow start concerns with both Booth and Yielding in Q1 of 2017. (Ex. 103A at 506; D7 552:22-24; D7 553:1-3). Tracking the poor talent rankings, Booth's Alabama Complex was also in the basement on percent to goal: 2015 68.78% (worst in complex, 5th worst in nation) and 2016 50.03% (worst in the complex and 3rd worst in nation). (Ex. 106C). In short, Booth and Yielding had issues partnering together. (D3 857:13-869:2). Nevertheless, Power and Dunlap **never issued Booth or Yielding a performance warning** nor was Valletta consulted regarding doing so. (D7 554:5-7; D8 145:2-6; D9 155:12-156:24). Dunlap simply had "verbal conversations" with them. (D5 173:12-18). It does not appear HR was even consulted. (D9 201:1-9).

- **Lead Private Banker Mike Fernandez (Central North Florida)**
  Fernandez's complex was also toward the bottom on percent to goal: 2014 84.19% (2nd worst in complex, 8th worst in nation); 2015 at 74.49% (2nd worst in complex, 19th worst in nation); 2016 69.64% (2nd worst in complex, 19th worst in the nation). (Exs. 106, 106C). On an individual basis, Fernandez was the worst banker in the region in 2015, and in Q1 of 2016 he was at 45.7% to goal. (Ex. 106; D5 169:23-25, 172:5-13). The 2016 talent ranking rated Fernandez as a C2 performance improvement required category, put him in the bottom 10%, and reflected a needs improvement score on Performance Contributions. (Ex. 140B). Yet, Fernandez was **not issued a performance warning, let alone terminated**. Dunlap simply had "verbal conversations" with him. (D5 170:1-5; D7 555:25-556:4; D9 166:24-167:4). It was not until Fernandez was caught for a fraud related compliance issue that he was terminated. (D8 556:5-558:11; D9 167:5-8).

Zooming out from these particular instances, the Arbitrator should consider how extremely

rare performance warnings and terminations were. (D9 122:22-123:22). Other than Chip and

Seegers, Cucuzza and Carriere could not identify any other instances where performance warnings had been issued to PBs in the Southeast Region. (D3 861:7-19; D4 202:17-203:13). And yet, Chip was emailed a performance warning literally on the same day Power was lauding his performance on percent-to-goal and amidst his best performance year. If there was any doubt as to how bright Sario's rising star shone or the power of her influence, the issuance of that October 2017 performance warning certainly dispels it.

**2. Power's problems dwarfed the accusations leveled at Chip, but she was shown far more leniency and given a glide path to continued employment as a lead PB.**

Valletta's more lenient handling of Power's litany of conduct and performance issues also seriously discredits MS's rationale for terminating Chip. At the outset, Valletta's performance warning of Power is more credible on its face because it contains examples with details and dates of incidents of exactly what Power did to precipitate the warning. In contrast, Power's performance warning of Chip lists "examples of what she wants Chip to do prospectively;" Power does not identify when she previously addressed problems with Chip or even what Chip failed to do to warrant the action. (*Compare* Ex. 62 *and* Ex. 31). As to their substance, Valletta's performance warning and double needs improvement evaluation of Power are a condemning indictment of Power in almost every facet of her job and even on personal integrity level. Valletta all but called Power a liar and impugned her integrity around her travel expenditures on her performance warning. It's hard to believe that Valletta would need to call out the need for Power to cease misleading him, to "refrain from regularly cancelling meetings" or to "demonstrate good judgment," but he did. (Ex. 31). And the double needs improvement evaluation traverses the same problems such as "chronic" cancelling of meetings and takes aim on Power's "inability to establish effective working relationships with a large percentage of her complex managers and directs" as being troublesome.

To be sure, this statement is a far more condemning assessment of Power than Chip's alleged problems with Sario and her team. Power is also described as having had "no impact on banking success," which was her job. Despite all this, Valletta had no plans to demote or terminate Power before she resigned. She was provided paid time off to look for another job; and Valletta supported Power's transition to a lead private banker role. (D9 138:24-139:22, 142:3-25).

