| | | |
|---|---|---|
| **In the Matter of Arbitration Between:** | ) | |
| | ) | |
| **CHARLES RANDALL,** | ) | |
| | ) | |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1440006508** |
| | ) | |
| **MORGAN STANLEY PRIVATE BANK, NA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

### ANSWER AND DEFENSES
### TO CLAIMANT'S DEMAND FOR ARBITRATION

Pursuant to JAMS Employment Arbitration Rules and Procedures 9(a), as modified by the Morgan Stanley Private Bank, N.A. CARE: Guidebook, Respondent Morgan Stanley Private Bank, NA ("Morgan Stanley" or "the Firm") by and through its counsel of record, submits this Answer to the JAMS Demand for Arbitration ("Demand") filed by Claimant Charles Randall ("Randall" or "Claimant"). Morgan Stanley denies any allegations not specifically admitted herein.

### I.  INTRODUCTION

Charles Randall, a former Private Banker with Morgan Stanley, was terminated on February 1, 2018, after his performance failed to improve despite years of performance management by more than one manager. Over a four-year span, Randall's poor productivity caused him to rank in the bottom of all Private Bankers for the Southeast Region, even though he received frequent and detailed feedback on ways to improve his business. (At one point, Randall was receiving coaching on a weekly basis from two managers.) Randall did not put forth any real effort to improve his performance or even acknowledge the issues. He even insisted (late in the process) that he had no idea his performance was inadequate, despite previously receiving multiple

EXHIBIT
**16**

written warnings and verbal coaching sessions relating to his deficient performance. Although Randall was given a generous amount of time to improve, he failed to engage in the activities or build the necessary relationships for success. Randall was ultimately terminated for his failure to meet performance expectations.

Despite all the opportunities Morgan Stanley afforded Randall to improve his performance and salvage his employment, Randall blames Morgan Stanley for his discharge and contends that he was somehow terminated not because of his performance, but rather, because of his sex (male) and/or age (51, at the time of termination).

Randall's claims fail both factually and legally. The documentary record is clear: he was terminated because of his poor performance and failure to improve it. Moreover, his new tortured discrimination theories are inconsistent with the facts. Virtually all of the Private Bankers reporting to Kristen Sario ("Sario"), the Carolina Complex Manager and decision-maker, were males over the age of 40. There was no reason to target Randall because he shared these same characteristics as the others in his position. Nor is there evidence that Sario harbored a discriminatory animus against "older" (51-year-old) males. To the contrary, Sario partnered with her father (who was older than Randall) and more importantly, she replaced Randall with an older male following his discharge. Randall's claims are utterly without merit and due to be dismissed as a matter of law.

## II.     FACTUAL BACKGROUND

### A.     Morgan Stanley Is Committed to Non-Discrimination.

Morgan Stanley Private Bank, NA is a national bank subsidiary of Morgan Stanley that provides banking and credit products and services. Morgan Stanley is dedicated to preventing all forms of discrimination and maintains a Non-Discrimination and Anti-Harassment Policy ("the

Policy"), a copy of which is attached hereto as Exhibit A. The Policy reflects the Firm's commitment to providing a professional work environment free of discrimination on the basis of sex or age (among other protected categories). The Firm strongly urges employees to report incidents of discrimination and prohibits discrimination of any kind. Morgan Stanley's policy is disseminated to all employees and managers in numerous ways. It is provided to each new employee upon hire, posted in each branch of the Firm, available on the Firm's internal website, and disseminated by the Chairman of the Firm to each employee to review and acknowledge annually. Morgan Stanley also conducts regular training for its supervisory employees regarding the prevention of discrimination in the workplace.

**B.**    **Morgan Stanley Hires Randall as a Private Banker.**

Morgan Stanley hired Randall on April 19, 2010 as a Private Banker in the Western Long Island Complex. In this role, Randall partnered exclusively with Morgan Stanley Smith Barney's Financial Advisors ("FAs") to build awareness about banking and lending products and to help clients develop strategies for borrowing and managing cash. The FAs are Private Banker's primary clients, so it is critical that the Private Banker build productive relationships with the FAs in his/her complex. The job description for a Private Banker emphasizes the need to "work with and communicate effectively with Financial Advisors, Branch Managers, Branch staff, and Product partners." *See* Exhibit B, Private Banker Position Description. Private Bankers are also expected to grow new banking revenue by selling banking and lending products. Morgan Stanley monitors performance by measuring a Private Banker's actual performance against the Firm's stated goals, and it publishes these performance metrics in quarterly dashboards that rank Private Bankers regionally and nationally.

**C.    Morgan Stanley Honors Randall's Request for a Transfer, and Randall's Performance Begins to Decline.**

In July 2013, Randall requested to be reassigned from the Western Long Island Complex to the Carolinas Complex in the Southeast Region.  Morgan Stanley granted the request, and Randall began working in the Charlotte, North Carolina branch.  As part of this move, Robert Rettig became Randall's manager.  At the end of 2013, Randall ranked 12th out of 12 Private Bankers in the Southeast Region for production and 139th nationally.

In May 2014, Alex Dunlap ("Dunlap") became the Executive Director for the Southeast Region and Randall's manager. Despite having two Associate Private Bankers to assist him in achieving goals (which was more than most), Randall had difficulty achieving the complex's productivity goals.  Randall did not thrive in his new complex, despite Dunlap coaching him and accompanying him when he met with FAs.

Randall ended 2013 at 71% of his production goal and 2014 at 83% of goal, which placed him in the bottom half of all Private Bankers in the Southeast Region for two consecutive years (in 2014, he was again ranked 12th out of 12 in production).