### 3. Bush had problems as Associate Private Banker and they were magnified during his try out and in 2018 and 2019, but he faced no repercussions.

From Bush's early days as PB, Chip had questions about his work ethic in that he had issues putting in a full day of work, and Sario herself expressed similar concerns around Bush's laxness and untimeliness even before he was promoted (D3 637:17-25, 644:6-7; D8 162:11-163:23). Apparently, Sario grew increasingly more concerned as her 360 Reviews of Bush became more damning. In 2018, Sario lamented hearing from branch managers and senior leadership on a regular basis that he was "lax" and did not take the role seriously. Others on her team, including Libby Harris called out those same concerns that year. (Ex. 116A; D6 330: 21-25). By 2019, there was a consistent theme across multiple reviewers that there were serious problems with Jared. His 2019 360 adjectives were pock marked with more negative descriptors. Out of the five adjectives, Sario included three negative adjectives to describe Jared Bush: "overwhelmed, inconsistent, lacks follow up." Sario further called him out on coming unprepared to meetings without meaningful information and there being time lags with his responsiveness. Hatala led his adjective selection with "overwhelmed" as well, and another commentor described Bush as "lax." Libby Harris, again expressed some concerns with Bush in the 2019 360 review. In comparison, Chip's 360s were, year in and year out uniformly positive, including in 2017.

Furthermore, Bush inherited a major upward trajectory from Chip in 2017, yet there was a substantial contraction in those metrics in Bush's first year. (*Compare* Ex. 116D at 13634 *with* Ex.

116D at 13635). Bush missed "on several key metrics" on his 2018 evaluation. (Ex. 116A). In fact, the only reason Bush hit his percent-to-goal that year was because the goals were lowered across all the complexes. (Ex. 106D; D9 173:11-16; D9 246:12-23). To better illustrate, Chip was at 92.79% with 377M, whereas Bush was at 102.92% with only 369M. In short, MS cannot claim it validly terminated Chip for performance issues when it failed to terminate, or even discipline, Jared Bush who had even worse performance numbers.

### E. Respondent's eventual selection of Bush as lead PB is not a Panacea to the mountain of other evidence establishing that age and sex bias permeated the termination decision.

Respondent cannot evade liability because it ultimately replaced Chip with Jared Bush, a 40-year-old male. For ADEA purposes, Bush being eleven years younger than Chip is sufficient to treat him as valid comparator outside the class, even though he was technically 40. *See O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308 (1996) (holding in age discrimination claim that fact that plaintiff in protected class has been replaced by another person in protected class is irrelevant, so long as he has been replaced because of his age); *see also, Laber v. Harvey*, 438 F.3d 404, 430 (4th Cir. 2006) (plaintiff must demonstrate that comparator was "substantially younger"); *see also*, *Grosjean v. First Energy Corp.,* 349 F.3d 332, 336–38 (6th Cir. 2003) (collection of cases); *see also*, *Rhymer v. Yokohama Tire Corp.,* 106 F.3d 391 (4th Cir.1997) (replacement of a 54–year old by a 41–year old sufficient); *see also*, *Buckner v. Lew*, No. 5:13-CV-199-FL, 2014 WL 1118428, at *3 (E.D.N.C. Mar. 20, 2014) (nine-year age disparity did not warrant dismissal of plaintiff's ADEA claim).

Bush's status as a male replacement does not create an escape hatch to liability either. Courts have long recognized that an employer may hire a replacement in the protected class as a tactical maneuver to mask its previous discrimination. "[I]t is clear that nondiscriminatory employer actions