Randall's performance continued to decline in 2015.  In the first quarter of 2015, his production was at 55% of goal, and in the second quarter, it had only risen to 69% of goal.  In April 2015, Dunlap and Randall met to discuss Randall's lagging production, but this did nothing to improve Randall's performance.  Instead, by August 2015, Randall's production was only at 35% of his annual goal, placing him in the bottom 8% of Private Bankers nationwide.  As a result of his declining performance, Dunlap issued a written warning to Randall on August 4, 2015, a copy of which is attached hereto as Exhibit C.  As reflected in the warning, Dunlap had counseled Randall multiple times regarding his performance and activities necessary for success, but Randall did not seem to implement any changes.  The written warning included an action plan for Randall

4

and required him to satisfy the Q3 Loan Commitments (which required Randall to reach 100% of his third quarter goals) by September 30, 2015. The action plan also instituted weekly meetings between Randall and Dunlap. The warning emphasized to Randall that he could be terminated if he continued to fail to meet performance standards.

**D.**    **Randall Fails to Improve His Performance.**

In November 2015, Kristen Sario ("Sario"), a 37-year-old female, became the Carolinas Complex Manager. As part of her efforts to get to know her new team, Sario received feedback from FAs and branch managers that while Randall was a nice guy, he was disengaged, did not collaborate and failed to follow up. FAs and branch managers also reported to Sario that Randall hurt business opportunities and made too many excuses when asked why initiatives were not moving forward. Sario attempted to work with Randall to address these concerns, including him in her leadership team huddles and planning meetings, and consulting with Randall to develop ideas to drive sales, but Randall still failed to engage with Sario and her team in a meaningful way. Randall's performance metrics did improve slightly in 2015, but not to a significant degree. His lending production rose to 88% of goal, making him 10th out of 12 Private Bankers, and he had achieved 60% of his annual loan commitment goal by November 30, 2015. Dunlap noted in Randall's year-end evaluation that while Randall had the highest individual unit production of any Private Banker in the region, he also had the lowest average ticket size and needed to better leverage the Assistant Private Bankers in his market.

In September 2016, Barbara Power ("Power"), a 57-year-old female, became Executive Director for the Private Banking Group in the Southeast Region, taking over for Dunlap. In getting acclimated to her new role, Power, like Sario, learned that Randall was perceived by his colleagues (FAs and other complex team members) as lacking initiative and follow-through and that he did

not appropriately develop his Assistant Private Bankers. Power also noticed Randall's poor performance metrics. His production at the end of 2016 was 72% of his goal, ranking him ninth out of 12 Private Bankers in the Southeast Region. His lending participation was at 63% of goal (placing him sixth out of 12), and his FA Lending Adopters were at 5.83%, compared to the Southeast Regional average of 8.27% (and putting him in ninth place regionally). In Power's 2016 year-end evaluation of Randall, she noted that Randall should use his relationships with his wealth management teammates to drive new business and suggested that he do more to develop his Assistant Private Bankers and gain client access. Power began meeting regularly with Randall to discuss strategies for improving his performance.

In September 2017, Sario emailed Power with her concerns about Randall. She pointed out that he lacked initiative, did not engage the FAs, and was reactive rather than proactive. Sario was concerned about Randall's lack of relationship with the FAs, since a major part of his role was to work with the FAs to drive the sale of banking and lending products. Power, sharing Sario's concerns and troubled by the fact that Randall's performance had not improved despite months of active performance management, issued a performance warning to Randall on October 12, 2017, a copy of which is attached as Exhibit D. Power provided Randall with specific examples of his poor performance, including the negative feedback from FAs and his need to better engage with them to leverage business opportunities. Power also committed to meeting with Randall on a weekly basis to discuss his progress and asked Associate Regional Manager Andrew Cucuzza ("Cucuzza"), responsible for Private Banker development across the region, to meet with Randall regularly as well. The performance warning emphasized that "[f]ailure to improve your performance will result in further discipline, up to and including termination of your employment." *See* Exhibit D.

## E. After Randall Fails to Improve His Performance, Morgan Stanley Terminates Randall's Employment.

Cucuzza met with Randall regularly to address the issues pointed out in Randall's performance warning. Together, Cucuzza and Randall created a Carolinas Complex Quarter 4 2017 Action Plan with goals consistent with the Firm's performance expectations for a Private Banker. Unfortunately, despite management's best efforts, Randall did not achieve any of three production goals he set for himself:

| Production Measure | Goal set by Randall | Actual Performance |
|---|---|---|
| Premier Cash Management | 782 units | 565 units |
| FA Lending Participation | 75% participation | 56% participation |
| Ultra-High-Net-Worth (>$10 million) | Randall mapped out a strategy for several deals. | Randall closed one deal in excess of $10 million. The value of his average deal was $982,000, the lowest average dollar amount per unit out of the 12 Private Bankers in the Southeast Region. |

On November 6, 2017, Power met with Randall discuss his failure to meet the Firm's performance expectations. Randall acted as if he was unaware that Sario and Power had concerns about his performance, illustrating his lack of self-awareness and unwillingness to act upon the feedback he had repeatedly been given. Once again, Power gave Randall the opportunity to acknowledge and address management's concerns, outlining a list of action items for Randall to complete. These items included Randall completing an activity tracking chart to demonstrate his performance improvement actions, providing detailed updates to Sario and her team on any requests they made of him, and improving his communications with the complex. Cucuzza also met with Randall to discuss the changes Randall needed to make to succeed. Cucuzza provided

Randall with a spreadsheet he planned to use to evaluate Randall's performance on a weekly basis and outlined specific steps Randall could take to improve his performance.