occurring subsequent to the filing of a discrimination complaint will rarely be relevant as circumstantial evidence in favor of the employer, because of the incentive for the employer to take subsequent remedial measure to shield itself from liability." *Chuang v Univ of California Davis*, 225 F3d 1115, 1129 (9th Cir 2000); s*ee also Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 658 (4th Cir. 1967) ("protestations of repentance and reform timed to anticipate or to blunt the force of a lawsuit offer insufficient assurance that the practice sought to be enjoined will not be repeated"); *Gamble v. Birmingham Southern Railroad Co.*, 514 F.2d 678, 683 (5th Cir.1975) (actions taken in response to a lawsuit are equivocal in purpose, motive, and permanence); *EEOC v. Monarch Machine Tool Co.*, 737 F.2d 1444, 1449 (6th Cir.1980) (defendant relied heavily upon the corrective practices taken since the filing of the plaintiff's complaint but the court determined the voluntary changes effectuated by the defendant "do not render moot the questions presented in the litigation or make judicial sanctions inappropriate") (internal citations omitted). Similarly, when there is a significant lapse of time between the plaintiff's adverse action and the subsequent hiring of another employee, the significance of that selection is even more suspect and may even prove fodder for pretext. *See Brown*, 159 F.3d at 905 (citing *Howard v. Roadway Express, Inc.,* 726 F.2d 1529, 1535 (11th Cir. 1984) (finding lapse of eleven months would significantly diminish reliability of subsequent hiring as indicator of employer's intent at time it rejected plaintiff's application and thus could not rule out inference of discrimination in connection with earlier denial of plaintiff's application)).

Here, the same day Chip was terminated (January 8, 2018), MS acted to replace him "as soon as possible" because it was a priority to fill that position. (D3: 822:17-20; D8 148:1-8). Despite the immediate desire to fill Chip's position, Jared Bush was not promoted until August 2018— some **eight months** after Chip's termination. Tellingly, Bush's promotion came four months after

Chip's legal demand letter and one month after filing an EEOC Charge, which allowed ample time for legal considerations to come into play. Indeed, it appears that Sario's hatchet email triggered a consultation with MS' legal department on September 22, 2017 (just 10 days following the hatchet email) and subsequent legal consultations with Power and HR through to Chip's termination. (Ex. 131).

Furthermore, Bush's talent rankings scores illustrate that he was an unlikely organic candidate to replace Chip absent litigation considerations. The 2017 talent rankings listed Bush as a "3", which was middle 70-30%. (Ex. 140C at 15152). Similarly, the 2018 talent matrix lumped Bush in middle 30-60% and designated him "average" potential readiness designation. Were Bush objectively earmarked for potential promotion, Bush would have been given a "high' potential readiness designation and certainly rated higher than average on performance. Accordingly, given his average talent ranking and his documented struggles in the proverbial trenches as outlined in Section III. D. 3. above, the Arbitrator should accord no real weight to Bush's late arriving promotion.

### F. The fact that a male manager over 40 "approved" Chip's termination does not defeat Chip's claim for discrimination under Title VII or the ADEA.

In *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 78, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court noted "[b]ecause of the many facets of human motivation, it would be unwise to presume as a matter of law that human beings of one definable group will not discriminate against other members of their group") (internal quotation marks omitted). The Seventh Circuit has applied that concept with particular force in the age discrimination context:

> **For it is altogether common and natural for older people, first, to exempt themselves from what they believe to be the characteristic decline of energy and ability with age; second, to want to surround themselves with younger people;** third to want to protect their own jobs by making sure the workforce is not too old,

which might, if "ageist" prejudice is rampant, lead to RIFs of which they themselves might be the victims; and fourth, to be oblivious to the prejudices they hold, especially perhaps prejudices against the group to which they belong. We emphatically rejected the "same-actor inference" in the race-discrimination setting in *Johnson v. Zema Systems Corp.,* 170 F.3d 734, 745 (7th Cir.1999), and our conclusion there applies with equal force to proof of age discrimination.

*Kadas v. MCI Systemhouse Corp.*, 255 F.3d 359, 361 (7th Cir. 2001) (emphasis added); *see also Wexler v. White's Fine Furniture, Inc.,* 317 F.3d 564, 574 (6th Cir. 2003) ("by emphasizing that [decisionmaker] was actually older than [plaintiff] when he demoted [plaintiff], the district court was relying on the idea that one member of a group is unlikely to discriminate against another member of the same group" which was rejected by *Oncale*, and seeing no reason not to apply that concept to the ADEA.).