Even with management's guidance, Randall's performance had not improved by the end of 2017. His production was 93% of goal, when the average for the Southeast Region was 117% (ranking Randall as 10th out of 12 Private Bankers in the Southeast Region), and his lending participation was 56% of goal (placing him 11th out of 12). As a result, Power gave Randall a "Does Not Meet Expectations" rating on his 2017 year-end evaluation and determined that due to his lack of improvement and unwillingness to embrace feedback, Randall should be terminated. Out of compassion, Power did not terminate Randall during the holiday season and waited until January 8, 2018 to inform him that he was being terminated as a result of his inability to meet the performance objectives laid out in his action plan and his inability to create productive partnerships with the complex team. Randall received benefits until February 1, 2018, his official termination date. Randall accepted employment with Charles Schwab in September 2018 and now works for RBC Capital Markets. Randall's position at Morgan Stanley was filled with another male in the age-protected class.[1]

### III.  LEGAL ANALYSIS

Notwithstanding the overwhelming weight of evidence that defeats these claims, Randall asserts that Morgan Stanley discriminated against him on the basis of his age  and sex when it terminated him, in violation of Title VII of the Civil Rights Act ("Title VII"), the Age Discrimination in Employment Act ("ADEA"), and North Carolina public policy.[2]  The evidence

---

[1] Randall and another Private Banker were ranked the lowest out of the 12 Private Bankers in the Southeast Region for four consecutive years.  Along with Randall, the other Private Banker was also terminated in early 2018 and replaced by another male in the age-protected category.

[2] It is unclear if Randall's Title VII and ADEA claims are based on more than his termination.  To the extent Randall is claiming that he was also discriminated against when he did not receive a 2017 bonus and a severance package, or that he was not allowed to determine the wording describing his termination on his Form U5, Randall's claims also

presented at the final hearing will conclusively demonstrate that all of Randall's legal claims lack any factual or legal merit.

A. **Randall's Age Discrimination Claim Fails.**

A plaintiff can establish a claim for age discrimination by demonstrating either direct evidence of discrimination or by applying the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Randall attempts to provide direct evidence of discrimination by alleging that Sario stated she intended to hire and promote diverse candidates and commented that the Carolinas Complex was "too old" and "too white." These statements do not make sense in light of the fact that Sario's former business partner and long-time mentor was her father, a Morgan Stanley FA who is over sixty-years-old. The composition of Sario's team also does not reflect that she believed her branch was "too old." Twenty-nine team members in the Carolinas Complex currently report to Sario. Twenty of them are over the age of 40, and ten of them are age 50 or older. Even if Sario did make the remarks attributed to her by Randall (which she did not), they are a far cry from direct evidence of age discrimination. To constitute direct evidence of age discrimination, an allegedly discriminatory remark has to "both reflect directly the alleged discriminatory attitude and [] bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (citing *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 232 (4th Cir. 1999)). "Even if there is a statement that reflects a discriminatory attitude, it must have a nexus with the adverse employment action." *Id.* (internal citation omitted); *see also EEOC v. Clay Printing Co.*, 955 F.2d

---

fail. According to Firm policy, employees are not eligible for a bonus if they: (1) are not actively employed by Morgan Stanley at the time the bonuses are communicated; (2) have received notice of termination prior to the time bonuses are communicated; or (3) are deemed by the Firm (in its sole discretion) not to be eligible for a bonus because, for example, the employee is not meeting Morgan Stanley's performance or conduct expectations. Any one of these is enough to eliminate eligibility for a bonus, and all three applied in Randall's case. Morgan Stanley employees are also not entitled to receive severance packages after termination for performance reasons, and there is no certainly no requirement that any firm consult with a former employee when drafting a Form U5 disclosure.

936, 942 (4th Cir. 1992) (holding that the alleged discriminatory remarks were not probative of age discrimination because they were "not related to a person, employment decision, or hiring or firing practice").

Here, the comments Randall alleges Sario made were not directed at Randall and were at most, generalized remarks about the nature of the Carolinas complex as a whole. The Fourth Circuit has been clear that comments about the desire to bring in "young blood" are "not probative of age discrimination or a discriminatory purpose." *Clay Printing Co.*, 955 F.2d 936 at 942. Sario's comments also had no bearing on Randall's termination. Again, Power, not Sario, made the decision to terminate Randall, and Randall makes no allegations that Power ever made discriminatory remarks. Randall has therefore failed to proffer direct evidence of age discrimination and must rely on the *McDonnell Douglas* framework.

To make out a *prima facie* case of age discrimination under the *McDonnell Douglas* framework, Randall must prove (1) he is a member of a protected class (over 40); (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met his employer's legitimate expectations at the time of his termination; and (4) similarly situated employees outside of his protected class received more favorable treatment, or he was replaced by a substantially younger person. *Austin v. Alltel Communs., Inc.*, 2013 U.S. Dist. LEXIS 51284, at *31-32 (M.D. N.C. April 11, 2013). If Randall makes out a *prima facie* case of age discrimination (which he cannot do), the burden of production shifts to Morgan Stanley to articulate legitimate, non-discriminatory reasons for his termination, which Randall must prove were pretext for discrimination. *See Hill v. Southeastern Freight Lines, Inc.*, 877 F. Supp. 2d 375, 384-85 (M.D. N.C. 2012). Ultimately, Randall must prove that his age was the "but-for" cause of his termination. *See Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 176 (2009) ("To establish a disparate-

treatment claim under the plain language of the ADEA . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."). Since he is unable to do so, his ADEA must fail as a matter of law.

1. Randall was Not Meeting his Job Expectations at the Time of His Termination.

As described in detail above, Randall clearly was not performing his job responsibilities as a Private Banker at a level that met Morgan Stanley's legitimate expectations at the time of his termination. Randall's two most recent managers, Power and Dunlap (both over 40), identified similar significant and quantifiable performance issues that continued to occur despite frequent feedback. Randall failed to meet the performance objectives outlined by the Firm and was consistently ranked at the bottom of the 12 Private Bankers in the Southeast Region, despite Power and Dunlap both issuing written warnings to Randall emphasizing his failure to meet the minimum production requirements.[3] Both Power and Dunlap created action plans for Randall to help him get his performance back on track, but he also failed to meet the goals outlined in these plans (and even those he established for himself). Power and Dunlap also stressed to Randall the importance of having strong relationships with the FAs and other team members in the Carolinas Complex in order to drive new business, but Randall failed to heed this advice. Randall never addressed his performance challenges and, as a consequence, was ultimately unable to demonstrate the kind of sustained improvement necessary to maintain his employment. He cannot possibly show that he was performing his job duties at a level that met Morgan Stanley's expectations at the time of his termination, and his own opinion that he was performing well is irrelevant. *See Evans v.*

---

[3] In his Demand for Arbitration, Randall claims that he received "solely subjective criticism" of his performance. This could not be further from the truth. Randall's performance metrics were based on quantifiable data illustrating his production in comparison with that of other Private Bankers in the region and in relation to goals set for all Private Bankers by the Firm. Although Randall was given feedback to improve his relationships with his team (which is a necessary part of his position), he was not terminated because of "Kristen," as he alleges in his demand.