Furthermore, connoting significance to Power's age, or Valletta's age and his maleness would be particularly misguided here given Sario's overarching and predominant role in effectuating the termination, and the deep evidentiary roots of both the institutional preferential treatment of women and her own personal biases relating to sex and age. Sario was approximately 38 when she orchestrated Chip's (52) termination, and there is no credible evidence showing that Valletta or Power would have terminated Chip absent her overwhelming influence. Rather, Valletta was operating at his customary 30,000 feet altitude and simply deferred to those he deemed closer to the facts on the ground. And Power for her part, was effectively a disengaged and malleable puppet who Sario artfully guided to achieve the result she wanted–Chip following Reznikov out of her all-female leadership team orbit.

## V. Respondent Violated North Carolina Public Policy by Terminating Chip because of his Age and Sex.

Chip's NCEEPA claim is governed by the same standards applicable to Title VII and the ADEA. *Chancellor v. Harry's Cadillac-Pontiac-GMC Truck Co*., No. 1:07CV342, 2008 WL

11363810, at *3 (W.D.N.C. Sept. 11, 2008) ("This Court will apply the evidentiary standards and principles to plaintiff's [North Carolina Equal Employment Practices Act claim] that are used to determine whether plaintiff can go forward on his claim…under Title VII."); *see also Bayles v. Fid. Bank*, 44 F. Supp. 2d 753, 759 (M.D.N.C. 1998) ("the North Carolina Equal Employment Practices Act (NCEEPA) . . . is subject to the same standards as those developed under Title VII and the ADEA."). Because Chip's sex and age claims survive summary judgment under Title VII and the ADEA, Chip's wrongful discharge claim under the NCEEPA also survives. *See id.* (denying summary judgment on both plaintiff's Title VII sex-based discrimination claim and connected wrongful discharge claims).

## **DAMAGES**

I.  **If Claimant Prevails, He Seeks Back Pay, Front Pay, Emotional Distress Damages, Punitive and/or Liquidated Damages, Pre-Judgment Interest, and Attorney's Fees and Costs.**

Claimant respectfully requests the same relief here that he would be entitled to receive from a jury. Accordingly, Claimant asks for damages inclusive of:

(i)  Back Pay through September 3, 2019 which is when Chip began earning the same or more than he did while employed with Respondent, plus reimbursement for his out-of-pocket expense from having to take a job in Arizona;

(ii)  Emotional distress in the amount of $300,000 consistent with the Title VII cap, although the Arbitrator may exceed that amount under Claimant's wrongful discharge in violation of public policy claim, which is not subject to a cap on compensatory damages;

(iii)  Punitive damages in the amount of three times the total compensatory damages consistent with North Carolina's Punitive Damages statute, N.C.G.S. § 1-D-1;

(iv)  or Liquidated damages in the amount of double Claimant's backpay award if said amount is greater than the Arbitrator's punitive damages award;

(v)  Interest (at the rate of 8% per annum) starting from Plaintiff's termination date through the date of the award; and

(vi)     Attorney's Fees and Costs pursuant to the fee shifting provisions under Title VII and the ADEA.

**A.     Back Pay**

As a general rule, back pay is awarded to successful Title VII plaintiffs. *Hylind v. Xerox Corp.,* 749 F. Supp. 2d 340, 345 (D. Md. 2010), *aff'd in part, rev'd in part and remanded,* 481 F. App'x 819 (4th Cir. 2012) (citing *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 421–22, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975)). An award of back pay ensures that victims of unlawful employment practices are "restored to a position where they would have been were it not for the unlawful discrimination." *Id.* at 421, 95 S.Ct. 2362.