*Technologies Applications & Serv. Co.*, 80 F.3d 954, 960-961 (4th Cir. 1996) ("It is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff.") (other citation omitted). Randall's age discrimination claim therefore must fail.

      2.    <u>Randall Cannot Identify a Similarly Situated Comparator Treated More Favorably or a Substantially Younger Replacement.</u>

In addition, Randall's claim fails because he does not (and cannot) identify another Private Banker outside of his protected class (under the age of 40) who was treated more favorably than he was, as required to establish a claim under the ADEA. *See Austin v. Alltel Communs., Inc.*, 2013 U.S. Dist. LEXIS 51284, at \*39 (M.D. N.C. April 11, 2013) (holding that employee failed to establish her *prima facie* case of age discrimination because she did not show that she received less favorable treatment than similarly situated people outside of the protected class).

      3.    <u>Randall Cannot Show that Age was the But-For Cause of His Termination.</u>

Even if Randall could somehow show that he was meeting Morgan Stanley's legitimate expectations at the time of his termination (which he was not) and also identify a similarly situated comparator who was treated more favorably than he or a substantially younger Private Banker who replaced him (which he cannot do), Randall's ADEA claim still fails because he cannot demonstrate that age was the but-for cause of his termination. Instead, he was terminated for obvious and legitimate business reasons (his failure to meet the Firm's performance objectives and his inability to create productive partnerships with the complex team). There is no evidence that this was somehow a pretext for age. Furthermore, after Randall's termination, he was replaced by another man in his age-protected class, a clear indication that Randall's termination was not motivated by his age. *See Hill*, 877 F.Supp.2d 375 at 387-388 (granting summary judgment to employer on employee's age discrimination claim partly because the employee failed to establish that he was replaced by a substantially younger person).

Randall's age discrimination claim is further undermined by the fact that the decision-maker in this case, Power, is also within the protected age category – indeed, she is older than Randall by at least five years.  *See Orgain v. City of Salisbury*, 305 Fed.  App'x 90, 103 (4th Cir. 2008) (noting that an inference of discrimination is weakened if the decision-maker is a member of the same protected class as the plaintiff).  Randall has not provided any evidence that the actions challenged here would not have occurred had he been younger.  In addition, Morgan Stanley hired Randall when he was over 40 years of age and already within the protected class, which also undercuts his claim.  *See Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 513 (4th Cir. 1994) ("[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing.")  (internal citations and quotations omitted).  As such, Randall certainly cannot show that age was the "but for" reason for his termination, and his age discrimination claim must therefore be denied .  *See Bodkin v. Town of Strasburg*, 386 F. App'x 411, 413-14 (4th Cir. 2010).

## B.      Randall's Sex Discrimination Claim Fails as a Matter of Law.

Similar to a claim for age discrimination, a plaintiff  can establish a claim for sex discrimination under Title VII with direct evidence or by using the *McDonnell Douglas* framework. *Hepburn v. Workplace Benefits, LLC*, 2014 U.S. Dist. LEXIS 143334, at *5-6 (E.D. N.C. Oct. 7, 2014).

Randall attempts to use direct evidence to support his claim for sex discrimination by alleging that Sario stated she wanted to hire and promote diverse candidates, wanted to get rid of the "old white guys," and bragged about her all-female leadership team, as evidenced by an invitation to a tea for women employees (which was attached to Randall's demand), but his claim misses the mark.  Sario was not a sponsor of the tea and did not send  that invitation or cause it to

be sent. Even if she had sent the invitation and even if she had made the comments Randall alleges (which she did not), these comments and actions do not rise to the level required to demonstrate direct evidence of discrimination. The alleged comments were not directed at Randall, and it was Power, not Sario, who made the decision to terminate Randall. *See Williams v. PPG Indus.*, 2002 U.S. Dist. LEXIS 22282, at *10 (M.D. N.C. July 16, 2002) ("[R]emarks by non-decision makers or remarks unrelated to the decision-making process itself are not direct evidence of discrimination.") (citing *Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998)). Sario's alleged intent to support other women and encourage them to mingle does not equate to a desire to terminate Randall because he is a man. Additionally, the make-up of Sario's team belies Randall's allegation that Sario aimed to get rid of men. Twenty-nine team members in the Carolinas Complex currently report to Sario, and 22 of them are men (including the male who replaced Randall). This certainly does not seem indicative of a person who desires to "get rid" of the guys.

Without direct evidence of discrimination, Randall must again resort to the burden-shifting framework established in *McDonnell Douglas* and show that: (1) he is a member of a protected class, (2) he suffered an adverse action, (3) he was meeting Morgan Stanley's legitimate expectations at the time of his termination, and (4) similarly situated female employees received more favorable treatment. *Broussard v. Local Book Publ'g, Inc.*, 2018 U.S. Dist. LEXIS 192058, at *6 (E.D. N.C. Nov. 8, 2018). If Randall is able to establish this *prima facie* case of discrimination (which he cannot do), he must also prove that Morgan Stanley's legitimate, non-discriminatory reasons for his termination were pretext for discrimination (which they are not). *Id.* Randall cannot establish a claim for sex discrimination using this framework, either.