| | |
|---|---|
| Backpay and Benefits From 1/8/18 Firing Through 9/3/19<br>• $221,250 annual / $18,437.50 mthly (2016 W-2) x 20 mos. = $368,750<br>• Fringe benefits @ 25% of $368,750 = $92,187 | $460,937 |
| Reduction for Mitigation Earnings Through 9/3/19<br>• 2018 W-2 Schwab (8/13/18-12/31/18) = $43,688 +$10,922 (fringe benefits @ 25%) = $54,610<br>• 2019 W-2 Schwab (1/16/19-8/16/19) = $119,647 + $28,750 (fringe benefits @ 25%) = $149,397<br>• City National Bank job started 9/3/2019 @ roughly comparable comp. | -$203,007 |
| Living Expenses Incurred During Arizona Employment<br>• Monthly rent and utilities = $1,600 x 16 mos. = $25,600<br>• Avg. monthly travel expense of $800 x 16 mos. = $12,800<br>• Penalty for breaking lease = $2,600<br>• Shipping on car = $1,000 | $42,000 |
| Unpaid 2017 Bonus<br>• Full anticipated bonus was $100,000 | $100,000 |
| Total Backpay Award | $399,930 |

## B. Front Pay

Courts recognize that reinstatement is not always a viable option [under Title VII and the ADEA], and that an award of front pay as a substitute for reinstatement in such cases is a necessary part of the "make whole" relief mandated by Congress and by this Court in *Albemarle*. *See*, *e.g.*, *Shore v. Federal Express Corp.,* 777 F.2d 1155, 1158–1159 (C.A.6 1985) ("Front pay is ... simply compensation for the post-judgment effects of past discrimination." It is awarded "to effectuate fully the 'make whole' purposes of Title VII"); *Brooks v. Woodline Motor Freight, Inc.,* 852 F.2d 1061, 1066 (C.A.8 1988) (stating that front pay was appropriate given substantial animosity between parties where "the parties' relationship was not likely to improve, and the nature of the business required a high degree of mutual trust and confidence"); *Fitzgerald v. Sirloin Stockade, Inc.,* 624 F.2d, at 957 (upholding award of front pay where continuing hostility existed between the parties); *Cassino v. Reichhold Chems., Inc.,* 817 F.2d 1338, 1347 (C.A.9 1987) (same).

Claimant successfully mitigated his earnings beginning on September 3, 2019 and remains gainfully employed through the date of this filing. Accordingly, Claimant only seeks front pay to the extent he loses his job prior to the issuance of an award.

## C. Emotional Distress

Claimant asks for $300,000 in compensation for emotional distress he suffered as a result of his wrongful termination. The Fourth Circuit has held that a plaintiff's testimony, standing alone, can support an award of compensatory damages for emotional distress. *Bryant v. Aiken Reg'l Med. Centers Inc*., 333 F.3d 536, 546–47 (4th Cir. 2003) (citing *Price v. City of Charlotte,* 93 F.3d 1241, 1251 (4th Cir.1996). Indeed, a Tenth Circuit case which held that a $50,000 jury verdict could be supported by testimony about emotional distress by a plaintiff and his wife. *Id. (citing Wulf v. City*

*of Wichita,* 883 F.2d 842, 875 (10th Cir.1989) (noting that while plaintiff's "testimony and the evidence presented are not the most graphic and detailed display of emotional and mental anguish and distress, we cannot conclude that *some* award for such anguish and distress is unsupported by substantial evidence")). Such testimony must "establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated. *Bryant*, 333 F.3d 536 at 1254.

Additionally, a claimant need not evidence a physical injury or symptoms in order to recover emotional distress damages. *See Cline v. Wal–Mart Stores,* 144 F.3d 294, 306 (4th Cir. 1998) (affirming award of emotional distress damages even though there was no evidence in the case of "physical symptoms of stress, such as depression or loss of sleep."); *Phillips v. Bowen*, 278 F.3d 103, 111 (2d Cir. 2002) (affirming $400,000 emotional distress award even in the absence of physical injury).

Claimant's sister, Virginia Randall Sigel and his wife, Dania Randall, testified in vivid detail about the devastating effect this termination had on the Claimant. (D2 486:1-499; D3 667:1-676:13). The Claimant exhibited signs of telltale depression: not getting out of bed, difficulty sleeping, drinking too much, grinding his teeth, weight gain, over-eating, withdrawing from friends and activities. Claimant's rheumatoid arthritis flared up, experiencing physical symptoms like shoulder pain that spread into his legs and hands and eventually got to the point where he could barely walk and stopped playing golf. (D2 493:15, 497:18-497:25). In fact, both Dania and Virgina described the termination as causing more emotional harm and stress than Claimant's cancer diagnosis. (D2 495:3-496:7; D3 675:8-13).