14

1.  <u>Randall Cannot Identify a Similarly Situated Comparator Treated More Favorably.</u>

Not only does Randall fail to identify a similarly situated comparator for his age discrimination claim, but he also fails to do so for his sex discrimination claim, despite it being a crucial part of his *prima facie* case. *See Davis v. HP Enter. Servs., LLC*, 2013 U.S. Dist. LEXIS 86256, at *8 (W.D. N.C. June 18, 2013) (noting that plaintiff failed to establish a *prima facie* case under Title VII because he did not allege facts sufficient to establish that he was treated differently than female employees). Because Randall has not identified, and cannot identify, any female comparators who similarly failed to meet performance metrics despite frequent coaching and warnings and yet were treated more favorably than he was, Randall's sex discrimination claim must be dismissed. *See Logan v. Kellogg's Snack Charlotte Bakery*, 2015 U.S. Dist. LEXIS 35869, at *6-7 (W.D. N.C. Feb. 24, 2015) (dismissing plaintiff's Title VII claim partly because he did not "even offer a conclusory allegation that female comparators were treated more favorably").

2.  <u>Randall was Not Meeting Legitimate Job Expectations at the Time of his Termination.</u>

Furthermore, Randall clearly was not meeting legitimate job expectations at the time of his termination, as required by Title VII. *See McDougal-Wilson v. Goodyear Tire & Rubber Co.*, 427 F.Supp.2d 595, 611 (E.D. N.C. 2006) (granting summary judgment to employer because employee was not meeting legitimate job expectations at the time of her termination and had "merely stated her perception that her performance was satisfactory"). Again, Randall's two most recent managers, Power and Dunlap (one of them male), both issued written warnings to Randall about similar and significant performance concerns relating to his inability to meet performance metrics. They both also highlighted to Randall in frequent coaching sessions that he needed to strengthen his relationships with FAs and other members of the Carolinas Complex team to encourage the sale of banking and lending products and reach his goals. Randall failed to accept their feedback

and make changes in his behavior, which resulted in his inability to meet the legitimate and quantifiable performance standards of Morgan Stanley and to rectify his consistent placement at the bottom of the rankings for Private Bankers in the Southeast Region. Because Randall cannot present any evidence that his termination for poor performance was somehow a pretext for discrimination based on his sex, his sex discrimination claim fails.

C. **Randall Cannot Establish a Wrongful Discharge Claim under North Carolina Law.**

Randall also brings a claim for wrongful discharge based on the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C.G.S. § 143-422.1 *et seq*. Although NCEEPA does not provide for a private cause of action, it allows employees to assert a common law claim of wrongful discharge in violation of the public policy outlined in NCEEPA, which prohibits employment discrimination on the basis of sex and age. N.C.G.S. § 143-1422.2(a). The same standards applicable to Title VII and the ADEA apply to claims based on the public policy set forth in NCEEPA. Because Randall bases his wrongful discharge claim on the same alleged conduct by Morgan Stanley that fails as age or sex discrimination under Title VII and the ADEA, he cannot succeed on a claim for wrongful discharge for the same reasons. *See Hepburn*, 2014 U.S. Dist. LEXIS 143334, at * 12-13 (granting summary judgment on both plaintiff's Title VII and wrongful discharge claims); *Dubnick*, 2009 U.S. Dist. LEXIS 75231 at * 20 (dismissing all of plaintiff's state law claims after he failed to establish an ADEA claim).

IV. **CONCLUSION**

Morgan Stanley denies any and all of the remaining allegations contained in Randall's Demand for Arbitration, including all legal conclusions, alleged causes of action, and claimed damages. Furthermore, Morgan Stanley specifically denies that it acted unlawfully or improperly toward Randall. For all of the foregoing reasons, Randall's claims should be denied in their

entirety.

## V.     AFFIRMATIVE AND OTHER DEFENSES

By way of further Answer to Randall's Demand for Arbitration, Morgan Stanley sets forth the following defenses:

1.      Claimant's claims are barred, in whole or in part, because they fail to state a claim upon which relief can be granted.

2.      Claimant's claims are barred, in whole or in part, by the applicable statute of limitations and/or the equitable doctrine of laches.

3.      Claimant's claims are barred, in whole or in part, because he failed to exhaust administrative remedies.

4.      Morgan Stanley acted in good faith and without malice towards Claimant.

5.      Claimant's claims are barred, in whole or in part, by the doctrine of unclean hands.

6.      Morgan Stanley denies that any unlawful acts were committed against Claimant. However, even assuming Claimant was subject to unlawful acts (which Morgan Stanley denies) and to avoid waiver, Morgan Stanley neither authorized nor ratified any alleged wrongful actions.

7.      At all relevant times, Morgan Stanley has had anti-discrimination policies with complaint procedures in place and has exercised reasonable care to prevent and correct promptly any alleged acts of discrimination known by Morgan Stanley in accordance with *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). Claimant failed to utilize those policies and complaint procedures. *Id*.

8.      Claimant's claims are barred by the employment at-will doctrine.

9.      All wages and amounts owed to Claimant were paid by Morgan Stanley.

10.      Claimant's claims for equitable relief are barred on grounds that Claimant has an

adequate and complete remedy at law if Claimant were to prevail with regard to these claims.

11.     Claimant's claims and/or damages may be limited by the after-acquired evidence doctrine.

12.     Claimant's claims are barred, in whole or in part, because any losses he has sustained or will sustain are due to his own failures and/or conduct.

13.     Claimant's claims are barred, in whole or in part, by the doctrines of estoppel, ratification, acquiescence, consent, agreement, accord and satisfaction, release, payment, and/or waiver.

14.     Claimant's claims are barred, in whole or in part, by Claimant's contributory negligence and/or willful misconduct.

15.     Morgan Stanley would have taken the same actions with regard to Claimant irrespective of his age, and Claimant cannot satisfy his burden to show his age was the "but-for" reason for the challenged decision.

16.     Morgan Stanley denies that Claimant's sex or any other impermissible factor played a role in any decision or act challenged by Claimant.