### D. Interest

The Arbitrator should add eight percent pre-judgment interest to the amounts he awards for back pay and emotional distress, as provided by North Carolina law. N.C. Gen. Stat. § 24-1;

*E.E.O.C. v. Ligget & Myers, Inc.*, 1074 (4th Cir. 1982) (affirming use of North Carolina interest rate).

E. **Attorney's Fees and Costs**

42 U.S.C. § 2000e–5(k) permits a court to award attorney's fees to the prevailing party in a Title VII suit. The purpose of awarding fees is to encourage attorneys to prosecute cases that vindicate the objectives of Title VII though they might be economically unattractive under a contingency fee arrangement. *See Daly v. Hill,* 790 F.2d 1071, 1076–77 (4th Cir.1986). Furthermore, the Supreme Court made clear that "under § 706(k) of Title VII a prevailing *plaintiff* ordinarily is to be awarded attorney's fees in all but special circumstances." *Christiansburg Garment Co. v. Equal Emp. Opportunity Comm'n*, 434 U.S. 412, 417, (1978) (emphasis in original). The ADEA also specifically authorizes awards of attorney fees by referencing the attorney fee provision in the Fair Labor Standards Act, 29 U.S.C. § 216(b).

II. **Claimant has Met his Burden to Show that he is Entitled to Punitive Damages Under his Title VII or WDPP Claims. Likewise, Under the ADEA, Claimant has Met his Burden to Show he is Entitled to Liquidated Damages.**

A. **Claimant is entitled to punitive damages under Title VII.**

Punitive damages are available for a Title VII violation when the discriminatory act was conducted "with malice or with reckless indifference to the [plaintiff's] federally protected rights." *Kolstad v. Am. Denal Ass'n*, 527 U.S. 526, 535-36 (1999) (citing 42 U.S.C. § 1981a(b)(1)). The terms "malice" and "reckless indifference" refer to "the employer's knowledge that it may be acting in violation of federal law." *Id.* However, a showing that the employer committed egregious or outrageous discrimination is not required. *Id.* (rejecting the notion that punitive damages are only available upon a showing of egregious misconduct).

10

Punitive damages are warranted if (1) the employer's decision maker discriminates in the face of a perceived risk that its decision would violate federal law; (2) the decision maker was a principal or served the employer in a managerial capacity; (3) the decision maker acted within the scope of his/her employment in making the challenged decision; and (4) the employer failed to engage in good-faith efforts to comply with the law. *Lowery v. Circuit City Stores, Inc.,* 206 F.3d at 443 (citing *Kolstad*, 527 U.S. at 536). This is an intensive factual analysis where all evidence should be considered.  Here, the evidence here supports an award of punitive damages under Claimant's Title VII claim.

In the instant matter, there exists sufficient evidence to show that Morgan Stanley's managers acted in the face of a perceive risk that Sario and Power's conduct violated federal law. In other words, its is evident that (1) Kristen Sario and Barbara Power knew the perceived risks of discriminating against Chip Randall as evidenced by their numerous discussions with Human Resources and the Legal Department (Ex. 131); (2) Kristen Sario and Barbara Power served Morgan Stanley in a managerial capacity; (3) Kristen Sario and Barbara Power were acting within the scope of their employment, as managers, in making the decision to terminate Chip Randall (Ex. ); and (4) Morgan Stanley failed to engage in good-faith efforts to comply with the law as evidenced by the facially discriminatory diversity plan and the complete absence of any HR investigation into the decision to terminate Chip Randall.