17.     Claimant is precluded from any recovery because he has not suffered any damages or any legally recognizable injury and/or the damages he seeks are speculative and not recoverable as a matter of law.

18.     Claimant has failed to mitigate his damages, if any.

19.     Claimant is not entitled to recover punitive damages because he failed to allege facts sufficient to state a claim for such damages.

20.     An award of punitive damages would be an unconstitutional denial of Morgan Stanley's rights to due process and/or equal protection under the Fifth and Fourteenth Amendments

to the United States Constitution and under the Constitution of the State of North Carolina.

21.     Claimant cannot recover punitive damages because Morgan Stanley at all relevant times made a good faith effort to comply with all applicable statutes and law with regard to Claimant.

22.     Claimant cannot recover liquidated damages because Morgan Stanley at all relevant times made a good faith effort to comply with the law with regard to Claimant, and any contrary actions or decisions by its managerial agents were inconsistent with those good faith efforts.

23.     Morgan Stanley reserves the right to assert additional affirmative defenses insofar as Claimant's Demand for Arbitration is clarified in the course of this proceeding.

24.     At the time of filing this Answer, Morgan Stanley has neither commenced nor completed discovery in this matter and respectfully reserves the right to amend this Answer based upon discovery of additional information or affirmative defenses at a later date, up to and including the time of hearing.

Dated: October 24, 2019

*/s/ Carole G. Miller*
Carole G. Miller, Esq.
Emily T. Vande Lune, Esq.
*Attorneys for Morgan Stanley Private Bank, N.A.*

BRESSLER, AMERY & ROSS, PC
2001 Park Place, Suite 1500
Birmingham, Alabama 35203
Tel. (205) 719-0400
Fax (205) 719-0500
cmiller@bressler.com
evandelune@bressler.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was served by providing a copy to Claimant's counsel below via email on October 24, 2019.

Joshua R. Van Kampen
VAN KAMPEN LAW, PC
315 East Worthington Avenue
Charlotte, NC 28203
(704) 247-3245
josh@vankampenlaw.com

/s/ Carole G. Miller
OF COUNSEL

# EXHIBIT A

# Morgan Stanley

## NON-DISCRIMINATION AND ANTI-HARASSMENT POLICY

Consistent with Morgan Stanley's core values, the Firm is committed to providing a work environment in which all individuals are treated with respect and dignity. Each individual should have the ability to work in a professional atmosphere that promotes equal employment opportunities and prohibits discriminatory practices, including harassment. Therefore, the Firm expects that all relationships among persons in the workplace will be business-like and free of bias, prejudice and harassment.

### Equal Employment Opportunity

It is the policy of the Firm to ensure equal employment opportunity without discrimination or harassment on the basis of race, color, religion, creed, age, sex, sex stereotype, gender, gender identity or expression, transgender, sexual orientation, national origin, citizenship, disability, marital and civil partnership/union status, pregnancy, veteran or military service status, genetic information or any other characteristic protected by law (Protected Status).[1,2]

**Discrimination and harassment are against Firm policy and may be prohibited by law. The Firm prohibits and will not tolerate any such discrimination or harassment, whether committed by management, co-workers, contingent workers, clients, vendors or guests.**

### Retaliation is Prohibited

The Firm prohibits retaliation against any individual who, in good faith, reports discrimination or harassment, or participates in, or otherwise supports, an investigation of such reports, or as otherwise prohibited by applicable law. Anyone who exhibits retaliatory behavior against an individual under such circumstances will be subject to disciplinary action up to and including termination.

### Conduct Covered

**Definitions**

a.  **Sexual harassment** constitutes a form of discrimination. For the purposes of this policy, sexual harassment is generally defined as unwelcome sexual advances, requests for sexual favors and other verbal, nonverbal or physical conduct of a sexual nature when, for example: (i) submission to such conduct is made, either explicitly or, implicitly, a term or condition of an individual's employment by a supervisory employee; (ii) submission to or rejection of such conduct by an individual is used by a supervisory employee as the basis for decisions that affect an individual's employment opportunities in a tangible way; or (iii) such conduct is unwelcome and severe or pervasive enough to create an intimidating, hostile or offensive work environment for a reasonable individual.

Sexual harassment may include subtle behavior and may involve individuals of the same or different gender. Depending on the circumstances, these behaviors may include, but are not limited to: unwanted sexual advances or requests for sexual favors; sexual jokes and innuendo; verbal abuse of a sexual nature; commentary about an individual's body, sexual prowess or sexual deficiencies; leering, catcalls or touching; insulting or obscene comments or gestures; display or circulation in the workplace of sexually suggestive objects or pictures; and other physical, verbal or visual conduct of a sexual nature.

---

[1]  Individuals who wish to identify themselves as disabled or as a veteran should contact HR Services.

[2]  It is the policy of the Firm to reasonably accommodate employees with disabilities and employees' religious beliefs or practices, in accordance with applicable law. Employees who believe they require such accommodations should contact their Human Resources Representative.

CONFIDENTIAL

b. **Harassment on the basis of any protected characteristic** is also strictly prohibited.  Under this policy, harassment is unwelcome verbal, nonverbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her Protected Status or that of his/her relatives, friends or associates, and that is severe or pervasive enough to create an intimidating, hostile or offensive work environment for a reasonable individual, or otherwise adversely affects an individual's employment opportunities in a tangible way.

Harassing conduct includes, but is not limited to: epithets, slurs or stereotyping; threatening, intimidating or hostile acts; denigrating jokes and display or circulation in the workplace of written or graphic material that denigrates or shows hostility or aversion toward an individual or group.

This policy prohibits such harassing conduct in any form.

Conduct prohibited by this policy is unacceptable in the workplace and in any work-related setting outside the workplace, such as during business trips, business meetings and business-related social events.

Similarly unacceptable under this policy is participation in work-related activities whether in or outside the workplace that (i) are inconsistent with a professional atmosphere and an environment that promotes dignity, respect and equal employment opportunity or (ii) that are exclusionary with respect to any individual's Protected Status.  This includes patronizing, in connection with work-related activities, adult entertainment establishments or facilities that exclude use by any individual on the basis of his or her Protected Status.