### B.   Alternatively, Claimant is entitled to punitive damages under his state Wrongful Discharge claim.

North Carolina courts have held that punitive damages are available for a wrongful discharge claim, just as they would be with respect to other torts. *Sides v. Duke Univ.*, 74 N.C.App. 331, 349 (1985) (plea for punitive damages on claims for wrongful discharge…was appropriate); *see also* Roberts v. First-Citizens Bank and Trust Co., 124 N.C.App. 713 (affirming jury verdict of

$300,000 in compensatory damages and $1M in punitive damages, where plaintiff was wrongfully discharged [in violation of public policy]). To recover punitive damages, Claimant must show that Respondent acted to cause Claimant's injury willfully, with malice, or with a reckless disregard for plaintiff's rights. *Id.* (citing *Hardy v. Toler*, 288 N.C. 303 (1975); *Lutz Industries, Inc. v. Dixie Home Stores,* 242 N.C. 332 (1955). *See generally*, 5 Strong's N.C. Index 3d, *Damages* §§ 11-11.2 (1977 and Supp. 1984).

Similar to recovering punitive damages under Title VII, the evidence shows that Respondent acted to terminate Chip Randall willfully, with malice, with reckless disregard for his rights. *See supra* Section II. A.

### C. Claimant is entitled to liquidated damages under his ADEA claim.

Under the ADEA, liquidated damages are awarded for "willful" violations of such statute. 29 U.S.C. § 626(b) (2006). Similar to the standard for punitive damages under Title VII and state WDPP, a "willful" violation under the ADEA is one in which the employer "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines v. Thurston*, 469 U.S. 111, FEP 977 (1985); *see also Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 581 (7th Cir. 2003) (ADEA violation is willful if employer knows that its conduct is prohibited by statute or manifests reckless disregard for that possibility). Moreover, the standard for liquidated damages mirrors the standard for punitive damages because "liquidated damages [under the ADEA] are intended to be 'punitive in nature.'" *Trans World Airlines,* 469 U.S. 111 (1985). *See Kashif v. Amerigroup Corp*., No. 2:10CV239, 2010 WL 11530358, at *2 (E.D. Va. Nov. 30, 2010) (deeming plaintiff's request for compensatory and punitive damages to be a request for liquidated damages if defendant is found to willfully violated the ADEA).

Accordingly, using the same factors to show that Respondent acted willfully, with malice, or with reckless disregard for Claimant's rights under Title VII and WDPP, Claimant is also able to show evidence that Respondent willfully terminated him in violation of the ADEA. *See supra* Section II. A. As such, Claimant is entitled to liquidated damages under his ADEA claim.

## **CONCLUSION**

For the foregoing reasons, Claimant has decisively surpassed his burden of proving by a preponderance of the evidence that his age and sex were ultimate deciding factors in why he was terminated from Morgan Stanley in violation of Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act of 1967 and North Carolina public policy.

This is 4th day of April, 2022.

/s/ Joshua Van Kampen
Joshua R. Van Kampen, Esq. (NC Bar No. 32168)
Kathryn C. Hagerman, Esq. (NC Bar No. 57306)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, NC 28203
Telephone: (704) 247-3245
Facsimile: (704) 749-2638
Email: josh@vankampenlaw.com
Email: kathryn@vankampenlaw.com
*Attorneys for Claimant*

## CERTIFICATE OF SERVICE

THE UNDERSIGNED HEREBY CERTIFIES that the document to which this certificate is attached was served via E-mail to the attorney of record for each party, or to the party, at their last known address, as outlined below.

Carole G. Miller, Esq.
Anthony Dellasala, Esq.
Bressler, Amery & Ross, PC
2001 Park Place, Suite 1500
Birmingham, Alabama 35203
Telephone: (205) 719-0400
Facsimile: (205) 719-0500
Email: cmiller@bressler.com
*Attorneys for Respondent*

This the 4th day of April, 2022.

/s/ Joshua Van Kampen
Joshua R. Van Kampen, Esq. (NC Bar No. 32168)
Kathryn C. Hagerman, Esq. (NC Bar No. 57306)
Van Kampen Law, PC
315 East Worthington Avenue
Charlotte, NC 28203
Telephone: (704) 247-3245
Facsimile: (704) 749-2638
Email: josh@vankampenlaw.com
Email: kathryn@vankampenlaw.com
*Attorneys for Claimant*