### Individuals Covered

This policy applies to all applicants and employees, and prohibits harassment, discrimination, and retaliation whether committed by management, co-workers, contingent workers, clients, vendors or guests.  The purpose of this policy is not to outline every example of conduct that is inconsistent with a work environment that promotes dignity, respect and equal employment opportunity.  Employees are expected to at all times exercise sound judgment consistent with the obligations set forth in the Code of Conduct and to avoid behavior or activity that may negatively affect the Firm's image and reputation.

### Complaint Procedure

#### Reporting an Incident of Harassment, Discrimination or Retaliation

The Firm strongly urges the reporting of all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position, so that an effective, impartial and thorough investigation can be conducted promptly and discreetly, and effective remedial action can be taken when appropriate.  Complaints will be accepted in writing or orally.

Further, individuals who believe they have experienced, or managers who have learned of, conduct that is contrary to the Firm's policy or who have concerns about such matters must contact their Human Resources Representative for their business unit.  If these representatives are not available or if the circumstances make it inappropriate to contact them, individuals may contact any Human Resources Representative.  For a listing of all designated Human Resources Representatives, please click here.

**In addition, individuals may always take their complaints to the CARE Program Administrator at 1-866-227-3123 or Jessica Krentzman, Executive Director at 914-225-6979.**

CONFIDENTIAL

**Important Notice to All Employees**

**EMPLOYEES WHO HAVE EXPERIENCED CONDUCT THEY BELIEVE IS CONTRARY TO THIS POLICY MAY HAVE A LEGAL OBLIGATION TO TAKE ADVANTAGE OF THIS COMPLAINT PROCEDURE. AN EMPLOYEE'S FAILURE TO FULFILL THIS OBLIGATION COULD AFFECT HIS OR HER RIGHT TO PURSUE LEGAL ACTION.**

Early reporting has proven to be a highly effective method of resolving actual or perceived incidents of harassment or discrimination. Therefore, the Firm strongly urges the prompt reporting of complaints or concerns so that rapid and constructive action can be taken when appropriate.

The availability of this complaint procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that his or her behavior is unwelcome and requesting that it be discontinued.

**The Investigation of Allegations**

Any reported allegations of harassment, discrimination or retaliation will be investigated promptly and impartially and brought to a timely closure under the circumstances. The investigation may include individual interviews with the parties involved and, when necessary, with individuals who may have observed the alleged conduct or may have other relevant knowledge.

Confidentiality will be maintained throughout the investigation process to the greatest extent possible and to the extent consistent with adequate investigation and appropriate corrective action. Individuals involved in the investigation process are expected to provide their full cooperation and to maintain confidentiality, where requested.

At the conclusion of the investigation, the Firm will advise any individual who has made a complaint under this policy that the investigation has concluded and share other information as may be appropriate under the circumstances.

**Consequences of Inappropriate Behavior**

Misconduct including harassment, discrimination, retaliation or other forms of unprofessional behavior, even if not unlawful, may subject employees to disciplinary action by the Firm up to and including termination. In addition, conduct that is unlawful may subject employees to civil, and in some cases, criminal liability.

California employees click here to go to California Sexual Harassment information Sheet.

Massachusetts employees click here to go to Massachusetts Sexual Harassment information Sheet.

Rhode Island employees click here to go to Rhode Island Sexual Harassment information Sheet.

Vermont employees click here to go to Vermont Sexual Harassment information Sheet.

CONFIDENTIAL

# EXHIBIT B

# Morgan Stanley

**POSITION DESCRIPTION**

| | |
|---|---|
| **Title:** | Vice President / Private Banker |
| **Business Unit:** | National Sales Division - Private Banking Group[i] |
| **Position Location:** | Various |

Morgan Stanley ("MS") is a global financial services firm that conducts its business through three principal business segments—Institutional Securities, Morgan Stanley Wealth Management (MSWM), and Asset Management. MSWM provides comprehensive financial advice and services to its clients including brokerage, investment advisory, financial and wealth planning, credit & lending, deposits & cash management, annuities, insurance, retirement and trust services. MS Private Banking Group is seeking a high potential private banker ("Private Bankers") to consider the financial needs of the client and recommend private banking products to MSWM's FAs and their clients. Private Bankers will be assigned to a single high opportunity office, two offices or multiple offices in a Region.

## Position Responsibilities

- Partner with FAs to provide the best financial advice on private banking products to clients
- Build product awareness and understanding among Financial Advisors, with emphasis on the high opportunity FAs.
- Partner with Financial Advisors to profile their client base, identify and analyze business opportunities and succeed in growing new banking revenue.
- Act independently in making financial recommendations on private banking products to the client.
- Provide the best private banking financial advice to clients in conjunction with FAs.
- Build, promote, market and maintain an adequate pipeline of opportunities to meet private banking revenue goals.
- Establish a reputation of execution and excellence. Gain confidence of FAs to fully develop the banking opportunities with their clients.
- Develop and present creative and intelligent solutions and advise in structuring client transactions or offer constructive alternatives.
- Partner with the Associate Private Banker(s) in the Private Bank Contact Center to provide FA and client private banking product, distribution and service support.
- Act as the subject matter expert for all FA and Branch inquires on private banking products and client service offering direct or indirect solutions.
- Understand competitive environment and develop strategies to retain and win new business.
- Develop and implement product marketing strategies with Branch Management and FA team, consistent with providing sound financial private banking advice.
- Work with and communicate effectively with Financial Advisors, Branch Managers, Branch staff and Product partners.

## Experience

- Minimum of 7 years of successful lending business development experience with an investment, commercial or private bank.
- Expert knowledge of credit products including credit cards, residential mortgage products, home equity lines of credit, securities based loans, high net worth tailored lending products and commercial credit facilities.
- Experience in understanding the financial needs of all types of clients.
- Proven new business development / origination experience with Lending products is required.
- Completion of formal credit training strongly preferred.
- BA preferred.
- Series 7, 63 (or 66) securities licenses required or to be obtained within 90 days of employment.

## Skills/Abilities

- Strong relationship building capabilities with Financial Advisors, Branch Managers, Clients, Product Specialists and matrix partners.
- Strong understanding of the suite of all Banking & Lending products including deposit and cash management products.
- Ability to understand the financial needs of the retail brokerage clientele.
- Ability to efficiently, tactfully & professionally screen, manage and/or decline transactions while maintaining FA and client relationships.
- Possess excellent business development and marketing skills and desire to consistently achieve top revenue results.
- Maintain poise, presence and professionalism with FAs and their affluent clients in the most difficult circumstances.
- Demonstrate positive initiative, leadership and comfort working in a fast paced environment
- Detail orientation with strong organizational and analytical skills
- Ability to train Financial Advisors on product suite
- Possess excellent oral and written communication skills. Exceptional presentation skills.
- Ability to meet deadlines and manage Financial Advisor and client expectations
- Good collaboration skills in a team-oriented environment

---

[i] Products will be offered by one or more Morgan Stanley subsidiaries

# EXHIBIT C

# Morgan Stanley

To:      Chip Randall, Vice President – Private Banker
From:    Alex Dunlap, Executive Director – Region Manager
Subject: Written Warning
Date:    August 4, 2015

I am writing in order to address matters of your performance as a Private Banker in the Southeast Region.  Despite numerous conversations, including one on April 13, 2015 and a conversation at the end of Q2, your performance continues to fall short of expectations.

## Performance

You ended 2014 at 82% to goal and 2013 at 70.9% to goal, ranking you in the bottom half of Private Bankers nationally in two consecutive years.  In 2015, your performance continues to fall below expectations. In Q1 2015, you ended at 54.6% to goal and in Q2 2015 you ended 68.6 % to goal. As of August 3, you are at 34.8% to your annual goal ranking 132 of 144 Private Bankers year to date.  Your current performance in loan commitments does not meet the expectations of the Private Banker role.

## Action Plan

It is imperative that you demonstrate immediate and sustained improvement in your performance.   You must satisfy the following minimum requirements going forward:

- Q3 2015 Loan Commitments: $114,929,000 (equivalent to 100% of your Q3 2015 goal) by September 30, 2015

Chip, your performance as a Private Banker is currently not meeting expectations.  Therefore, as a result of your continued deficient performance, I am compelled to issue this performance warning to you as the previous conversations have not resulted in your performance being brought to an acceptable level. We will conduct weekly meetings to discuss your progress.  Failure to achieve these performance standards may result in further disciplinary action, up to and including termination of employment.  I encourage you to take the necessary steps to correct your performance and, as always, I remain available to assist you in your efforts.

There is nothing in this written warning that changes your employment at-will status with the Firm.  This means that the firm may terminate your employment at any time with or without notice or cause.

Chip, I trust that you understand the serious nature of these concerns and that you are committed to improving your performance immediately. Please acknowledge your receipt and review of this written warning by signing below.  If there is anything in this memo that you do not understand, please advise me immediately.

## Received and Acknowledged by:

_____          _____

Chip Randall, Vice President                  Date

1

CONFIDENTIAL

# EXHIBIT D

# Morgan Stanley

# Memorandum

| | | | |
|---|---|---|---|
| **To:** | Chip Randall, Vice President | **Date:** | October 12, 2017 |
| **From:** | Barbara Power, Executive Director | **cc:** | Human Resources/Employee File |
| **Subject:** | Performance Warning | | |

---

I am writing to address a matter concerning your performance as a Private Banker in the Southeast Region. These issues and concerns have been discussed with you previously. Despite these discussions, your performance continues to fall short of expectations. The purpose of this warning letter is to alert you to the seriousness of the situation so that you take the necessary measures to improve your performance to a level that consistently meets Management's expectations for someone in your role.

Chip, I am particularly concerned because we have been discussing these issues since the beginning of the year. Specifically, you need to improve your performance in the following areas: partnership and business development.

For example,

- It's imperative that you work on your relationships with our Wealth Management partners. Specifically, I have received feedback that they have lost confidence in your ability to drive and expand the business. As you know, we are in a relationship business so I find this feedback particularly troubling.
- In addition, some of the feedback I am receiving describes you as unprepared, not proactive, and not operating effectively.
- There needs to be more focus on UHNW opportunities. This includes leveraging partners such as Bobby House.
- I am also looking for you to leverage current opportunities. For example, you should be meeting with Advisors who have recently opened CDs and identifying cross sell opportunities.
- Finally, I expect you to be doing book reviews with Advisors who are not lending champions. These book reviews should lead to client liability reviews. It is important that you are able to showcase the ability to provide banking and lending solutions for our clients.

To assist you in meeting expectations and improving your performance, the Firm is committed to providing you with support and guidance through this process. I will meet with you on a weekly basis to discuss your progress.

You must demonstrate immediate, significant and sustained improvement in each of the areas outlined above. Failure to improve your performance will result in further discipline, up to and including termination of your employment.

This written warning and the underlying circumstances which gave rise to it will be reflected in your annual performance evaluation and may impact your eligibility for, among other things, any base salary increase or the amount of any above base compensation for which you otherwise may have been considered.

Nothing in this warning changes your employment at-will status with the Firm. This means that you or Management may terminate your employment at any time with or without notice or cause.

CONFIDENTIAL

# Morgan Stanley

# Memorandum

Please acknowledge your receipt and review of this written warning by signing below. If there is anything in this memo that you do not understand, please advise me immediately.

**Received and Acknowledged by:**

_____

Chip Randall, Vice President

_____
10/12/17

_____

Barbara Power, Executive Director

_____
10/12/17

cc:     Employee File
          Human Resources

CONFIDENTIAL